Robert L. Brace, Esq., SBN 122240
Email: rlbrace@hbsb.com
Peter L. Candy, Esq., SBN 149976
Email: pcandy@hbsb.com
Michael P. Denver, Esq., SBN 199279
Email: mpdenver@hbsb.com
**HOLLISTER & BRACE**
P.O. Box 630
Santa Barbara, CA 93102
Telephone: 805.963.6711
Facsimile: 805.965.0329

Thomas G. Foley, Jr., Esq., SBN 65812
Email: tfoley@foleybezek.com
**FOLEY, BEZEK, BEHLE**
 **& CURTIS, LLP**
15 W. Carrillo Street
Santa Barbara, CA 93101
Telephone: 805.962.9495
Facsimile: 805.962.0722
*Attorneys for the Hunter Plaintiffs and the Class*

Anthony R. Zelle, Esq., Mass. SBN 548141
Email: tzelle@zelmcd.com
Brian McDonough, Esq., Mass. SBN 637999
Email: bmcdonough@zelmcd.com
Thomas Evans, Esq., SBN 552820
Email: tevans@zelmcd.com
**ZELLE MCDONOUGH & COHEN LLP**
101 Federal Street, 14th Floor
Boston, MA 02110
Telephone: 617.742.6520 x219
Facsimile: 617.742.1393
(Appearing *Pro hac vice*)
*Attorneys for Plaintiff Quirk Infiniti, Inc. and the Class*

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

ANITA HUNTER, an individual; JOHNNA BOZZO, an individual; CELLTEX SITE SERVICES, LTD., a Texas Limited Company; GRANDE INVESTMENT, LLC, a Colorado Limited Liability Company; QUIRK INFINITI, INC., a Massachusetts corporation; MICHAEL WHITTON, an individual; SADI SUHWEIL, as Trustee of the Suhweil Revocable Trust; and all others similarly situated,

Plaintiffs,

vs.

CITIBANK, N.A., a Nevada Corporation; COUNTRYWIDE BANK, FSB, a Virginia Corporation; BANK OF AMERICA CORPORATION, dba BANK OF AMERICA, N.A., a North Carolina Corporation; UNITED WESTERN BANK (f/k/a MATRIX CAPITAL BANK), a Colorado Corporation; BOULDER CAPITAL, LLC, a Massachusetts Corporation; BOULDER COLUMBUS LLC, a Massachusetts Limited Liability Company; BOULDER WEST OAKS, LLC, a Delaware Limited Liability Company; BOULDER HOLDINGS, VI, LLC, a Delaware Limited Liability Company;

**Case No.: 09-02079-JW**

**Assigned to Hon. James Ware**

**THIRD AMENDED COMPLAINT FOR:**

1.   **BREACH OF FIDUCIARY DUTY**

2.   **AIDING AND ABETTING BREACH OF FIDUCIARY DUTY BY MEANS OF NON-ELECTRONIC TRANSFERS**

3.   **AIDING AND ABETTING BREACH OF FIDUCIARY DUTY**

4.   **AIDING AND ABETTING FRAUD BY MEANS OF NON-ELECTRONIC TRANSFERS**

5.   **AIDING AND ABETTING FRAUD**

1    BOULDER HOLDINGS X, LLC, a Delaware
     Limited Liability Company; ROY S.
2    MACDOWELL, JR., an individual; CORDELL
     FUNDING, LLLP, a Florida Limited Liability
3    Limited Partnership; CORDELL
     CONSULTANTS INC. MONEY PURCHASE
4    PLAN, a Qualified Retirement Plan Trust;
     CORDELL CONSULTANTS NEW YORK,
5    LLC, a New York Limited Liability Company;
     ROBIN RODRIGUEZ, an individual; JORDEN
6    BURT, LLP, a Connecticut Limited Liability
     Partnership; KUTAK ROCK, LLP, a Nebraska
7    Limited Liability Partnership; JOSEPH O.
     KAVAN, an individual; FOLEY & LARDNER,
8    LLP, a Wisconsin Limited Liability Partnership;
     STEPHEN I. BURR, an individual; and SILICON
9    VALLEY LAW GROUP, a California Law
     Corporation,
10
                          Defendants
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

6.  **CONVERSION AND AIDING
    AND ABETTING A CONVERSION
    BY MEANS OF NON-ELECTRONIC
    TRANSFERS**

7.  **CONVERSION**

8.  **AIDING AND ABETTING
    CONVERSION**

9.  **CONSPIRACY TO CONVERT
    EXCHANGE FUNDS AND TO
    COMMIT FRAUD**

10. **INTERFERENCE WITH
    CONTRACT**

11. **BREACH OF CONTRACT**

12. **NEGLIGENCE**

13. **NEGLIGENT SUPERVISION**

14. **VIOLATIONS OF U.C.C.
    ARTICLE 4-A**

15. **AIDING AND ABETTING
    BREACH OF FIDUCIARY
    DUTY BY MEANS OF
    MARKETING EFFORTS ON
    BEHALF OF OKUN AND
    THE QIS HE OWNED AND
    CONTROLLED**

16. **AIDING AND ABETTING
    FRAUD BY MEANS OF
    MARKETING EFFORTS ON
    BEHALF OF OKUN AND
    THE QIS HE OWNED AND
    CONTROLLED**

17. **AIDING AND ABETTING
    BREACH OF FIDICUARY
    DUTY BY ASSISTING IN
    CONVINCING JANET
    DASHIELL TO MOVE
    EXCHANGE FUNDS HELD
    AT WACHOVIA TO
    CITIBANK**

18. **AIDING AND ABETTING
    FRAUD BY ASSISTING IN
    CONVINCING JANET
    DASHIELL TO MOVE**

EXCHANGE FUNDS HELD
AT WACHOVIA TO
CITIBANK

19.  **PLAINTIFFS' CONTINGENT
ASSERTION OF
LIQUIDATION TRUSTEE'S
CLAIM FOR AIDING AND
ABETTING BREACH OF
FIDUCIARY DUTY**

**CLASS ACTION**

**JURY DEMAND**

# TABLE OF CONTENTS

Page No(s).

I.      NATURE OF THE ACTION.............................................................1-4

II.     JURISDICTION AND VENUE ........................................................4-5

III.    PARTIES....................................................................................5-9

    A.      Plaintiffs......................................................................5-6

    B.      The Bank Defendants .................................................... 7

    C.      The Hard Money Lender Defendants ...........................7-9

    D.      The Lawyer Defendants.................................................. 9

IV.     INFORMATION ALLEGATIONS .................................................9-14

V.      AGENCY AND CONSPIRACY ALLEGATIONS ............................. 14

VI.     ALTERNATIVE PLEADINGS RE: THE LAWYER DEFENDANTS.............. 14-15

VII.    ALTERNATIVE PLEADINGS RE: CITIBANK AND MATRIX ........................... 16

VIII.   PRESERVATION OF RIGHTS FOR PURPOSES OF APPEAL ........................... 16

IX.     ALLEGATIONS REGARDING THE BUSINESS OF DEALING WITH
        EXCHANGE FUNDS...................................................................16-18

X.      ALLEGATIONS AGAINST CITIBANK .......................................18-26

XI.     ALLEGATIONS AGAINST UNITED WESTERN BANK (MATRIX)..............26-46

XII.    ALLEGATIONS AGAINST BOULDER CAPITAL...........................46-55

XIII.   ALLEGATIONS AGAINST CORDELL ......................................55-59

XIV.    ALLEGATIONS AGAINST KUTAK ROCK ...................................59-72

XV.     ALLEGATIONS AGAINST FOLEY & LARDNER...........................72-79

XVI.    ALLEGATIONS AGAINST JORDEN BURT................................79-85

XVII.   ALLEGATIONS AGAINST SILICON VALLEY LAW GROUP ..................... 85-88

XVIII.  CLASS ACTION ALLEGATIONS .............................................88-90

XIX.    CAUSES OF ACTION ..............................................................90-106

    FIRST CAUSE OF ACTION
    Breach of Fiduciary Duty
    (Against the Lawyer Defendants) ..............................................90-91

i

SECOND CAUSE OF ACTION
Aiding and Abetting Breach of Fiduciary Duty by Means of Non-Electronic Transfers
(Against Citibank and Matrix) ............................................................................ 91

THIRD CAUSE OF ACTION
Aiding and Abetting Breach of Fiduciary Duty
(Against All Defendants) .................................................................................... 92

FOURTH CAUSE OF ACTION
Aiding and Abetting Fraud by Means of Non-Electronic Transfers
(Against Citibank and Matrix) ....................................................................... 92-93

FIFTH CAUSE OF ACTION
Aiding and Abetting Fraud
(Against All Defendants) .................................................................................... 94

SIXTH CAUSE OF ACTION
 Conversion and Aiding and Abetting Conversion by Means of Non-Electronic Transfers
(Against Citibank and Matrix) ....................................................................... 94-95

SEVENTH CAUSE OF ACTION
 Conversion
(Against All Defendants, Except SVLG)......................................................... 95-96

EIGHTH CAUSE OF ACTION
Aiding and Abetting Conversion
(Against All Defendants) .................................................................................... 96

NINTH CAUSE OF ACTION
Conspiracy to Convert Exchange Funds and to Commit Fraud
(Against the Hard Money Lender Defendants)........................................................ 96

TENTH CAUSE OF ACTION
 Interference with Contract
(Against All Defendants, Except the Lawyer Defendants)...................................... 97

ELEVENTH CAUSE OF ACTION
 Breach of Contract
(Against SVLG) ............................................................................................ 97-98

TWELFTH CAUSE OF ACTION
 Negligence
(Against All Defendants) .................................................................................... 98

THIRTEENTH CAUSE OF ACTION
 Negligent Supervision
(Against the Lawyer Defendants) ........................................................................ 98

FOURTEENTH CAUSE OF ACTION
  Violations of U.C.C. Article 4-A
  (Against Citibank and Matrix) ..................................................................... 99-100

FIFTEENTH CAUSE OF ACTION
  Aiding and Abetting Breach of Fiduciary Duty by Means of Marketing Efforts
  on Behalf of Okun and the QIs He Owned and Controlled
  (Against Citibank) ..................................................................................... 100-101

SIXTEENTH CAUSE OF ACTION
  Aiding and Abetting Fraud by Means of Marketing Efforts on Behalf of Okun
  and the QIs He Owned and Controlled
  (Against Citibank) ..................................................................................... 101-102

SEVENTEENTH CAUSE OF ACTION
  Aiding and Abetting Breach of Fiduciary Duty by Assisting in Convincing Janet Dashiell
  to Move Exchange Funds held at Wachovia to Citibank
  (Against Citibank) ..................................................................................... 102-103

EIGHTEENTH CAUSE OF ACTION
  Aiding and Abetting Fraud by Assisting in Convincing Janet Dashiell to Move Exchange
  Funds held at Wachovia to Citibank
  (Against Citibank) ..................................................................................... 103-104

NINETEENTH CAUSE OF ACTION
  Plaintiffs' Contingent Assertion of Liquidation Trustee's Claim for Aiding and
  Abetting Breach of Fiduciary Duty
  (Against Citibank) ..................................................................................... 105-106

CONSEQUENTIAL DAMAGES ........................................................................ 106

PUNITIVE DAMAGES ...................................................................................... 107

XX.    PRAYER FOR RELIEF .......................................................................... 107

Plaintiffs, for themselves individually and as Class representatives of the Class as defined herein, allege with particularity pursuant to Fed. R. Civ. P. 9(b) as follows:

## I.

## NATURE OF THE ACTION

1.    This is a Class Action brought by seven (7) named Plaintiffs on behalf of a class of approximately 330 similarly situated people ("Exchangers") residing throughout the United States, each of whom lost substantial sums ("Exchange Funds") entrusted to seven (7) Qualified Intermediaries ("QIs") to facilitate their respective Internal Revenue Code Section 1031 Exchanges ("1031 Exchanges"). The seven (7) named Plaintiffs lost Exchange Funds totaling $8,236,751.06. Class members' lost Exchange Funds total approximately $150,000,000.

2.    In 2005, Edward H. Okun ("Okun") learned that QIs were unregulated businesses holding large pools of cash and requiring only a small percentage of Exchange Funds on deposit to operate as going concerns. Pursuant to a conspiracy, Okun and others agreed to purchase QIs to gain access to Exchange Funds held in trust, and then convert the Exchange Funds to their own use for personal gain. Okun purchased six (6) QIs and formed one (1) QI to act as a parent corporation to the other six. He gained access to the Exchange Funds held in trust in each QI and appropriated most of those funds to his own use. Okun concealed his theft by using incoming deposits of new Exchange Funds to fund older escrows at the various QIs. Okun operated a Ponzi scheme which was exposed when the real estate market cooled, and the infusion of new funds slowed, imposing a *de facto* audit. On May 14, 2007, the QIs filed for Chapter 11 bankruptcy. However, this filing was a subterfuge that was intended by Okun to further and conceal his fraud, which it did, until Gerard McHale was appointed Trustee on October 26, 2007.

3.    Okun purchased the stock of and/or gained control over the seven QIs as follows:

a.    **AEC Exchange Company, LLC ("AEC")** of Massachusetts (and its affiliated companies) were purchased on August 25, 2005 for $4,250,000 from, among others, **J. Patrick Dowdall ("Dowdall")** and Atlantic

1

Exchange Company, LLC, a Massachusetts Limited Liability Company. There, 26 Exchangers contracted with AEC, and lost more than $15.7 million in Exchange Funds. Plaintiff Quirk Infiniti, Inc., among others, executed an Exchange Agreement with AEC;

b.   **Security 1031 Services, LLC ("SOS")** of Connecticut was purchased on November 15, 2005 for $3,000,000 from, among others, Todd Pajonas ("Pajonas"). There, 57 Exchangers contracted with SOS, and lost more than $27.7 million in Exchange Funds. Plaintiff Johnna Bozzo, among others, executed an Exchange Agreement with SOS;

c.   **Real Estate Exchange Services, Inc. ("REES")** of Florida was purchased on June 9, 2006 for $4,250,000 from, among others, David Shefman ("Shefman"). There, 9 Exchangers contracted with REES, and lost more than $1.3 million in Exchange Funds. Plaintiff Michael Whitton, among others, entered into an Exchange Agreement with REES.

d.   **National Exchange Services QI, Ltd. ("NES")** of Texas was purchased on June 22, 2006 for $5,000,000 from, among others, William Bennett ("Bennett"). There, 54 Exchangers contracted with NES, and lost more than $36.9 million in Exchange Funds. Plaintiff CellTex Site Services, Ltd., among others, executed an Exchange Agreement with NES;

e.   **Investment Exchange Group, LLC ("IXG")** of Colorado was purchased on August 4, 2006 for $9,000,000 from, among others, Daniel McCabe ("McCabe"). There, 93 Exchangers contracted with IXG, and lost more than $21.5 million in Exchange Funds. Plaintiff Grande Investment, LLC, among others, executed an Exchange Agreement with IXG;

f.   **1031 Advance, Inc. ("1031 Advance")** of California was purchased on December 18, 2006 for $2,500,000 from, among others, Janet Dashiell

2

("Dashiell").  There, 56 Exchangers contracted with 1031 Advance, and lost more than $30.2 million in Exchange Funds.  Plaintiff Anita Hunter, among others,  executed an Exchange Agreement with 1031 Advance; and

g.  **1031 Tax Group, LLC ("1031 Tax Group"),** was formed by Okun as a Delaware corporation in December 2005, to serve as the ostensible parent corporation of AEC, SOS, REES, NES, IXG and 1031 Advance. 1031 Tax Group also contracted with 19 Exchangers who lost more than $6.6 million in Exchange Funds. Plaintiff Sadi Suhweil, among others, executed an Exchange Agreement with 1031 Tax Group.

4.    Okun purchased QIs and then withdrew the Exchange Funds held there in trust to purchase additional QIs, certain commercial real estate, personal luxury items, including mansions, race cars, two yachts, a Bell helicopter, a Gulfstream jet, two Bentleys, a Rolls Royce and expensive jewelry.

5.    In July 2008, the United States Department of Justice filed a 27-count superseding indictment charging Okun with:

(i)  one count of conspiracy to commit mail and wire fraud;

(ii)  one count of conspiracy to commit money laundering;

(iii) 13 counts of wire fraud;

(iv) three counts of mail fraud;

(v)  seven counts of money laundering; and

(vi) one count of bulk cash smuggling.

Okun was also charged with making false statements.   Okun was convicted by a jury on March 19, 2009 on 23 counts contained in the indictment.  Also indicted were **David Field ("Field")**, **Lara Coleman ("Coleman")** and **Richard Simring ("Simring")**.  These three co-conspirators entered guilty pleas soon after indictment.  Okun has been sentenced to 100 years in prison.

6.    The Exchange Agreements executed by Exchangers with their respective QIs provided that Exchange Funds deposited with each QI upon the sale of relinquished property

3

1  would be held in trust on deposit in an insured bank or national depository institution, and used

2  solely to fund the purchase of replacement property identified by the specific Exchanger

3  depositing funds. Okun's looting of funds created deficits in the trust account at each QI. The

4  representations of security and use of the funds were false, intentionally misleading, and

5  intended to induce reliance by new Exchangers. Newly deposited Exchange Funds were

6  misappropriated and used as lulling payments to fund escrows of prior Exchangers, rather than

7  being maintained for each Exchanger's purchase of replacement property as promised, agreed

8  and contracted. Plaintiffs bring their claims in their capacity as: (i) damaged 1031 Exchangers;

9  (ii) beneficiaries of the damaged trust; and (iii) as equitable subrogees, due to the fact that

10  Plaintiffs' Exchange Funds were used to pay the claims of earlier Exchangers.

11         7.     Okun's plan required the participation of banks, "hard money" lenders and

12  lawyers who actively assisted Okun in committing these crimes, aiding and abetting his breach

13  of fiduciary duties owed to Exchangers. Because of the fiduciary nature of the relationship

14  between the Exchangers and the QIs, persons and entities who knowingly aided and assisted

15  Okun are civilly liable for the losses sustained by the Exchangers - the intended beneficiaries of

16  these fiduciary relationships. This action asserts liability against these aiders and abettors as

17  well as others who knowingly participated in the Ponzi scheme.

18                                      **II.**

19                          **JURISDICTION AND VENUE**

20         8.     This Court may exercise jurisdiction over this Class Action pursuant to 28 U.S.C.

21  § 1332. The putative class consists of greater than 100 members, at least some members of

22  which hold diversity of citizenship from some defendants. The claims of losses by the proposed

23  class members exceed the sum or value of $5,000,000 in the aggregate. Thus, the Court has

24  subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d).

25         9.     Venue is proper in the Northern District of California pursuant to U.S.C. §

26  1391(b) because it is the "judicial district in which substantial parts of the events or omissions

27  giving rise to the claim occurred." 1031 Advance (one of Okun's QIs) was located here,

28  approximately 56 class members lost $30.2 million in Exchange Funds deposited at a

7316.001                    THIRD AMENDED COMPLAINT
                            Case No. 09-cv-2079-JW

1   Countrywide Bank branch located in Northern California, and at least one class representative

2   resides in California.

3       10.    This Court has personal jurisdiction over all the defendants because: (i) they

4   conducted ongoing business in California with California citizens; (ii) they maintained offices

5   in California; and (iii) their specific and unlawful actions injured California residents doing

6   business in California.

7                                              **III.**

8                                          **PARTIES**

9   **A.    The Plaintiffs**

10      11.    Plaintiff **Anita Hunter** ("Hunter") is an individual residing and doing business

11  in Santa Clara County, California.  Hunter owned real property in San Jose, California which

12  was sold (relinquished) to facilitate the purchase of like-kind replacement property.  The equity

13  from the sale was then deposited at **1031 Advance** on March 29, 2007, pursuant to an

14  Exchange Agreement executed with 1031 Advance. Hunter lost $1,365,294.58 when the

15  exchange transaction could not be completed by 1031 Advance, because the funds were

16  diverted and unlawfully appropriated by Okun who converted them to his own use.

17      12.    Plaintiff **CellTex Site Services, Ltd.** ("CellTex") is a Texas Limited Partnership

18  doing business in San Antonio, Texas.   CellTex owned real property in Arkansas and

19  Oklahoma which was sold (relinquished) to facilitate the purchase of like-kind property. The

20  equity from the sale was deposited at **NES** on March 1, 2007 pursuant to an Exchange

21  Agreement executed with NES.  CellTex lost $2,107,900.00 when the exchange transaction

22  could not be completed by NES, because the funds were diverted and unlawfully appropriated

23  by Okun who converted them to his own use.

24      13.    Plaintiff **Grande Investment, LLC** ("Grande Investment") is a Colorado

25  Limited Liability Company.  Grande Investment owned real property in Littleton, Colorado

26  which was sold (relinquished) on December 28, 2006, to facilitate the purchase of like-kind

27  property.  The equity from the sale was deposited at **IXG** on January 3, 2007, pursuant to an

28  Exchange Agreement executed with IXG. Grande Investment lost $1,227,341.51 when the

                                              5

1  exchange transaction could not be completed by IXG, because the funds were diverted and
2  unlawfully appropriated by Okun who converted them to his own use.

3      14.   Plaintiff **Johnna Bozzo** ("Bozzo") is an individual residing and doing business
4  in Nassau County, New York.  Bozzo owned real property in New York, New York which was
5  sold (relinquished) to facilitate the purchase of like-kind property.  The equity from the sale
6  was deposited at **SOS** on November 27, 2006, pursuant to an Exchange Agreement executed
7  with SOS.  Bozzo lost $359,064.65 when the exchange transaction could not be completed by
8  SOS, because the funds were diverted and unlawfully appropriated by Okun who converted
9  them to his own use.

10      15.   Plaintiff **Michael Whitton ("Whitton")** is an individual residing and doing
11  business in Hillsborough County, Florida. Whitton owned real property in Tampa, Florida
12  which was sold (relinquished) to facilitate the purchase of like-kind property.  The equity from
13  the sale was deposited at **REES** in November of 2006, pursuant to an Exchange Agreement
14  executed with REES.  Whitton lost $135,000 when the exchange transaction could not be
15  completed by REES, because the funds were diverted and unlawfully appropriated by Okun
16  who converted them to his own use.

17      16.   Plaintiff **Quirk Infiniti, Inc. ("Quirk")** is a Massachusetts corporation that
18  owed real property which was sold (relinquished) with the equity deposited at AEC pursuant to
19  an Exchange Agreement executed with **AEC**.  Quirk lost $2,000,000 when the exchange
20  transaction could not be completed by AEC, because the funds were diverted and unlawfully
21  appropriated by Okun who converted them to his own use.

22      17.   Plaintiff **Sadi Suhweil, as Trustee of the Suhweil Revocable Trust**
23  **("Suhweil")** is an individual residing in Lake of the Hills, Illinois who owned real property in
24  Pinellas County, Florida which was sold (relinquished) to facilitate the purchase of like-kind
25  property.  The equity from the sale was deposited at The 1031 Tax Group pursuant to an
26  Exchange Agreement executed with 1031 Tax Group.  Suhweil lost $1,042,150.32 when the
27  exchange transaction could not be completed by The 1031 Tax Group, because the funds were
28  diverted and unlawfully appropriated by Okun who converted them to his own use.

**B.    The Bank Defendants**

18.    Defendant **Citibank, N.A. ("Citibank")** is a commercial bank holding a national bank charter, with its principal place of business at 3900 Paradise Road, Las Vegas, Nevada 89109 and with offices throughout the state of California and across the United States. Its bank holding company is Citigroup, Inc., whose principal place of business if at 399 Park Avenue, New York, N.Y. 10022.

19.    Defendant **United Western Bank (f/k/a Matrix Capital Bank) ("Matrix")** is a federal savings and loan company, holding a charter from the Office of Thrift Supervision, whose parent holding company is United Western Bankcorp, having its principal place of business at 700 17th Street, Denver, Colorado 80202.

**C.    The Hard Money Lender Defendants**

20.    Defendant **Boulder Capital, LLC ("Boulder Capital")**, is a Limited Liability Company organized under the laws of the state of Delaware, with its principal place of business at 21 Center Street, Weston, Massachusetts 02493.

21.    Defendant **Boulder Columbus, LLC ("Boulder Columbus")**, an affiliate of Boulder Capital, is a Limited Liability Company organized under the laws of the state of Delaware, with its principal place of business located at 21 Center Street, Weston, Massachusetts 02493.

22.    Defendant **Boulder West Oaks, LLC ("Boulder West Oaks")**, an affiliate of Boulder Capital, is a Limited Liability Company organized under the laws of the state of Delaware, with its principal place of business located at 21 Center Street, Weston, Massachusetts 02493.

23.    Defendant **Boulder Holdings VI, LLC ("Boulder Salina")**, an affiliate of Boulder Capital, is a Limited Liability Company organized under the laws of the state of Delaware, with its principal place of business located at 21 Center Street, Weston, Massachusetts 02493.

24.    Defendant **Boulder Holdings X, LLC ("Boulder Water View"),** an affiliate of Boulder Capital, is a Limited Liability Company organized under the laws of the state of

7

1   Delaware, with its principal place of business located at 21 Center Street, Weston,

2   Massachusetts 02493.

3       25.    Defendant **Roy S. MacDowell, Jr**. (**"MacDowell"**) is a resident of

4   Massachusetts, the President and founder of Boulder Capital LLC, and an officer and/or

5   member of each of the other "Boulder" defendants. MacDowell personally authorized each of

6   the loans by Boulder to Okun and his fraudulent entities (hereinafter "Okun Entities") and was

7   knowledgeable about, approved and directed each of the activities of the other "Boulder"

8   defendants, as alleged herein. (Defendants Boulder Capital, Boulder Columbus, Boulder West

9   Oaks, Boulder Salina, Boulder Water View and MacDowell are referred to collectively

10  hereinafter as (**"Boulder Capital"**).

11      26.    Defendant **Cordell Funding, LLLP ("Cordell Funding")** is a Florida Limited

12  Liability Limited Partnership, with its principal place of business at 3333 Poinciana Avenue,

13  Coconut Grove, Florida 33133.

14      27.    Defendant **Cordell Consultants Inc. Money Purchase Plan** is a Qualified

15  Retirement Plan Trust (**"Cordell Retirement"**), with its principal place of business at 3333

16  Poinciana Avenue, Coconut Grove, Florida 33133.

17      28.    Defendant **Cordell Consultants New York, LLC ("Cordell Consultants")** is a

18  New York Limited Liability Company with its principal place of business at 116 Titus Avenue,

19  Staten Island, New York 10306.

20      29.    Defendant **Robin Rodriguez**, ("Rodriguez") is an individual residing at 3333

21  Poinciana Avenue, Coconut Grove, Florida 33133. Rodriguez personally authorized each of the

22  loans by the "Cordell Entities" to Okun and the fraudulent Okun Entities and was

23  knowledgeable about, approved of and directed each of the activities of the "Cordell Entities",

24  as alleged herein. (Defendants Cordell Funding, Cordell Retirement, Cordell Consultants and

25  Rodriguez are collectively referred to hereinafter as **"Cordell"**).

26  \ \ \

27  \ \ \

28

7316.001               THIRD AMENDED COMPLAINT
                            Case No. 09-cv-2079-JW

D.    **The Lawyer Defendants**

30.    **Kutak Rock, LLP ("Kutak Rock")** is a Limited Liability Partnership with its principal place of business in Nebraska, with offices at 515 South Figueroa Street, Suite 1240, Los Angeles, California 90071.

31.    **Joseph O. Kavan ("Kavan")** is an individual residing in Nebraska and was, at all times relevant hereto, an employee of Kutak Rock.

32.    **Foley & Lardner, LLP ("F&L")** is a Limited Liability Partnership with its principal place of business at 777 E. Wisconsin Ave., Milwaukee, WI  53202. It maintains its law offices at multiple locations including 2029 Century Park E., #3000, Los Angeles, California 90067-3016.

33.    **Stephen I. Burr ("Burr")** is an individual residing in Boston, Massachusetts and was, at all times relevant hereto, an employee of Foley Lardner.

34.    **Jorden Burt, LLP ("Jorden Burt")** is Limited Liability Partnership with its principal place of business at 175 Powder Forest Drive, Salisbury, Connecticut, and with offices in Florida and Washington, D.C. 06089-9658.

35.    **The Silicon Valley Law Group, LLC ("SVLG")** is a Limited Liability Company organized under the laws of the state of California, with its principal place of business at 25 Metro Drive, San Jose, California 95110.

**IV.**

**INFORMATION ALLEGATIONS**

36.    Allegations made in this Complaint have been made on information and belief, except those allegations that pertain directly to Plaintiffs, which are based on their personal knowledge.  Plaintiffs' information and belief is based, *inter alia*, on the investigation conducted by Plaintiffs and Plaintiffs' counsel after its retention.  Each and every allegation and factual contention contained in this Complaint has evidentiary support or, alternatively, is likely to have evidentiary support after reasonable opportunity for further investigation or discovery by Plaintiffs or their counsel.

9

37.    Plaintiffs have only recently discovered the facts alleged herein after actively and prudently investigating the causes of their losses. The initial bankruptcies filed by Okun for the QIs were intended by Okun to delay discovery of losses by Plaintiffs. Okun fraudulently promised to obtain loans to complete outstanding 1031 Exchange transactions pending at the seven QIs. These purported loans did not exist, but caused delay in the appointment of a Trustee. Plaintiffs were further hampered in obtaining case information, including accurate and timely account information, due to the pending criminal trial of Okun.

38.    Despite diligent efforts, Plaintiffs were unable to gain access to the information which allowed them to prepare and file claims against defendants until March and April 2009, just one to two months before the action was filed.

39.    In March 2009, two events occurred which allowed Plaintiffs to begin to obtain the information needed to file their claims. First, Plaintiffs began to get access to certain documents in the possession of the bankruptcy Trustee, and second, the criminal trial of Edward Okun occurred in Virginia. Until these two events occurred, Plaintiffs did not have access to the information upon which the claims against the defendants are based.

40.    With respect to the documents in the possession of the bankruptcy Trustee, those materials included representation agreements, letters, emails, other communications, work product and related materials which the Trustee claimed were privileged due to the attorney/client relationships between the Debtors and the Law Firm Defendants. The Trustee would not waive his claim to privilege or otherwise share those materials with the Plaintiffs before the Plaintiffs entered into the Common Interest Agreement and the Class/Trustee Agreement approved by this Court and by Bankruptcy Judge Glenn in the bankruptcy proceedings styled *In Re: The 1031 Tax Group, LLC*, U.S. Bankr. Ct., SDNY, Case No. 07-11448(MG) (the "Bankruptcy Proceedings").

41.    The timing concerning the Plaintiffs' entry into (i) the Common Interest Agreement and (ii) the Class/Trustee Agreement is as follows:

        (i) The Common Interest Agreement: The Joint Privilege,
        Common Interest and Non-Disclosure Agreement (the

THIRD AMENDED COMPLAINT
Case No. 09-cv-2079-JW

"Common Interest Agreement"), was entered into by the Plaintiffs and the Trustee on or about November 18, 2008. Amendment One thereto was executed on or about November 24, 2008.

(ii) The Class/Trustee Agreement: The Class/Trustee Agreement was entered into by the Plaintiffs and the Trustee on or about January 20, 2009. Amendment One thereto was executed on or about February 24, 2009. Amendment Two thereto was executed on or about February 27, 2009. Amendment Three thereto was executed on or about March 23, 2009. Amendment Four thereto was executed on or about May 6, 2009.

42.    When the Common Interest Agreement and the Class Trustee Agreement were originally executed, they included Plaintiffs' counsel at Hollister & Brace ("H&B") and Foley, Bezek, Behle & Curtis ("FBBC"), which firms had filed the first class action addressing Okun's fraud styled *Hunter, et al. v. Okun, et al.*, Case No. 07-CV-2795-JW.  The agreements did not include Zelle, McDonough & Cohen ("ZMC"), which is co-class counsel with H&B and FBBC in the more recently filed above-captioned class action.  ZMC was not included because, at the time the agreements were being executed, ZMC was representing the Plaintiff in the competitive class action styled *Quirk Infiniti, Inc. v. Wachovia Bank, N.A.*, United States District Court for the District of Massachusetts, Case No. 1:08-cv-12060-JLT (the "Quirk action"), which was transferred to this court for coordination with Hunter v. Okun by the MDL panel in MDL No. 2028, *In re: Edward H. Okun Internal Revenue Service §1031 Tax Deferred Exchange Litigation*, Case No. 07-CV-2795-JW ("*Hunter I*").  Thus, at the time the Common Interest Agreement and the Class Trustee Agreement were executed, ZMC was not aligned with H&B and FBBC and could not be a signatory to the agreements.  ZMC did not become aligned with H&B and FBBC until after the agreements were executed.

43.    While H&B and FBBC had executed the Common Interest Agreement and the Class Trustee Agreement by the end of January 2009, they were not at that time granted access to the documents the Trustee claimed were privileged.  This was because the Trustee was aware that H&B, FBBC and ZMC were working to align themselves so all class claims could be prosecuted harmoniously.  As such, the Trustee would not share his documents and information

11

1  with H&B and FBBC until the relationship between the three Plaintiff firms was finalized and

2  ZMC agreed to be bound by the prior agreements between the Class and the Trustee, which was

3  effectuated by the execution of the Second Amendment to the Class Trustee Agreement, on or

4  about February 27, 2009.

5       44.    After the Plaintiffs entered into the Common Interest Agreement and the

6  Class/Trustee Agreement, including Amendment Two thereto at the end of February 2009, the

7  Trustee began sharing certain materials with the Plaintiffs in March 2009, and, on or about April

8  15, 2009, the Trustee granted the Plaintiffs access to the Trustees' electronic database containing

9  roughly one million of the Debtors' documents, which enabled the Plaintiffs to electronically

10  search the documents and investigate the roles played by third parties associated with the

11  Debtors.  This access allowed the Plaintiffs to learn the information needed to prepare and file

12  the claims against the Law Firm Defendants.  Until the Trustee agreed to waive his claim to

13  privilege and granted Plaintiffs access to his documents in March and April 2009, the Plaintiffs

14  did not have access to the information upon which they could have filed claims against the Law

15  Firm Defendants.

16       45.    With respect to the criminal trial of Edward Okun ("Okun"), which occurred

17  between March 3 and March 19, 2009, the witness testimony and documentary evidence

18  presented during the trial provided Plaintiffs with information important to the preparation of

19  the Plaintiffs' claims.  More critical, however, was the fact that certain trial witnesses who

20  would not share information with Plaintiffs before the trial, were willing to share information

21  with the Plaintiffs after the trial.

22       46.    For example, Okun would not share information concerning his theft of the

23  Plaintiffs' Exchange Funds with the Plaintiffs before he was convicted, however after his

24  conviction on March 19, 2009, his attitude changed, and on May 7, 2009, Plaintiffs' counsel

25  were able to interview Okun at his Virginia jail, and thereafter speak with him on the telephone,

26  which discussions were important to the preparation of certain claims.  Another witness, Lara

27  Coleman, (who executed a plea agreement with respect to her role in the theft of Exchange

28  Funds on January 6, 2009, and who was sentenced on August 13, 2009), agreed to cooperate

1  with the Plaintiffs, and, after Okun's trial, but before she was sentenced, she visited Plaintiffs'

2  counsels' office in Santa Barbara for several days in April 2009, and imparted information

3  important to the preparation of certain claims.  Additionally, Richard Simring, who executed a

4  plea agreement on July 24, 2008, and who was sentenced on November 12, 2009, became

5  communicative with the Plaintiffs at or around the same time as Coleman.  These witnesses

6  were not forthcoming prior to Okun's trial, and had the Plaintiffs attempted to depose Okun,

7  Coleman, Simring or David Field (another person who executed a plea agreement on July 3,

8  2008, and who was sentenced on August 13, 2009) before their plea arrangements were

9  finalized, they would have asserted their respective 5th Amendment rights against self-

10  incrimination.

11       47.     Another key witness in Okun's trial, Janet Dashiell, who was the

12  "whistleblower" that reported Okun to the authorities, was also not forthcoming with the

13  Plaintiffs until after the Okun trial was completed.   Dashiell, whom Plaintiffs sued in the related

14  action styled MDL No. 2028, *In re: Edward H. Okun Internal Revenue Service §1031 Tax*

15  *Deferred Exchange Litigation*, Case No. 07-CV-2795-JW, was an adverse party until her

16  settlement with the Plaintiffs and the Trustee in late February 2009.  Thereafter, until mid-

17  March 2009, she was not accessible to the Plaintiffs as she was occupied with assisting the

18  government in its efforts to prepare for the Okun criminal trial.  After the trial, Dashiell became

19  communicative with the Plaintiffs and imparted information important to the preparation of

20  certain claims, including the claims against SVLG,  the law firm which had represented

21  Dashiell, as well as one of the Debtors.  Had Dashiell been deposed before she voluntarily

22  became communicative, she would not have imparted the information she held regarding the

23  Law Firm Defendants because she would have refused to waive the attorney/client privilege.

24       48.     Until Plaintiffs (i) gained access to the Trustee's privileged communications and

25  documents, and (ii) were able to obtain information from witnesses after the Okun trial, all of

26  which began to occur in March and April 2009, the Plaintiffs did not have access to the

27  information needed to file the claims against the defendants which they filed just one to two

28  months later.

1 | **V.**

2 | **AGENCY AND CONSPIRACY ALLEGATIONS**

3 |     49.    Plaintiffs allege that at all times relevant hereto, certain individuals identified

4 | herein were employees of certain entity defendants, whose acts complained of were performed

5 | within the course and scope of their employment and occurred substantially within the time

6 | and space limits authorized by their employment, were motivated in part by an intention to

7 | serve their employers, were of a kind and nature that they were hired or authorized to perform,

8 | were in part beneficial to their employers, and were ratified and affirmed by said employers.

9 | Plaintiffs allege that the "hard money" lender Defendants knowingly and intentionally

10 | conspired with Okun to perpetuate his Ponzi scheme, and are therefore liable for all damages

11 | suffered by Plaintiffs as a consequence of the operation of that Ponzi scheme.

12 | **VI.**

13 | **ALTERNATIVE PLEADINGS RE: THE LAWYER DEFENDANTS**

14 |     50.    The Lawyer Defendants were hired to represent one or more of the QIs, which

15 | the Lawyer Defendants knew to be corporate trustees holding client Exchange Funds in trust.

16 | The Lawyer Defendants knew the QIs were sole purpose entities, with the sole purpose being

17 | to benefit their clients by safeguarding Exchange Funds until the money was used to close the

18 | clients' 1031 exchanges.  The Lawyer Defendants knew that any action taken by the QIs

19 | which did not benefit their clients would be inconsistent with their sole purpose, would harm

20 | their clients, and would constitute a breach of the fiduciary duties the QI-trustees owed their

21 | client-beneficiaries.  Because the Lawyer Defendants knew that any action taken by the sole-

22 | purpose QIs had to benefit their clients, the Lawyer Defendants knew that any legal services

23 | they performed for the QIs were also, necessarily, done for the benefit of the QIs' clients.

24 | Otherwise, any legal service the Lawyer Defendants provided would aid and abet a breach of

25 | the QIs' fiduciary obligations.  Therefore, the QIs and the Lawyer Defendants intended the

26 | legal services to be rendered to benefit both the QIs and the QIs' clients.  Because the QI

27 | clients were intended beneficiaries of the legal services to be rendered, the Lawyer Defendants

28 | owed a duty of care directly to the QI clients. *Zenith Ins. Co. v. Cozen O'Connor*, 148 Cal.

<div align="center">14</div>

1 App. 4th 998, 1008 (2007); *B.L.M. v. Sabo & Dietsch*, 55 Cal. App. 4th 823, 832 (1997).

2     51.    In the First Amended Complaint, Plaintiffs alleged the Lawyer Defendants are

3 liable for the Plaintiffs' damages based on the following causes of action, as numbered in the

4 First Amended Complaint: (1) conversion (excepting SVLG); (2) aiding and abetting

5 conversion; (3) breach of fiduciary duty; (4) aiding and abetting a breach of fiduciary duty; (5)

6 aiding and abetting fraud; (8) breach of contract (SVLG only); (9) negligence; and (10)

7 negligent supervision.  In the Court's Order addressing the Defendants' Motions to Dismiss

8 the First Amended Complaint (Docket No. 264, "Order"), the Court determined that because

9 the Plaintiffs alleged the Lawyer Defendants assisted Okun in acting adverse to the interests of

10 the QI clients, the Plaintiffs cannot sustain causes of action for negligence, or negligent

11 supervision. See Order, pp.21:21, 22:20-26, 23:20-24, and 28:21-29:3.  However, the Plaintiffs

12 anticipate that at trial, or afterward, the Defendants will attempt to avoid liability for the aiding

13 and abetting claims by arguing they did not have the actual knowledge sufficient to support

14 these causes of action, and that, if they did anything wrong, they merely made errors or

15 mistakes.  Because Plaintiffs anticipate this defense, and because they contend the Lawyer

16 Defendants owed a duty directly to the QIs' clients (as intended beneficiaries of legal

17 services), the Plaintiffs maintain their allegations that the Lawyer Defendants are liable to

18 them, not only based upon the aiding and abetting claims which require actual knowledge, but

19 also, alternatively pursuant to Fed. R. Civ. P. 8(d), for those claims which amount to the lesser

20 included offenses of negligence and negligent supervision, as well as breach of fiduciary duty.

21 As an additional alternative pleading, Plaintiffs contend that each individual attorney

22 defendant is liable to the Plaintiffs under the aiding and abetting claims and that each law firm

23 defendant is vicariously liable for the acts of the applicable attorney defendants which were

24 performed within the course and scope of the attorney defendants' employment.

25                              **VII.**

26      **ALTERNATIVE PLEADINGS RE: CITIBANK AND MATRIX**

27     52.    Plaintiffs First Amended Complaint contained common law causes of action

28 against the Banker Defendants.  Citibank and Matrix contended in their Motions to Dismiss

15

those common law claims that U.C.C. Article 4-A ("Article 4-A"), which was enacted into law in New York and Colorado, among other states, applied to the Plaintiffs' allegations against the banks, and that Plaintiffs' common law causes of action were preempted thereby. The Court agreed and granted Plaintiffs leave to amend their complaint against Citibank and Matrix to state a claim under Article 4-A. (See Docket No. 264). Plaintiffs continue to maintain that, as a matter of law, their common law claims against the banks are viable, without regard to whether claims for violation of Article 4-A may also be maintained against them. Pursuant to the admissions by Citibank and Matrix that Article 4-A also provides remedies for their misconduct, and the Court's resultant Order, Plaintiffs have included in this Third Amended Complaint alternative claims (alternative to the common law claims) pursuant to Fed. R. Civ. P. 8(d) based upon Article 4-A against Citibank and Matrix, as well as claims for the banks' misconduct which cannot be preempted by Article 4-A because the misconduct at issue is not based on the execution of wire transfers.

## VIII.

## PRESERVATION OF RIGHTS FOR PURPOSES OF APPEAL

53.    The Plaintiffs include in this Third Amended Complaint certain causes of action which the Court previously dismissed (see Docket No. 264), in order to preserve their rights to appeal, if necessary. *Forsyth v. Humana, Inc.*, 114 F.3d 1467, 1474 (9th Cir. 1997).

## IX.

## ALLEGATIONS REGARDING THE BUSINESS OF

## DEALING WITH EXCHANGE FUNDS

54.    The business of 1031 Exchanges derives from 26 U.S.C. Section 1.1031(k) which permits deferred capital gains tax for like-kind transfers of property as graphically depicted on the following page:

16

## 1031 EXCHANGE



55.    IRC §1031 prohibits the seller of property from taking possession or control of sale proceeds at any time prior to completion of the 1031 transaction. Thus, "Qualified Intermediaries" ("QIs") were established for the sole purpose of holding funds in trust for sellers while substitute/replacement property was identified by sellers. Therefore, the QIs undertook to transfer those trust funds directly to the escrow established to complete the purchase of the replacement property or properties, and to hold them there until a request was made by the Exchanger to move the funds to purchase replacement property.

56.    The deferral of capital gains is the incentive for property owners to utilize tax deferred 1031 Exchange programs. As a result, QIs often hold large sums of Exchange Funds for periods of up to 180 days. QIs are largely unregulated, unlike banks and insurance companies which also provide this same trust service for a fee. Generally, a QI will retain interest earned on the funds held in trust during the Exchange period as part of its fee. The Exchange Agreement generally provides that funds will be invested in safe, segregated, fiduciary accounts, at banks of other insured depository institutions. Because usually QI clients do not receive interest earned on funds invested, no accounting is generally due to QI clients. This void of accountability makes QI trust exchanges vulnerable to theft. As alleged herein, the thieves, working in collusion with unscrupulous and opportunistic fiduciaries, engaged in high-risk, unlawful practices, using client's funds for their financial advantage and

17

1  gain, without the consent of, and to the detriment of the Exchangers. These practices

2  continued, undetected, for extended periods of time.

3      57.    During the exchange process, legal title to QI client funds is transferred to the

4  QI. However, clients retained full equitable interest and rights to the sums on deposit, but for

5  the use and benefit of the money during the exchange period.  All QI client funds were

6  required to be held in trust by the intermediary acting in the capacity of a Trustee for the client,

7  who is the trust beneficiary. Thus, QI owners such as Okun have access not only to substantial

8  Exchange funds, but can create financial advantages for other fiduciaries by awarding

9  contracts for services related to large cash transactions.

10                                      X.

11                  ALLEGATIONS AGAINST CITIBANK

12     58.    **Todd Pajonas ("Pajonas")** owned SOS, a QI in Connecticut.  Pajonas chose

13  Citibank for its bank accounts and there developed a close and mutually beneficial business

14  relationship with Citibank employees **Joe Curran ("Curran"), Tom Linehan ("Linehan")**

15  and **Jay McGetrick ("McGetrick")**.  SOS referred clients to Citibank for banking services and

16  Citibank referred its clients to SOS for 1031 Exchange services. Citibank allowed Pajonas and

17  other SOS employees to host SOS sales meetings using its conference rooms.   At these

18  meetings, Citibank clients were exposed to SOS's 1031 Exchange services, where it was

19  emphasized that SOS would act as a Trustee with fiduciary duties owed to each Exchanger.

20  Citibank knew that SOS was under a legal duty to act as a fiduciary to each Exchanger doing

21  business at SOS.  Citibank also knew that SOS's deposits at Citibank were the legal property of

22  each Exchanger to be held in trust, subject to the obligations provided by the Exchange

23  Agreements executed with SOS.  Citibank operated as a commercial bank, accepting escrowed

24  funds and managing trust accounts thus it knew well that SOS Exchange Funds on deposit could

25  only be used to fund 1031 Exchanges for each Exchanger who owned and held equitable title to

26  the Exchange Funds. Citibank knew that Exchange Funds could not be loaned, borrowed or used

27  for any purpose other than funding the replacement property identified by the QI Exchanger

28  client.

                                      18

59.    Citibank had extensive familiarity with 1031 Exchange requirements. A December 20, 2005 Memorandum from **Susan Hallinan ("Hallinan")**, Business Banking Offices, recorded on Citibank letterhead regarding Atlantic Exchange Company, LLC (a 1031 Exchange) illustrates the extent of Citibank's knowledge. Hallinan wrote, *inter alia*:

> ". . .the most important banking as part of the transaction is the holding of funds from the sale of property until the transfer is complete. . ."

60.    Citibank knew the pattern of money movement in and out of these accounts. It also knew of Okun's purchase of high-value luxury items and real estate. Citibank had full knowledge that Exchange Funds were not fungible, and that Exchange Funds deposited by one QI could not be used to fund the 1031 Exchanges of other QIs.

61.    Okun acquired SOS on November 15, 2005 for $3,000,000. At or about this time, Okun met with Curran, Linehan and McGetrick and informed them of his plan to acquire QIs, "roll them up," and to borrow QI Exchange funds to acquire real estate. Prior to Okun's acquisition, SOS maintained separate, segregated accounts at Citibank for each 1031 Exchanger. According to Pajonas, "all funds were deposited [at Citibank] in separate, segregated escrow accounts." Thus, Citibank also was aware of the change in practices regarding management of the funds once Okun assumed SOS ownership.

62.    The Exchange Agreements between SOS and its Exchanger clients provided that Exchange Funds were to be deposited into an escrow account. The intention of the parties was unambiguous. Each SOS Exchange Agreement stated:

> ". . . the funds held by SOS 1031 are **to be used solely** by SOS 1031 for its obligations under this Agreement and shall not be deemed a part of SOS 1031's general assets or subject to the claims of creditors of SOS 1031." [Emphasis Added].

63.    SOS Exchange Agreements also contained a non-assignability clause, preventing SOS from transferring its duty to hold and protect the QI client Exchanger's trust *res* to another QI, without the express consent of each Exchanger. Therefore, under no circumstances could one Exchanger's funds be lawfully used to complete another Exchanger's exchange.

THIRD AMENDED COMPLAINT
Case No. 09-cv-2079-JW

64.     Prior to Okun's acquisition of SOS, he acquired AEC for $4,250,000 and immediately looted substantial Exchange Funds on deposit at AEC, held in accounts at Bank of America. Okun withdrew client funds to repay Boulder Capital for its loan to Okun's purchase of AEC and to repay loans outstanding on certain real estate. Okun then named Pajonas as President of AEC approximately one month prior to Okun's purchase of SOS.

65.     In late January and February, 2006, Okun ordered Pajonas to transfer SOS Exchange Funds on deposit at Citibank to Bank of America to close AEC escrows. Deficits in AEC accounts were caused by Okun's "borrowing" funds there. The following unlawful transfers were made:

- on January 23, 2006, SOS, with the assistance of Citibank, Okun transferred $1,667,673 to AEC to close escrows at AEC;

- on January 31, SOS, with the assistance of Citibank, Okun transferred $4,548,510 to AEC to close escrows at AEC; and

- on February 15, 2006, SOS, with the assistance of Citibank, Okun transferred $8,406,438 to AEC to close escrows at AEC.

66.     The above transfers were made with funds withdrawn from SOS segregated accounts at Citibank, and then moved to AEC's account at Bank of America. The SOS Exchange Funds were then disbursed to waiting AEC Exchangers as lulling payments, to conceal Okun's past looting of AEC Exchange Funds. The transfer of SOS Exchange Funds to AEC accounts constituted a knowing breach of fiduciary duty by SOS, in violation of the SOS Exchange Agreements. Citibank knew that these transfers contravened the terms of Exchange Agreements and the rights of SOS QI Exchangers with accounts held at Citibank, but nonetheless cooperated in this transfer scheme willingly.

67.     On February 15, 2006, Pajonas alerted Okun and others about the liquidity crisis at SOS and AEC and recommended that Okun seek loans from Boulder Capital to close pending escrows. On March 23, 2006, Pajonas expressed further concern to Okun and others about liquidity problems at AEC and SOS, stating:

20

". . . but in all events we need the $8 million today/tomorrow, otherwise we are staring into an empty vault."

By the summer of 2006, Pajonas was engaged in public shouting matches with Okun, vehemently insisting that Okun stop looting client funds.

68.     On March 2, 2006, Boulder Capital made a $15 million lulling payment loan to Okun. On May 3, 2006, Cordell made a $26.5 loan to Okun which was used to pay off the $15 million Boulder Capital Loan and to make additional lulling payments. In June 2006, Okun acquired two new QIs: Real Estate Exchange Services, Inc. ("REES") and National Exchange Services, Ltd. ("NES"). Exchange Funds on deposit at REES and NES were used in part by Okun to make lulling payments to Exchangers at AEC and SOS. These infusions of cash only temporarily eased liquidity concerns.

69.     From the fall of 2005 through the early winter of 2006, Pajonas, on behalf of AEC and SOS, had significant ongoing and mutually beneficial business dealings with Citibank. Citibank actively solicited Pajonas' business because QIs SOS and AEC held substantial sums on deposit at Citibank, generating fees, interest and commissions for Citibank. New accounts were opened by SOS at Citibank, with Okun and Coleman as signators, even though they were neither officers nor employees of SOS. Pajonas and Citibank together planned, sponsored and presented marketing seminars, whereby Citibank paid for conference rooms at hotels and made marketing presentations to potential SOS and AEC clients. At these seminars, Citibank extolled the security and safety of client funds in 1031 Exchange accounts at SOS because, in part, the Exchange Funds were on deposit at Citibank. These presentations by Citibank immediately preceded those made by Pajonas or other SOS employees at the time, date and location, to the same customers.

70.     During this time, Citibank and Pajonas met frequently to discuss and implement collaborative and joint marketing efforts to induce clients to do business with SOS, AEC and Citibank, specifically for Citibank's own advantage and gain. These joint efforts included a "Citibank SOS 1031 CLE/Golf Outing", invoiced on May 15, 2006, which occurred on or about September 14, 2006 at the Centennial Golf Club in Connecticut.

21

71.     On September 7, 2006, (one week before the co-sponsored golf tournament) Curran, Linehan, and McGetrick of Citibank met with Okun on the "Simone" yacht docked at Pier 59 in New York.  The ostensible business purpose of the meeting was to discuss marketing of 1031 Exchange services with the joint participation of Citibank.  Additionally, Okun hoped to interest Citibank in acting as a lending for IPofA's real estate investments.  Okun may also have been seeking an opportunity to show off his lavish yacht, "Simone" (purchased with stolen Exchange Funds) in order to eliminate concerns as to the extent of his wealth and to conceal the fact that he had no cash reserves.  Citibank's purpose in meeting with Okun was to obtain more QI deposits, obtain more referrals, and to solicit business from Okun and the Okun Entities, including Investment Properties of America ("IPofA").

72.     By the time of the co-sponsored golf tournament, Pajonas was alarmed about Okun's use of Exchange Funds to invest in real estate, and about ongoing liquidity issues at the various QIs.  On September 21, 2006, Pajonas prepared and submitted a 1031 Tax Group Investment Policy to Okun for signature.  This policy would limit Okun's borrowing, and require dual signatures from members of the Investment Policy Committee (which included Pajonas) prior to any money transfer.  At this meeting on the "Simone" in Boston, Pajonas, agitated and upset, "confronted Edward Okun" calling him a "thief and a liar" and predicted that Okun was "going to jail." Pajonas and others physically forced Okun to execute promissory notes, evidencing his purported loans from the QIs to Okun and the Okun entities.  It was an emotional and memorable meeting.

73.     On September 28, 2006, SOS' Pajonas and Barry Powlishen (a former employee of Citibank) met with Curran, Linehan and McGetrick at "Bogey's", a restaurant in Westport, Connecticut.  The purpose of the meeting was to discuss the existing banking relationship with Citibank and the deposit of more QI money at Citibank, in order to advance Citibank's earnings.  The meeting took place just one week after the Pajonas' shouting match with Okun on the yacht, where Pajonas correctly predicted Okun would "go to jail" for his illegal borrowing.

74.     According to Pajonas, at this meeting, "Citi[bank] expressed concern" about the large deposits of the QIs at the time they were acquired by Okun, which maintained small

22

average daily balances on account at Citibank after the acquisitions by Okun.  Citibank was not earning the same income contemplated by the pre-Okun arrangement.  Citibank's concern was evident from its co-sponsorship of marketing events with SOS, and discussions about referring depositors to Pajonas to accomplish safe 1031 Exchanges.  Pajonas specifically informed the Citibank employees -Curran, Linehan and McGetrick- that the reason for the small daily average balance was because Okun had been borrowing QI Exchange Funds to buy real estate for his own account, without the knowledge or consent of the owners of the Exchange Funds.  Pajonas further informed them that Okun's unauthorized borrowings from QIs, and his inability to repay same, also had made it necessary to transfer Exchange Funds held at Citibank to close exchange transactions of Exchangers whose Exchange Funds were being held at other banks, such as Bank of America.  Notwithstanding these and earlier disclosures to Citibank about Okun's improper borrowing, Citibank continued to assist Okun by referring additional 1031 Exchange clients to Okun, and by physically processing fraudulent wire transfers. Exchange Funds transferred out of QI accounts at Citibank after September 28, 2006, for purposes other than to close legitimate 1031 Exchanges exceed $100 million. Citibank physically assisted in these unlawful transfers with full knowledge of their impropriety, fully aware that they breached the terms of the Exchange Agreements.

75.    On or about October 9, 2006, Pajonas received a copy of a Kutak legal memorandum (hereinafter the "Kutak Rock Memo") which revealed that Okun could not properly "borrow" Exchange Funds to buy real estate for his own account, or for any personal purpose. The memo outlined the Prudent Investor Rule, identified relevant money transmitters' statutes, as well as the Virginia Consumer Real Estate Settlement Protection Act ("RESPA") which clearly required the segregation of escrowed QI client funds.

76.    Once he reviewed the Kutak Rock Memo, Pajonas contacted the Citibank employees and warned them that Okun's borrowing of QI Exchange Funds was illegal. Pajonas told Citibank:   I'm getting out and you need to get out as well.

77.    Despite this new warning, and despite Citibank's pre-existing knowledge of proper trust transactions and segregation requirements, Citibank continued to assist Okun by

23

continuing to market Okun's QI business and by transferring money out of Citibank for lulling payments to clients of various QIs.

78.     Instead of terminating Okun as a client, Citibank unlawfully aided and abetted his activities, thus endorsing his Ponzi scheme by opening additional QI accounts in the name of "The 1031 Tax Group", with sub-accounts for the newly acquired QIs designated as "d/b/a's" of The 1031 Tax Group.   These arrangements allowed Okun to receive Exchange Funds at Citibank from Exchangers contracting with one QI, and then use those same Exchange Funds to close escrows for other QI Exchangers, in breach of each Exchange Agreement, in furtherance of his Ponzi scheme, and with the knowing assistance of Citibank.

79.     On November 30, 2006, Okun terminated Pajonas' employment with the assistance of Kutak.  A day or two later, Pajonas called Joe Curran at Citibank to warn him that Okun was using Exchange Funds for personal purchases, in addition to his "borrowing" funds to invest in real estate.  Curran responded with grave concern and he proposed to commence an investigation. On December 1, 2006, McGetrick of Citibank learned that Pajonas had been "removed" as Manager of The 1031 Tax Group and as the President of SOS.   McGetrick learned that Barry Powlishen had resigned, on the same day that Citibank and SOS were conducting a joint seminar on Long Island. Despite these additional warnings, Citibank exerted further efforts to build its business relationship with Okun, to obtain more deposits from existing and newly acquired QIs.

80.     On December 15, 2006, Wendy Craft ("Craft") of The 1031 Tax Group requested that McGetrick of Citibank meet with McCabe of IXG, a QI acquired by Okun in August of 2006.  McGetrick consented to the meeting to build on the business relationship and informed Craft that he had met McCabe at a prior Federation of Exchange Accommodators ("FEA") meeting.   McCabe was President of FEA.  At FEA annual meetings, its Code of Ethics was distributed to participants.  The FEA Code of Ethics prohibits owners from borrowing from QI accounts and from investing Exchange Funds in real estate.

7316.001                          THIRD AMENDED COMPLAINT
                                  Case No. 09-cv-2079-JW

81.    In December of 2006, Citigroup[1] co-hosted a party with The 1031 Tax Group on the "Simone" yacht in Florida.  The purpose of the party was to introduce Smith Barney and Citibank clients to REES, The 1031 Tax Group's QI in Florida.  On or about February 10, 2007, Citigroup and The 1031 Tax Group co-hosted another party at the Breakers Hotel in West Palm Beach, Florida.  Linehan attended for Citibank.  Okun's purpose for this $30,000 party was to introduce wealthy clients of Citibank and Smith Barney to Okun's QIs. Citibank's purpose was to entertain its clients and meet new ones for financial gain.  Citibank also intended to build on its existing business relationship with Okun.  At about this same time, Okun informed Citibank of his plan to move QI funds deposited at Wachovia to Citibank, in exchange for additional 1031 business referrals from Citibank.  Okun knew that Wachovia owned its own 1031 Exchange and would therefore not make referrals to Okun.  Citibank, by contrast, had no separate 1031 Exchange business and would make referrals to Okun, to further his Ponzi scheme.

82.    On February 12, 2007, Linehan, Curran, and McGetrick of Citibank travelled to Richmond, Virginia to market Citibank's QI banking services and to solicit further Exchange Fund deposits for Citibank, including Exchange Funds deposited at Wachovia to Citibank.  After the February 12, 2007 meeting, $11,743,224.88 in Exchange Funds were transferred from Wachovia QI accounts to Citibank QI accounts.  This money was then promptly looted by Okun, with Citibank's full knowledge, cooperation, and assistance.

83.    On April 10, 2007, Citibank finally terminated the Okun accounts stating:

> "We request that your organization cease the migration of your banking to Citibank, as we are uncomfortable with continuing our relationship at this time."

Citibank requested that all of Okun's accounts be closed by April 27, 2007 and informed Dashiell that "we will provide your staff with **any assistance** they need to facilitate the closing

---

[1] Citigroup Global Markets, Inc. is a global, full-service financial firm that provides brokerage, investment banking and asset management services to corporations, government and individuals around the world.  Smith Barney forms part of Citigroup's global wealth management operations. Citibank forms part of Citigroup's Consumer Banking Division.

of your Citibank accounts." [Emphasis added]. This "assistance" from Citibank contributed to additional looting by Okun of sums exceeding $10 million in Exchange Funds, with willful disregard for the rights of the QI Exchangers.

## XI.

## ALLEGATIONS AGAINST
## UNITED WESTERN BANK ("MATRIX")

84.    Matrix knowingly assisted IXG in breaching fiduciary duties owed to Plaintiffs, converted and knowingly assisted IXG in converting trust funds held for the benefit of Plaintiffs, assisted IXG in committing fraud on the Plaintiffs, and was negligent, causing over $119 million in damages to the trust and to the beneficiaries of the trust.

85.    At all times relevant to this Complaint, IXG was acting as a QI pursuant to Exchange Agreements ("the IXG Exchange Agreements") which stated that IXG was the QI hired to assist Exchangers in performing Section 1031 Exchanges. See **Exhibit 1**, which is a sample form IXG Exchange Agreement entered into between all IXG class members (the "Exchangers") and Investment Exchange Group, LLC (hereinafter "IXG" or "the QI"). The IXG Exchange Agreements remained the same before and after the acquisition of the membership interests in IXG by Okun and his 1031 Tax Group on or about August 3, 2006.

86.    The IXG Exchange Agreements transferred legal title of the Exchangers' Exchange Funds received from the sale of relinquished property to IXG (and only IXG) to hold for up to 180 days while the Exchangers identified and then purchased replacement property. IXG's legal interest in the money was explicitly time - and event - limited. The same Exchange Funds received from the sale of the relinquished property were to be used to fund the purchase of replacement property. The Exchange Funds could not be transferred by IXG, except to purchase replacement property or to be returned to the Exchanger. See **Exhibit 1**.

87.    IXG did not treat the Exchange Funds as assets belonging to IXG, but treated the funds as assets belonging to each Exchanger which were not available to pay creditors of IXG or to be conveyed to third parties for any purpose. This is because, for all purposes other than

7316.001

THIRD AMENDED COMPLAINT
Case No. 09-cv-2079-JW

1   the application of 26 USCA § 1031(a), IXG was the agent of each exchanger holding the money

2   on each Exchanger's behalf. Treas. Reg. §1.1031(k)-I(g)(4)(i).

3           88.    IXG represented in its Exchange Agreements, a copy of which was provided to

4   Matrix prior to March 30, 2005, that Exchange Funds would be deposited at Matrix.  On March

5   30, 2005, Matrix and IXG entered into a Sub-Accounting and Marketing Agreement (**Exhibit

6   2**) which required IXG to perform certain accounting procedures for Matrix to ensure that each

7   Exchanger received the maximum amount of FDIC insurance for each Exchanger's Exchange

8   Funds on deposit at Matrix. The FDIC would provide insurance to cover each Exchanger,

9   provided that IXG acted as a trustee of the funds on deposit at Matrix and Matrix could account

10  for each Exchanger's funds.

11          89.    Pursuant to the Sub-Accounting and Marketing Agreement, Matrix paid IXG

12  $28 per Exchanger to perform the requisite accounting required of Matrix by the FDIC to

13  maximize insurance coverage.   Matrix also paid IXG $300 for each client of IXG whose

14  Exchange Funds were deposited at Matrix.   In exchange for the $300 per Exchanger, IXG

15  agreed to use Matrix as the **exclusive depository bank** for all Exchange Funds received by

16  IXG, and Matrix was entitled to keep the interest earned on the Exchange Funds for itself.

17  From March 30, 2005 to August 3, 2006, the average monthly balance of IXG client Exchange

18  Funds on deposit at Matrix in the "omnibus account" was approximately $75 million.  IXG was

19  one of Matrix's largest clients.   Matrix paid IXG approximately $50,000 per month for the

20  exclusive depository relationship with IXG.   The money received from Matrix was the largest

21  source of IXG's income.

22          90.    On August 3, 2006, the McCabe Group's[2] membership interest in IXG was

23  acquired by Okun's The 1031 Tax Group. IXG remained an entity and the contracting party

24  with Matrix and the IXG Exchangers. At the time of the acquisition, Judy Thornton

25  

26  [2]  The McCabe Group consists of Daniel McCabe, Shirley McCabe, Andrew McCabe, Pete
    McCann, and Chad Greenberg.  The McCabe Group owned all of the membership interest in IXG
27  and sold these interests to The 1031 Tax Group on August 3, 2006 for $9,000,000.  IXG remained
    an LLC after the acquisition and continued to execute Exchange Agreements and to receive
28  Exchange Funds.

7316.001                          THIRD AMENDED COMPLAINT
                                   Case No. 09-cv-2079-JW

1  ("Thornton") of Matrix was informed by the McCabe Group that some of the Exchange Funds

2  on deposit at Matrix in the IXG omnibus account would soon be transferred to a Wachovia

3  account in the name of The 1031 Tax Group, the separate entity acquiring the McCabe Group

4  membership interest in IXG.[3] Thornton was also told by both Andrew McCabe and Peter

5  McCann that IXG was not terminating its relationship with Matrix and more Exchange Funds

6  would continue to be deposited into the bank.

7       91.     Thornton knew that The 1031 Tax Group had no contractual or fiduciary

8  relationship with the hundreds of Exchangers who had entered into Exchange Agreements with

---

[3] **Deposition Testimony of Judy Thornton at Matrix**

**Question by Attorney:**   And what did they [the McCabe group] tell you?

**Answer by Thornton:**    That the new ownership had a banking relationship with Wachovia . . . they were given directives by the Tax Group to move their banking relationship to Wachovia.

**Question:**  And when was the next conversation on this topic?

**Answer:**    Well, it was ongoing . . . at Matrix, it [IXG] was my largest customer, they were taking funds out of my bank and moving it to Wachovia. So there were a number of conversations taking place.

(Thornton Dep.74:1-5, 75:21-76:2, August 24, 2007)

**Question:**  Do you recall what they told you?

**Answer:**   Not word for word.

**Question:**  Well, do you recall – tell me as best you recall.

**Answer:**    The meeting took place at their office at 600 South Cherry, and they – they explained to me that they had been purchased by – I don't even know if they said the Tax Group but they told me they were purchased and they **would be** taking out the bulk of the money from Matrix Capital Bank **within the next couple of days.** (Emphasis added.)

\*     \*     \*     \*

**Answer:**   Based on my conversations with Chad Greenberg and Drew McCabe back in August of 2006, when the Tax Group purchased them and they were moving out $50 million or so at that time . . . they told me they were moving it to the Tax Group accounts at Wachovia.

(Thornton Dep. 130:17-131:1, 207:6-11, August 24, 2007)

The above excerpts are from testimony taken in *Investment Exchange Group v. Colorado Capital Bank*, U.S. Bankr. Ct., S.D.N.Y. Case No. 07-11448-MG, Adv. Proc. No. 07-01710-MG).

28

IXG prior to August 3, 2006 and who had deposited over $75 million at Matrix. Thornton also knew that the Exchange Agreements (of which Matrix had a copy) would preclude such a transfer. Notwithstanding this knowledge, from August 3, 2006 to August 31, 2006, over $62 million in trust funds were transferred from IXG to The 1031 Tax Group and then looted pursuant to Okun's Ponzi scheme as described below. Matrix was aware of the August transfers from IXG to The 1031 Tax Group before, during and after the transfers were made. The August 2006 illegal transfers from IXG to The 1031 Tax Group are set out in **Exhibit 3** and summarized below:

**Illegal August 2006 Transfers of Exchange Funds**
**From the IXG Account at Matrix**

| Date | Amount | Beneficiary | Location |
|------|--------|-------------|----------|
| 8/3 | $20,000,000 | The 1031 Tax Group | Virginia |
| 8/8 | $30,000,000 | The 1031 Tax Group | Virginia |
| 8/10 | $7,000,000 | The 1031 Tax Group | Virginia |
| 8/17 | $902,297.23 | The 1031 Tax Group | Virginia |
| 8/18 | $82,104.70 | The 1031 Tax Group | Virginia |
| 8/21 | $472,400.61 | The 1031 Tax Group | Virginia |
| 8/22 | $535,792.46 | The 1031 Tax Group | Virginia |
| 8/24 | $441,307.40 | The 1031 Tax Group | Virginia |
| 8/25 | $286,623.19 | The 1031 Tax Group | Virginia |
| 8/28 | $189,625.13 | The 1031 Tax Group | Virginia |
| 8/29 | $642,460.94 | The 1031 Tax Group | Virginia |
| 8/31 | $2,177,180.95 | The 1031 Tax Group | Virginia |
|  | **Total:  $62,729,792.61** |  |  |

92.    Matrix knew that the obligations IXG owed its clients (e.g. to complete their 1031 exchanges) were non-assignable because: (i) Matrix was provided an exemplar IXG Exchange Agreement which required IXG, not some other QI, to **hold** the Exchange Funds to complete the exchange; (ii) the obligation of IXG to "hold" the Exchange Funds and use the money to buy replacement property was a non-assignable personal service contract; and (iii) the law of trusts prohibits a trustee like IXG from resigning and then delegating its non-delegable duty to protect the trust *res* without: (a) complying with the trust documents; (b) the consent of

29

1    all the beneficiaries; or (c) a Court Order. Restatement (Third) of Trusts §§ 2 comment (b), 34,

2    36, 47 comment (f), and 80 (2003). Thus, Matrix knew that the transfer of trust funds and the

3    delegation of the Trustee's obligations to protect the trust *res* from IXG to The 1031 Tax Group

4    was improper as a matter of law.

5        93.     The transfer of over $62 million out of the $75 million in the IXG trust account

6    at Matrix created a massive deficit with exchange liabilities exceeding exchange assets by at

7    least $62 million. By the end of August 2006, most of the millions in 1031 exchange assets

8    held by IXG at Matrix were no longer available to fund the $75 million in exchange liability at

9    IXG because the money had been knowingly transferred out of the control of IXG, the Trustee,

10   to a third party with no known fiduciary or contractual relationship with the existing IXG

11   Exchangers. As shown below, Matrix knew: that (i) the Exchange Funds had been transferred

12   to another QI because it was a breach of the exclusivity clause in the Sub-Accounting and

13   Marketing Agreement between IXG and Matrix; (ii) that IXG characterized the relationship

14   with its Exchangers as a fiduciary relationship; (iii) that IXG accounted for the Exchange Funds

15   as assets of the Exchangers and not IXG's assets; (iv) that IXG was continuing to fund existing

16   exchanges with transfers out of the Matrix account with a deficit in the trust account; (v) knew

17   as described in detail below the full measure of the remaining exchange assets at Matrix and the

18   exchange liabilities owed by IXG; and (vi) knew that IXG had no legally cognizable source of

19   assets to fund existing exchanges, other than the daily influx of new Exchange Funds deposited

20   at Matrix from September through December of 2006.

21        94.     Despite this financial debacle, Matrix did not declare IXG to be in breach of the

22   Sub-Accounting and Marketing Agreement because IXG promised to deposit more Exchange

23   Funds at Matrix. After August 4, 2006, IXG continued to solicit and accept over $111 million

24   (see **Exhibit 4**) in newly deposited Exchange Funds from new IXG Exchangers pursuant to

25   false representations in form Exchange Agreements which stated that the Exchangers' money

26   would be deposited and would remain deposited at Matrix until: (i) used to purchase

27   replacement property; or (ii) returned to each Exchanger. After August 4, 2006, Matrix

28   continued to accept and act as the depository the $111 million in new Exchange Funds and paid

1  IXG's prior exchange liabilities with this new money, without which IXG could not otherwise

2  close.  Matrix also made further substantial illegal disbursements to The 1031 Tax Group in

3  breach of each Exchange Agreement entered into by the Exchangers identified in **Exhibit 4.**

4       95.    Out of the $111 million in newly deposited Exchange Funds received by IXG

5  from August 4, 2006 to October 23, 2006 (**Exhibit 4**), Matrix assisted IXG in making another

6  $57 million in out of trust transfers to The 1031 Tax Group. (See **Exhibit 5**.)

**Illegal Transfers of Exchange Funds Made by IXG to The 1031 Tax Group in September and October 2006 with the Assistance of Matrix**

| Date | Amount | Beneficiary | Location |
|---|---|---|---|
| 9/1/06 | $746,753.82 | The 1031 Tax Group | Virginia |
| 9/5/06 | $2,813,881.33 | The 1031 Tax Group | Virginia |
| 9/6/06 | $1,530,377.27 | The 1031 Tax Group | Virginia |
| 9/7/06 | $212,462.29 | The 1031 Tax Group | Virginia |
| 9/8/06 | $294,797.23 | The 1031 Tax Group | Virginia |
| 9/11/06 | $1,799,802.47 | The 1031 Tax Group | Virginia |
| 9/13/06 | $3,019,978.23 | The 1031 Tax Group | Virginia |
| 9/14/06 | $591,416.56 | The 1031 Tax Group | Virginia |
| 9/15/06 | $3,816,600.17 | The 1031 Tax Group | Virginia |
| 9/18/06 | $3,209,727.47 | The 1031 Tax Group | Virginia |
| 9/26/06 | $10,000,000.00 | The 1031 Tax Group | Virginia |
| 9/26/06 | $2,222,069.19 | The 1031 Tax Group | Virginia |
| 10/06/06 | $10,000,000.00 | The 1031 Tax Group | Virginia |
| 10/13/06 | $9,178,795.35 | The 1031 Tax Group | Virginia |
| 10/23/06 | $8,013,542.35 | The 1031 Tax Group | Virginia |
| | **Total:    $57,450,203.73** | | |

22       96.    After August 2006, IXG stayed in business by operating a Ponzi scheme, using

23  newly deposited Exchange Funds to pay for older escrows.  As set out in **Exhibit 6**, $5.5 million

24  of these Ponzi scheme lulling payment transfers were by check.  In short,  IXG shifted the loss

25  caused by the August 2006 transfer of $62 million in Exchange Funds to The 1031 Tax Group to

26  new IXG clients, including the Plaintiffs herein identified in **Exhibit 4**.  Matrix knew that the

27  IXG Exchange Funds had been transferred out of the control of IXG, the Trustee, to The 1031

28  Tax Group because Matrix made the transfers while monitoring the account as a high-risk

31

1     account and Thornton was informed of the pending transfers before they were made. Matrix

2     also knew that IXG had breached and was breaching its fiduciary duties to older and newer

3     Exchangers pursuant to the terms of each Exchange Agreement because Matrix had an exemplar

4     copy in its files. [4]

5          97.      Matrix participated in the IXG Ponzi scheme and assisted IXG in breaching its

6     fiduciary duties to its Exchangers and converting their funds because the McCabe Group

7     promised to deposit more money at Matrix and Matrix wanted to keep receiving Exchange

8     Funds deposited by IXG, one of its largest clients. Matrix is liable for the natural and inevitable

9     consequences of its acts. Matrix provided substantial assistance to the intentional torts

10     committed by IXG by transferring over $62 million in Exchange funds to The 1031 Tax Group

11     in August of 2006. Matrix then assisted IXG in capturing new customers, the Plaintiffs herein,

12     by accepting over $111 million of their funds into IXG accounts at Matrix from September

13     through December of 2006. During this period, the Plaintiffs' Exchange Funds were diverted to

14     pay IXG's outstanding exchange obligations and another $57 million was illegally transferred

15     to The 1031 Tax Group with the assistance of Matrix. Matrix knew that IXG was breaching its

16     Exchange Agreements and the bank needed to freeze the account which would have caused the

17     scheme to collapse. Instead, Matrix continued to accept the deposit of Exchange Funds and

18     continued to allow out-of-trust disbursements with full knowledge of all relevant facts,

19     proximately causing at least $119 million in damages to the trust and to the beneficiaries of the

20     trust and $111 million in fraud damages to the Exchangers identified in **Exhibit 4**.

21         *IXG acted as a fiduciary and trustee of the Exchange Funds on Deposit at*

22         *on deposit at Matrix.*

23          98.      IXG conveyed no consideration to the Exchangers for receipt of the Exchange

24

25

26     [4] As set forth in Exhibit 7, Guy A. Gibson, the Co-Founder and Chairman of the Board of Matrix

27     was involved in his own personal 1031 Exchange at IXG in late 2005 and was a party to a reverse
1031 Exchange Agreement. Gibson must testify that he understood that IXG's entity was a trustee
of the property purchased by Gibson. Gibson must also testify that he understood that IXG could not

28     transfer his real property to some other QI without his consent.

7316.001            THIRD AMENDED COMPLAINT
                          Case No. 09-cv-2079-JW

Funds, except nominal, below-market earnings and the promise to keep the Funds safe and available for the purchase of replacement property. The Plaintiffs and other similarly situated Exchangers did not loan the money to IXG. They did not gift the money to IXG. They did not invest the money in IXG. They transferred legal title to the Exchange Funds to be held by IXG (and only IXG) in trust for their benefit for no more than 180 days. The role of IXG, as affirmed by the specific terms of the Exchange Agreements, was to act solely as a QI to these Funds, as agent (albiet not for Section 1031 purposes but for all others) and as a corporate trustee during the Exchange transaction.

99.    IXG personnel testified that IXG was a trustee of the Exchange Funds on deposit at Matrix, a fiduciary, and the clients of IXG were beneficiaries of the trust and fiduciary relationship.

**Deposition Testimony of Chad Greenberg - Part Owner and Executive of IXG**

**Question by Attorney:** . . . you mentioned the concern about breaching fiduciary duties to clients. Can you explain that in more detail . . .

**Answer by Greenberg:** I believed I had a fiduciary responsibility to our clients, exchange clients to act in an ethical and responsible fashion when dealing with their exchange trust funds. Therefore, when we were told that their exchange trust funds would be used to meet other unrelated obligations, I felt that that was a significant breach of fiduciary responsibility that I owed to those clients who entrusted us with their exchange trust money.

**Question:** You just used the words client's trust fund money. From your perspective, were the funds that were deposited by exchangers [trust funds]?

**Answer:** Yes, sir, that was always my belief.

**Question:** Do you know if IXG had the intent to hold funds obtained from exchange participants in trust for their benefit pending the completion of the exchange?

**Answer:** Yes.

**Question:** Is that because you personally believed those funds in those accounts belonged beneficially to the exchange clients?

**Answer:** Yes. That was my personal belief.

(Greenberg Dep. 30:2-19, 31:5, 31:9-14, 109:24-110:3, August 8, 2007). [5]

---

[5]    Excerpts are from testimony taken in *Investment Exchange Group v. Colorado Capital Bank*, U.S. Bankr. Ct, S.D.N.Y. Case No. 07-11448-MG, Adv. Proc. No. 07-01710-MG.

1    **Testimony of D. Sean Velarde  - Attorney for IXG**

2    **Question by Attorney:**   And did you tell Mr. Simring that you believed it
     would constitute a breach of fiduciary duty because you believed IXG owed
3    its customers a fiduciary duty?

4    **Answer by Velarde:**  Yes.

5
     **Question:**   And why did you believe that?
6
     **Answer:**    In my opinion, a qualified intermediary holds exchange client
7    funds as a fiduciary to the exchange client.

8    **Question:**   Did you ever indicate or did Mr. McCabe ever indicate to Mr.
9    Simring in your presence that he believed that the funds were held in trust
     by IXG for its customers?
10
     **Answer:**  I'm not clear if Mr. McCabe would have used the word "trust",
11   but the conversations with Mr. Simring, he, Mr. McCabe and I were of the
12   mind and opinion that the funds were held in trust as opposed to the
     operating capital of The 1031 Tax Group.
13
     **Question:**   When you say you were of the mind the funds were held in
14   trust, what funds are you talking about?

15
     **Answer:**  I'm talking about the 1031 exchange customer funds that are held
16   by IXG or some other qualified intermediary in between the exchange
     client's sale of a property and during the holding period for their purchase
17   of replacement property.

18   (Velarde Dep. 34:16-35:9, 35:16-23, August 23, 2007)

19
     **Question:**   And you're saying to me that you believed then and you still
20   believe today that the actions that were being requested by Mr. Simring that
     the McCabes enter into, would be a breach of fiduciary duty by the entity
21   Investment Exchange Group, LLC?

22   **Answer:**  I believe the qualified intermediary holds funds as a fiduciary or
23   trustee, and that he [Simring] was asking us to use those funds that I believed,
     and I believe my clients believed, were held specifically for a particular client
24   to be used to fund exchanges for other clients.

25   (Velarde Dep. 63:17-64:3, August 23, 2007)[6]

26   _____

27   [6]  Excerpts are from testimony taken in *Investment Exchange Group v. Colorado Capital Bank*,
28   U.S. Bankr. Ct., S.D.N.Y. Case No. 07-11448-MG, Adv. Proc. No. 07-01710-MG.

7316.001                        THIRD AMENDED COMPLAINT
                                  Case No. 09-cv-2079-JW

*Matrix knew that IXG acted as a fiduciary and trustee of the Exchange Funds on deposit at Matrix because Matrix had an exemplar copy of the IXG Exchange Agreement executed by the Plaintiffs.*

100.    Clients of IXG executed Exchange Agreements in order for IXG to serve as a QI to comply with Section 1031. As per the testimony of Daniel McCabe of IXG,[7] a copy of the form IXG Exchange Agreement (**Exhibit 1**) was given to Matrix as part of the negotiation process for the Sub-Accounting and Marketing Agreement between IXG and Matrix. As noted in Exhibit 1, the consideration for the transaction between the Exchanger and IXG can be depicted as follows:



101.    Pursuant to the Exchange Agreements, IXG agreed to act on behalf of Plaintiffs and other similarly situated Exchangers, solely for the purpose of facilitating the Exchangers'

---

[7]    **Deposition Testimony of Daniel McCabe on the Transfer of Exchange Agreements to Matrix**

**Question by Attorney:** And in the course of creating this document [the Sub-Accounting and Marketing Agreement, (Exhibit 2)] with Mr. Howard, did Mr. Howard or anyone else from Matrix request copies of IXG business records or anything like that from you?

**Answer by McCabe:** My recollection is that I gave Patrick, I think, a copy of our basic exchange docs because, this is -- number one, the 1031 business is unique and you have to kind of walk people through it so they understand how it works.

(McCabe Dep. 208:17-25, August 25, 2010, from testimony taken in *Hunter I* and *Hunter II*.)

**Question:** The documents that we have looked at here today, [IXG Exchange Agreements] would have been consistent with the form exchange agreement in existence in 2005 which you provided to Matrix; is that correct?

**Answer:** That's my recollection.

**Question:** I didn't hear your answer.

**Answer:** That's my recollection.

(McCabe Dep. 194:4-13, August 25, 2010).

exchange of the relinquished property for the replacement property. The Plaintiffs and other similarly situated Exchangers controlled: the selection of the relinquished property; the sale price and terms of sale of the relinquished property; the timing of the sale; the selection, purchase price and terms of acquisition of the replacement property; the timing of acquisition of the replacement property within the parameters of Section 1031; and controlled the Exchange Funds by requiring that they be immediately available to consummate the exchange on demand, within the first day of the exchange or the 180th day. The Plaintiffs and other similarly situated Exchangers required that IXG: (i) hold and apply the Exchange Funds solely to purchase replacement property; (ii) maintain availability of the Exchange Funds; (iii) make payment on Exchangers' behalf from the Exchange Funds to acquire the replacement property; (iv) act specifically in accordance with the Exchangers' Notice of Identification of replacement property; (v) pay deposits or option fees on Exchangers' behalf as directed in Exchangers' Notice of Identification; (vi) take all steps necessary to accomplish closing on the specific property identified by the Exchangers, on the date set by the Exchangers, for the specific price set by the Exchangers; and, (vii) **pay from the Exchange Funds** the purchase price, real estate commissions, prorations of income and expense, closing costs, title insurance premiums, escrow fees and any other charges, all as determined by the Exchangers. IXG, for all purposes other than the actual or constructive receipt determination under Section 1031 and the regulations thereunder, was acting as agent for the Plaintiffs and other similarly situated Exchangers, with all the commensurate duties and obligations imposed by state law, including the fiduciary duties owed by the agent to its principals. See **Exhibit 1**.

> ### *The IXG Exchange Agreement received by Matrix prohibited the transfer of Exchange Funds from IXG to The 1031 Tax Group.*

102.   A copy of the form Exchange Agreement signed by all of IXG's clients between 2002 and 2007 (with certain minor exceptions not relevant here) is attached as **Exhibit 1**. As set forth, IXG promised to:

> "accept the "assignment as Qualified Intermediary and to **hold** the proceeds from the sale of the Relinquished Property, and received from the Escrow, and to utilize **the same** in securing, acquiring, and

36

transferring to Exchanger suitable Replacement Property to complete the tax-deferred exchange according to the terms and conditions as set forth herein."

(Ex. 1, p. 1, last paragraph, emphasis added)

The form IXG Exchange Agreement received by Matrix also provided that:

"At the close of Escrow, **all net proceeds** from the sale of the Relinquished Property…shall be transferred…to [IXG] and be **held** by [IXG] pursuant to the terms of this Agreement."

(Ex. 1, ¶2.4, brackets and emphasis added)

"[IXG] agrees to establish an exchange account [the 'Exchange Account']…The opening entry for the Exchange Account shall be the net proceeds from the sale of the Relinquished Property…Thereafter, the balance in the Exchange Account **shall be reduced** from time to time by (i) QI's [IXG's] fees and costs, (ii) all amounts expended by QI in connection with the acquisition of each Replacement Property…and (iii) any other payments made or costs or expenses incurred by QI for which Exchanger is obligated or responsible under this Agreement."

(Ex. 1, ¶3.1, brackets and emphasis added)

"[IXG] is instructed to deposit **all cash funds received** by it from the sale of the Relinquished Property into one or more deposit accounts established with one or more financial institutions, and all cash so deposited shall be deemed to be held **in the Exchange Account**."

(Ex. 1, ¶3.4, underline and brackets and emphasis added)

"[IXG] is expressly authorized to pool funds in the Exchange Account with funds of other parties who have utilized [IXG's] services in other Exchange Agreements."

(Ex. 1, ¶3.5, brackets added)

103.    Additionally, a standard attachment to the form Exchange Agreement informed IXG's clients that "[t]he net proceeds of sale from this transaction are to be wired to our **trust account**" at Matrix Bank. (**Exhibit 1**, final page, underline added.)

104.    Matrix knew that IXG was required to create an Exchange Account at Matrix and to **"hold"** client funds in trust until the **"same"** funds were needed to close on the client's replacement property or returned to the Exchanger. Matrix knew that no other disbursements of

37

1  funds were permitted by the Exchange Agreements. While Exchange Funds of one IXG client

2  could be "pooled" in the omnibus account with the Exchange Funds of another IXG client, they

3  could not be pooled or commingled with funds from a different QI. IXG Exchange Funds on

4  deposit with IXG at Matrix could never be transferred out of Matrix to a Wachovia account in

5  the name of **The 1031 Tax Group, LLC.**

6      105.    The Plaintiffs herein were not required to do business with IXG as there are

7  many QIs operating throughout the United States who could accomplish their 1031 Exchanges.

8  Prior to depositing their Exchange Funds with IXG at Matrix, the Plaintiffs and others similarly

9  situated, were not informed of: (i) IXG's prior acquisition by The 1031 Tax Group; (ii) the

10  transfer of IXG Exchange Funds from IXG to The 1031 Tax Group; (iii) the multi-million dollar

11  deficit in the IXG trust account at Matrix; (iv) IXG's inability to access financial information

12  from The 1031 Tax Group about the deficit in the trust account; (v) the dire financial condition

13  of IXG; or (vi) the decision made by IXG and Matrix to use Plaintiffs' Exchange Funds as the

14  source of money to fund older exchanges at IXG which could not be completed because the

15  trust money had been looted.

16      ***Thornton of Matrix admits that she knew that the Exchange Funds***
17      ***on deposit at Matrix were fiduciary funds held in trust.***

18      106.    Matrix hired Thornton in the summer of 2004 to investigate the QI business "to

19  uncover if it would be lucrative for the bank to bring in core depositors of qualified

20  intermediaries of 1031 exchange money".[8]   In response, Thornton spent several months

21  developing a business plan for Matrix to act as the depositor institution for QIs.   Thornton

22  performed research on the internet, obtained writings from the Federation of Exchange

23  Accommodators ("FEA") and interviewed with five or six active QIs in the Denver area.

24      "So, through my interview process with a number of them [QIs], I
25      learned first hand what a qualified intermediary did, what the role

26  ────────────────

27  [8]  Thornton Dep. 23:4-7, August 24, 2007

28

7316.001              THIRD AMENDED COMPLAINT
                      Case No. 09-cv-2079-JW

was, and with each individual one that I spoke to, what their business practice was.[9]

107.    As part of Thornton's research, she learned that QIs acted as fiduciaries, Exchange Funds were held in trust by the QI, and the Exchangers were beneficiaries of the trust relationship.  Her testimony is quoted below:

### Deposition Testimony of Judy Thornton at Matrix

**Question by Attorney:**  You testified earlier today that you believed the exchange customers are the beneficial owners of the funds –

**Answer by Thornton:**  They are owners of the funds.    The exchangers own the funds.

**Question:** . . . I'm quite sure you used the word "beneficial" several occasions this afternoon.

**Answer:** It is the Exchangers' funds and they are held in entitlement as beneficiaries through IXG.

(Thornton Dep.185:24-186:7, August 24, 2007)[10]

**Question:**  If it [the account] doesn't have FBO on it, then funds are not being held for the benefit of the third party; isn't that correct?

**Answer:** Not necessarily.

**Question:**  Why not?

**Answer:** Because there's accounts, such as omnibus accounts, that are clearly defined as pooled accounts representing a number of other people's money, and it's not in the entitlement of the account.

(Thornton Dep. 193:19-194:4, August 24, 2007)

**Question:**  I think I heard you testify that [the IXG] Account 419 was considered by the bank to be a fiduciary account; am I right on that?

---

[9] Thornton Dep. 24:16-20, August 24, 2007

[10]  Excerpts are from testimony taken in *Investment Exchange Group v. Colorado Capital Bank*, U.S.B.C, S.D.N.Y. Case No. 07-11448-MG, Adv. Proc. No. 07-01710-MG.

39

1      **Answer:** Yes.

2  (Thornton Dep. 205:15-17, 206:2)

3      *Matrix knew that IXG acted as a fiduciary and trustee of the Exchange*
4      *Funds on deposit at Matrix because Matrix was a member of the FEA.*

5      108.    As set out in **Exhibit 8**, on November 30, 2004, Matrix joined the FEA and

6  publicly proclaimed to the FEA that:

7          "All officers, directors, shareholders and principals of [Matrix] have
8          read the FEA Code of Ethics (copy enclosed), and do hereby agree to
           abide by the FEA Code of Ethics and to further require all employees
9          and independent contractors of [Matrix] to do same." [11]

10     109.    The 2004 FEA Code of Ethics describe the relationship between the QI and its

11 client exchangers as a fiduciary relationship which requires a high level of confidence in that

12 "the client entrusts and deposits with the accommodator title to real estate and proceeds from

13 the sale of real estate in furthering an I.R.C. Exchange." The FEA Code required members such

14 as Matrix to protect the public against fraud and misrepresentation and mandated that QIs "shall

15 keep the exchange proceeds in a stable financial institution," avoid conflicts of interest, and

16 provide the Exchangers with a full accounting of the disposition and use of Exchange Funds.

17 Matrix voluntarily agreed to abide by the 2004 FEA Code of Ethics for the benefit of the public

18 performing 1031 Exchanges with IXG which would include the Plaintiffs herein and others

19 similarly situated which did business with IXG. Matrix voluntarily assumed certain affirmative

20 duties to the Plaintiffs, duties which would not otherwise arise for the benefit of non-customers

21 of the bank.

22     110.    Matrix continually renewed its annual membership in the FEA, was a gold

23 sponsor of the 2005 annual FEA convention in Las Vegas, was a platinum sponsor of the March

24 2006 Rocky Mountain Regional meeting which included an "Ethics Roundtable", was a sponsor

25 of the October 2006 annual FEA convention in Las Vegas and advertised itself to the FEA

26 _____

27 [11] IXG was hired by Matrix to perform accounting services for Matrix on the Exchange Funds
   deposed by IXG at Matrix. Therefore, Matrix had an affirmative duty to make IXG abide by the
28 FEA Code of Ethics.

7316.001                       THIRD AMENDED COMPLAINT
                               Case No. 09-cv-2079-JW

members as "providing innovative banking solutions nationally to the QI market." See **Exhibit**

**9**.  In 2006, the FEA published investment guidelines for Exchange Funds (**Exhibit 10**) which

equated Exchange Funds as trust funds similar to a lawyers trust account as follows:

> **Purpose of Trust Accounts**. The purpose of a lawyer's trust account is to safeguard client funds from loss and to avoid the appearance of impropriety.  QI trust accounts should be maintained for the same purpose.

(**Exhibit 10**, at p.3.)

> *Matrix knew that IXG acted as a fiduciary and trustee of the Exchange Funds on deposit at Matrix because the Sub-Accounting and Marketing Agreement acknowledged these facts.*

111.    On March 30, 2005, Matrix entered into a Sub-Accounting and Marketing

Agreement with IXG to establish and maintain Exchange Fund accounts at Matrix, a copy of

which is attached as **Exhibit 2**. **Exhibit 2** was prepared by Daniel McCabe of IXG and Patrick

Howard of Matrix with the assistance of Matrix's legal department.  **Exhibit 2** took between

60 to 90 days to prepare, required the production of an exemplar of **Exhibit 1**, and involved

multiple emails, phone calls and face-to-face meetings by the agents of IXG and Matrix. The

Matrix/IXG Agreement identified the basic understanding between the parties, as follows:

> (i)    Matrix acknowledged that IXG was engaged in the business of providing custodial services to individuals and entities in connection with property exchanges in accordance with Section 1031 of the Internal Revenue Code;
>
> (ii)    IXG opened one interest-bearing money market account ("MMA") and one non-interest bearing demand deposit account ("DDA") at Matrix.  These two accounts containing Exchange Funds were collectively referred to as the "Omnibus Custodial Account";
>
> (iii)   Matrix acknowledged that IXG was a fiduciary for each 1031 exchange;
>
> (iv)    IXG agreed to deposit all IXG client Exchange Funds at Matrix; and
>
> (v)    Matrix paid IXG a fee of $300 for each new active exchange (the "Marketing Fee") for IXG's decision to deposit those Exchange

41

THIRD AMENDED COMPLAINT
Case No. 09-cv-2079-JW

Funds with Matrix, and, also paid IXG $28 per active exchange per month for IXG to perform the necessary accounting for these funds (the "Sub-Accounting Fee").

112.    The Matrix/IXG Agreement further required IXG to: (i) provide Matrix, on a monthly basis, an accounting of each Exchangers' funds that were deposited into IXG's accounts at Matrix; (ii) carry out special record-keeping requirements for trust accounts in order to obtain supplemental F.D.I.C. insurance coverage on the Exchange Funds, *See* 12 C.F.R. § 330.5(b)(2); (iii) actively promote Matrix's depository services to third-parties; and (iv) exclusively use Matrix to hold its clients' Exchange Funds. In return, Matrix agreed to pay IXG fees based upon the number of Exchangers for which IXG was holding funds.

Pursuant to the Matrix/IXG Agreement, IXG and Matrix would, on a daily basis,[12] balance the books at IXG with the bank records at Matrix and each month IXG would send a report to Matrix entitled "IXG-Client Exchange Fund Report", a truncated copy of which is attached as **Exhibit 11**.

---

[12] **Deposition Testimony of Daniel McCabe**

**Question by Denver:** Are individual exchange deposits accountable within the MMA account?

**Answer by McCabe:** IXG maintained a complete set of records reflecting all of those accounts and then the bank maintained their records and daily, prior or the sale, daily our employees or in this case, quite often my wife, would balance to balance those two to make sure they balanced and she did that on a daily basis. She called it balancing to the bank.

(McCabe Dep. 179:13-19; August 25, 2010, from testimony in *Hunter I* and *Hunter II*)

**Question:** Prior to the transfer of funds from the IXG accounts at Matrix to an account at Wachovia, do I understand correctly that every day someone on your staff reconciled your books, IXG's books as to the Exchange Funds being held by it with the accounts at the bank to determine that the bank's records reconciled on a daily basis with IXG's records?

**Answer:** That is my understanding. . .the general policy was that those accounts got reconciled on a daily basis.

**Question:** Who within the IXG organization, other than yourself, had kind of the day-to-day responsibility for monitoring the accounting both at IXG and with the bank records?

**Answer:** That was overseen by my wife Shirley.

(McCabe Dep. 11:23-12:8, 12:12-15, August 26, 2010, from testimony in *Hunter I* and *Hunter II*.)

42

113.   As set out in **Exhibit 11**, Matrix was kept fully informed about the exchange assets and exchange liabilities existing at IXG, including the identity of closed versus open exchanges.   In April of 2005, Matrix designated the IXG account as requiring "high risk account monitoring" (**Exhibit 12**), and in October of 2005, Thornton requested that IXG provide her with more information to "better understand the entire QI/Exchanger relationship" as she was "trying to determine what steps you [IXG] take to ensure that the money being moved is being sent to valid recipients." As set out in **Exhibit 13**, Shirley McCabe outlined the IXG security procedures utilized by IXG to ensure that Exchange Funds wired out of the Omnibus account were sent to a valid IXG Exchanger, with the proper amount, and on a timely basis.   The process was described to Matrix as follows:

> The process we have in place is: an administrator verifies the funds, verifies the client's settlement sheet and then coordinates with the title company.   All corresponding numbers must be correct with out client exchange proceeds account balance before the wires are sent out. These transactions are calendared for the day of closing, given to us by the client and/or title closer.   Marilyda, Idania, Shon or a consultant signs the settlement sheet or a person who has the authority to release a wire. This is also in line with our bonding requirements.

(**Exhibit 13**.)

114.   The $62 million in August 2006 transfers and the $57 million transfers in September and October 2006 from IXG to The 1031 Tax Group did not comply with the security process in place at IXG because The 1031 Tax Group was not an IXG Exchanger with an exchange number and the transfers were not used to close a 1031 Exchange as was required by each Exchange Agreement.

115.   After the McCabe Group's membership interests in IXG were acquired by The 1031 Tax Group, the McCabe Group remained on as officers of IXG with signature authority over the IXG omnibus account at Matrix.   However, the McCabe Group had no authority over or access to financial information concerning The 1031 Tax Group's account at Wachovia. After August 3, 2006, there was no financial information available to IXG (as an entity) or Matrix in order to balance the exchange assets and liabilities of IXG or to account to the Exchangers who had deposited their Exchange Funds with Matrix.   After August 2006, the

43

accounting process stopped. IXG did not account to Matrix and Matrix did not demand an accounting from IXG pursuant to the Matrix/IXG Agreement because both contracting parties knew the accounts would not balance. Daniel McCabe's testimony is quoted below:

### Deposition Testimony of Daniel McCabe

**Question by Attorney:** It is your belief that as of April 27th of 2007, that IXG had in bank accounts in its name funds sufficient to cover all straight exchanges that were in process with IXG customers?

**Answer by McCabe:** No.

**Question:** . . .that was because of the transfers of funds out of IXG bank accounts to other 1031 Tax Group bank accounts, correct?

**Answer:** Correct.

**Question:** Was there a time before April 27th when you understood that the funds in IXG bank accounts were not sufficient to cover straight exchanges in process with IXG customers?

**Answer:** Yes.

**Question:** When did you first realize that?

**Answer:** About four days after the sale.
**Question:** All right.

**Answer:** When the funds were sent to Wachovia.

**Question:** So, within three or four days after August 4, 2006 you realized that?

**Answer:** Yes. [13]

> ***Okun looted the IXG Exchange Funds transferred from the IXG Matrix account to The 1031 Tax Group Wachovia account.***

116.    Okun acquired IXG in order to loot the Exchange Funds on deposit at Matrix. Okun agreed to pay the McCabe Group $9,000,000 ($7,000,000 up front and $2,000,000 over time) to get access to the $75 million on deposit at Matrix. D. Sean Velarde's testimony

---

[13] McCabe Dep. 61:10-62:9, August 23, 2007, from testimony taken in *Investment Exchange Group v. Colorado Capital Bank*, U.S.B.C, S.D.N.Y. Case No. 07-11448-MG, Adv. Proc. No. 07-01710-MG

summarizes the business purpose of the deal:

### Testimony of D. Sean Velarde

**Answer by Velarde:** He [Simring] started a conversation by expressing some surprise that neither I nor Dan McCabe had understood his [Okun's] reason for acquiring IXG in August of 2006, and he said point-blank, you realize that he [Okun] thought he was acquiring an unregulated bank. And he [Simring] then asked me for a piece of paper. He brought nothing with him to the meeting, asked me for a piece of paper. I had a legal pad, I handed him a piece of paper, and he looked at me and Dan McCabe and he said, How much money did you have in client funds on August 4, 2006, when you made the transfer, closed the sale to The 1031 Tax Group? And I piped up, A hundred million dollars, based on my recollection of my clients' business practices. The actual number was south of that. And Richard Simring wrote a hundred in big letters on one side of the sheet of paper. And then he [Simring] said How much did Ed Okun wire you at closing of that transaction? And I said, $7 million. And he wrote 7 on the other side of the sheet. And he held it up for Dan McCabe and I and he said. For $7 million Ed Okun bought a hundred million dollars worth of cash, that's the cheapest money he ever bought. My jaw hit the floor. [14]

117.    The purchase money for the sale of shares in IXG was transferred on August 3, 2006. The McCabe Group received a wire at matrix in the amount of $7 million from The 1031 Tax Group account at Wachovia. The wire was sent to a Matrix account held by "High Rock, LLC", an entity whose registered agent is Shirley McCabe. On the same day, within eleven minutes of receiving their $7 million from The 1031 Tax Group, the McCabe Group directed Matrix to wire $20 million worth of Exchange Funds belonging to IXG clients out of Matrix back to The 1031 Tax Group account at Wachovia; the same account from which the $7 million had just been paid. In substance, Okun paid the McCabe Group for control over IXG with IXG Exchanger Exchange Funds.

118.    Once Okun gained control over the IXG Exchange Funds transferred to The 1031 Tax Group account at Wachovia, he was able to loot those funds for his own personal business purposes and to close 1031 Exchanges pending at other QIs that could not close because those Exchange Funds had been looted. Attached as **Exhibit 14** is a diagram depicting the flow of

---

[14] D. Sean Velarde Dep. 30:13-31:10, August 23, 2007, taken in *Investment Exchange Group v. Colorado Capital Bank*, U.S.B.C, S.D.N.Y. Case No. 07-11448-MG, Adv. Proc. No. 07-01710-MG

funds of the first $52 million looted from the IXG Matrix account in early August of 2006. Other monies transferred from IXG to The 1031 Tax Group from August through October 2006 were treated similarly.

<div align="center">

**XI.**

**ALLEGATIONS AGAINST BOULDER CAPITAL**

</div>

119.    In approximately January 2005, just before Okun acquired AEC, Boulder Capital executed a 1031 Exchange agreement with AEC for its own account.  Specifically, Boulder Capital deposited more than $32 million with AEC.  MacDowell, acting on behalf of Boulder Capital, signed the AEC Exchange Agreement with AEC.

120.    Thus, by January 2005, Boulder Capital knew precisely the requirements, intent and nature of 1031 Exchange transactions.  AEC was a QI holding Exchange Funds solely for the benefit of Exchangers. Boulder Capital understood the terms of the AEC Exchange Agreements which required the customary trust limitations, anti-assignment clauses, depository limitations, and the account segregation provisions, as follows:

(i)    "The Exchange Funds shall be held by [AEC] for the exchange…and shall be used solely to enable [AEC] to perform its obligations to effectuate the exchange;"

(ii)    "The Exchange Funds shall at no time be considered part of [AEC's] general assets nor subject to claims by [AEC's] creditors";

(iii)    "[AEC] is instructed to deposit the Exchange Funds into banks, savings and loan accounts, money market deposit accounts, commercial paper, funding agreements, repurchase agreements or in time deposits";

(iv)    "No assignment of any right or interest or delegation of any duty, responsibility, or obligation under this Exchange Agreement shall be made, in whole or in part, by any party without the prior written consent of the other party. . ." and

(v)    "The parties hereto acknowledge and agree that all principal amounts of the Exchange Funds shall be used by [AEC] to effect the exchange transaction pursuant to this Exchange Agreement and in accordance with the Code

<div align="center">

46

</div>

and the Regulations there under."

121.   AEC advised Boulder Capital that its deposit of $32 million in Exchange Funds were held "in escrow". Boulder Capital knew that its own Exchange Funds could not be used by AEC or its owner for any reason, and surely not for the purchase of real estate, luxury goods, or to close escrows of other AEC QI Exchangers. Boulder Capital successfully completed its own $32 million 1031 Exchange transaction at AEC in March of 2005, without incident.

122.   Notwithstanding Boulder Capital's knowledge of the limitations of 1031 Exchange transactions, it thereafter provided multiple "hard money" loans to Okun to fund the close of QI escrows whose accounts were deficient because Okun had "borrowed" from them. Boulder Capital knowingly and willfully served as a financial bridge by which Okun could circulate cash to himself and various Okun entities, so as to perpetuate his Ponzi scheme. The incentive of Boulder Capital to conspire with Okun to facilitate his ongoing fraudulent scheme was its own financial advantage and gain, obtained through fees for services and usurious interest rates. All payments of loan fees, principal and interest made to Boulder Capital on all of the Boulder Capital loans, as set forth with particularity hereinafter, including all misappropriated QI Exchanger Funds were paid to Boulder Capital, by delivery to its Cambridge Trust Company account.

123.   On July 8, 2005 (before Okun bought his first QI), Boulder Capital loaned $18 million to The Columbus Works Virginia Trust, an Okun Entity, secured by real property known as Columbus Works and other collateral, including a personal guarantee from Okun (the "Columbus Loan"). The Columbus Loan had a four-month term, with a maturity date of November 7, 2005. Boulder charged an origination fee of $540,000 and its base interest rate, 17.64%, which increased monthly to 31.67% by November 7, 2005. Okun's personal, business and financial disclosures to Boulder Capital alerted Boulder Capital to Okun's minimal cash resources and limited access to the capital markets, and particularly foreclosed access to institutional lenders. Boulder Capital knew these facts and circumstances before Okun's first QI purchase.

47

124. By August 2005, while the Columbus Loan was still outstanding, Okun requested another loan from Boulder Capital to acquire AEC (the "AEC Acquisition Loan"). Because Boulder Capital had itself used AEC for Exchanger services, it knew that AEC was a QI holding substantial sums of protected Exchanger Funds. Boulder Capital also knew that Okun's impaired capital position would cause him to convert AEC Exchange Funds to his personal use, once he had acquired AEC. Okun and MacDowell (of Boulder Capital) had conversations throughout this period, witnessed by Coleman, wherein Okun used the term "my personal piggybank" to describe AEC Exchange Funds.

125. On August 22, 2005, Boulder Capital made its $4 million AEC Acquisition Loan to Okun, in exchange for a pledge of Okun's ownership interest in AEC as collateral. The AEC Acquisition Loan had a two-week term with a maturity date of September 7, 2005. It bore a base interest rate of 211%, yielding $400,000 in interest over this two-week period. At the time of the AEC Acquisition Loan, Boulder Capital and its agents knew that both the Columbus Loan and the AEC Acquisition Loan could only be repaid with misappropriated AEC funds once Okun acquired AEC. The AEC acquisition closed on August 25, 2005, looting by Okun ensued, and the Ponzi scheme began.

126. On September 7, 2005, funds misappropriated from AEC were used to pay off both the Columbus Loan and the AEC Acquisition Loan. Specifically, on August 31, 2005, $39,534,829.62 of AEC Exchange Funds deposited at Republic First Bank were transferred electronically to an AEC account at Bank of America. Later that day, two wire transfers -- one for $4,400,000 and the other for $18,369,000 -- were sent from the AEC account at Bank of America to a Boulder Capital account at Cambridge Trust Company. The wire instructions show that Boulder Capital was receiving Exchange Funds directly from the QI account of AEC.

127. The $18,369,000 wire transfer used to repay the two month-old Columbus Loan included $369,000 in interest on the $18,000,000 in principal. The $4,400,000 wire transfer which repaid the AEC Acquisition Loan included $400,000 in interest (A.P.R. 211%). In sum, on September 7, 2005, Boulder Capital received a total of $22,769,000 directly from misappropriated funds on deposit at AEC. Boulder Capital knew the source of the loan

repayment was AEC Exchange Funds. Boulder Capital would never have permitted Okun to "borrow" from Boulder Capital's $32 million in Exchange Funds on deposit with AEC from January to March, 2005.

128.    On August 22, 2005, just as the AEC Acquisition Loan closed, Boulder and Okun entered into a letter of intent for an $18 million "mezzanine" loan (the "Boulder WOM Loan") for the acquisition of the West Oaks Mall in Houston, Texas. The West Oaks Mall was acquired on September 20, 2005, by several Okun Entities for $102.5 million. The source of the funds for this acquisition included a mezzanine loan from Boulder Capital and funds contributed by Okun, including misappropriated AEC funds.

129.    The purchase price and closing costs for the West Oaks Mall included $6.25 million in funds to be contributed personally by Okun. Boulder Capital knew that Okun had no cash reserves and was using AEC as his "personal piggybank". Therefore, Boulder Capital knew that its loans were Okun's only source of liquidity, aside from his access to AEC funds. Boulder Capital further knew that the $6.25 million contributed by Okun was misappropriated from AEC Exchange Funds. Boulder Capital received more than $4 million in fees and interest on the Boulder WOM Loan, and therefore had no incentive to discontinue its profitable relationship with Okun. The loan repayment was always assured.

130.    On or about February 20, 2006, (with Pajonas vehemently complaining about the liquidity crisis at AEC and SOS) Boulder Capital agreed to provide still another loan to the Okun Entities for $15,000,000 (the "Lulling Payment Loan"). There was no real estate purchase connected to this loan. Okun told MacDowell directly that the loan proceeds were needed to complete active QI Exchanges. The available cash balances at AEC and SOS had become dangerously low, which could cause Okun to fail to close escrows. The failure to fund one escrow would expose Okun's prior looting and terminate the Ponzi scheme. MacDowell agreed to make the "Lulling Payment Loan" for the purpose of perpetuating Okun's Ponzi scheme, and advancing Boulder Capital's financial interests.

131.    Prior to making the Lulling Payment Loan, Boulder Capital demanded various forms of collateral, including a pledge of Okun's and Okun Entities' ownership interests in AEC

49

1  (acquired in August 2005), SOS (acquired in November 2005) and The 1031 Tax Group

2  (formed in December 2005). Boulder Capital began conducting due diligence regarding Okun

3  assets, requiring Okun to submit "as much info [information] as you have available", including

4  QI financial statements, balance sheets, organizational documents, ownership records, and other

5  information. Boulder Capital knew from its diligence review that Okun's QIs were insolvent,

6  with liabilities far exceeding Exchange Funds on deposit. Acquiring the QIs as collateral could

7  offer no repayment financial security unless Boulder Capital expected Okun to loot Exchange

8  Funds on deposit to repay the Lulling Payment Loan.

9          132.    On March 2, 2006, the Lulling Payment Loan closed. The $15 Million Loan

10 was reflected in three concurrent loan agreements:

11                          (i)     a loan agreement between Boulder Columbus and the
                                    Columbus Trust,
12
13                          (ii)    a mezzanine loan agreement between Boulder Columbus
                                    and the WOM Borrowers, and
14
15                          (iii)   a mezzanine loan agreement between Boulder Columbus
                                    and other Okun Entities regarding an adjacent parcel
                                    previously housing a JC Penney store (the "JC Penney
16                                  Parcel"). These loans were secured by the Columbus
                                    Works property, the West Oaks Mall, the JC Penney
17                                  Parcel, a personal guaranty from Okun, a pledge of
                                    Okun's ownership interest in the QIs and other collateral.
18                                  The Lulling Payment Loan had a three-month term, with
                                    a maturity date of June 2, 2006.
19

20         133.    Most notable among the provisions of these loan agreements are the interests

21 Boulder Capital took in the QIs, which had been previously looted, and which Boulder Capital

22 well knew contained anti-alienation provisions for these "trust funds". Facilitating Okun's

23 misconduct was Boulder Capital's only real access to Okun's QI fund misappropriations, and its

24 own loan repayment.

25         134.    The intended use of the $15 Million Lulling Payment Loan was not specified in

26 the loan agreements. Boulder Capital and Okun were deliberately silent about the purpose of

27 the loan in the written documents in order to conceal the fact that the loan proceeds were being

28 used for lulling payments to the QIs to enable Okun and his co-conspirators to continue the

Ponzi scheme. Without an immediate cash infusion in March, 2006, the QIs in Boston and Connecticut would have defaulted on outstanding exchanges and Okun's entire scheme would have been exposed. The instant Exchanger class members (79 from California) would not have done business with Okun or his QIs, and would not have sustained economic losses, but for the $15 Million Lulling Payment Loan from Boulder Capital.

135.    Boulder Capital benefited handsomely from this loan: $1,311,000 in loan proceeds repaid Boulder's fees and interest due on the WOM Loan. The base interest rate was 44% per month through the maturity date ($550,000 per month), and 56% thereafter. Payment of interest through the maturity date was required even if the loan was prepaid.

136.    On May 4, 2006, the Lulling Payment Loan was repaid from loan proceeds of a refinancing through another lender. On April 10, 2006, Boulder Capital received a $550,000 interest payment, and about $1 million in interest was paid on the repayment date, June 2, 2006. The $1,550,000 of interest received on the two-month loan reflects a 62% A.P.R. The Lulling Payment Loan was unconscionable in its terms, and Boulder Capital knew that Okun had no other recourse but to pay its usurious interest rate.

137.    During the spring of 2006, Okun and others were actively seeking to refinance the West Oaks Mall, to withdraw equity capital to pay pending Exchanges and to buy more luxury items. Okun found a new lender: Greenwich Capital Financial Products, Inc. ("Greenwich Capital"). On June 26, 2006, Okun refinanced the West Oaks Mall with a loan from a Greenwich affiliate, in the amount of approximately $86,000,000. In order to pay off the Boulder WOM Loan, Okun was personally required to contribute an additional $18,979,103.29 at closing.

138.    Okun's contribution to the closing derived from misappropriated NES funds. Okun acquired control of NES on June 22, 2006. On Friday, June 23, 2006, in anticipation of the closing of the West Oaks Mall refinancing, Okun and his co-conspirators transferred $25,076,790.63 of funds, representing cash from 31 segregated accounts at NES, into a new, "pooled" NES account. $18,985,221.41 was then immediately transferred from the pooled NES account to the LandAmerica Title Insurance Company ("LandAmerica"), which was handling

51

the refinancing of the West Oaks Mall. One day earlier, on June 22, 2006, Greenwich Capital had transferred $86,200,000 to LandAmerica. The closing of the West Oaks Mall refinancing with Greenwich Capital occurred on Monday, June 26, 2006. LandAmerica transferred $18,475,200 to Boulder Capital to repay the Boulder WOM Loan in full, with stolen NES Exchange Funds. Boulder Capital and its agents knew that Okun had no cash reserves nor access to capital, aside from converted Exchange Funds. Boulder Capital acted willfully, knowingly, and with reckless disregard for the interests of the Exchangers.

139.    In the summer of 2006, Okun sought Boulder Capital loans for new real estate acquisitions by Okun, including a loan for Okun's New Hampshire mansion. In August 2006, within the span of a few weeks, Boulder Capital made $17 million in loans to Okun and Okun Entities, knowing that he held only leveraged assets.

140.    By August 2006, Boulder Capital and MacDowell knew that Okun had purchased NES, and was acquiring IXG. They knew of Okun's misconduct in connection with AEC and other QI's and further knew that Okun had insufficient liquid assets to repay any short-term loans. Boulder Capital and MacDowell knew that Okun would use misappropriated QI funds to acquire real estate against which Boulder Capital was making loans and/or to pay Boulder Capital the fees, interest and principal associated with such loans.

141.    On or about August 1, 2006, The 1031 Tax Group acquired IXG. Two days later, on August 3, 2006, $20 million of IXG Exchange Funds were transferred from Matrix to a new, pooled bank account at Wachovia in the name of The 1031 Tax Group (the "3272 Account"). The following day, August 4, 2006, $4 million was misappropriated from the 3272 Account and transferred into an account of IPofA (another "Okun Entity"). On the same day, $3.5 million of such funds were transferred again to a new IPofA Salina Central Mall lockbox account (the "Lockbox Account").

142.    On August 8, 2006, Okun Entities acquired the Salina Central Mall in Salina, Kansas for approximately $36,000,000. Boulder Capital provided $6.24 million in mezzanine financing (the "Boulder Salina Loan"), and Okun misappropriated $3 million of Exchange Funds for his contribution to the purchase price.

7316.001                THIRD AMENDED COMPLAINT
                        Case No. 09-cv-2079-JW

143.    Okun used $6.1 million in misappropriated QI funds to acquire the "Water View" property in Red Bank, New Jersey. Once acquired, Okun obtained a loan against Water View from Boulder Capital, $3 million of which defrayed the loan on 39 Aaron Road, Wolfeboro, New Hampshire ("39 Aaron Road"). Boulder Capital did not ask about the source of the cash used to acquire Water View. Rather, Boulder Capital agreed to deliver the remaining loan proceeds to Okun for the acquisition of his New Hampshire personal residence. Based on Okun's prior misconduct and its knowledge of his financial status, Boulder Capital knew that such funds could only have been misappropriated from Okun's QIs.

144.    Boulder Capital made a $6 million loan to Okun and the Okun Entities (the "Boulder Water View Loan") with a maturity date of September 22, 2006, only four weeks after the loan closing date. The base interest rate was 72%, or $360,000 per month. On August 23, 2006, at Okun's direction, five days after the Water View loan, on the date of the 39 Aaron Road closing, Boulder Capital wire transferred half of the $6 million Water View loan proceeds to the escrow account of Okun's New Hampshire counsel for the 39 Aaron Road purchase.

145.    On August 28, 2006, following the close of escrow on the Boulder Water View property, the $3 million balance of the loan proceeds were delivered to IPofA, rather than to the purported "borrowers". $250,000 of such funds were immediately transferred from the IPofA account to a broker's escrow account in New Hampshire Okun's deposit against acquisition of a parcel contiguous to the New Hampshire mansion purchased 5 days earlier, known as 49 Aaron Road.

146.    Boulder Capital knew that $3 million of the loan proceeds from the Boulder Water View Loan had been misdirected to Okun personally. Despite its knowledge that these loan proceeds constituted an unlawful out-of-trust transfer and were not used for the benefit of the borrowers, Boulder Capital nonetheless obtained a lien against these properties.

147.    On September 29, 2006, the Water View property was refinanced with a $5 million loan from another lender. Those loan proceeds, together with $1,533,845.24 of misappropriated QI funds purportedly contributed by Okun, repaid the Boulder Capital Water View Loan in full. Thus, each of Boulder Capital's "loans" to Okun insured unconscionable

53

returns for Boulder and certainty of prompt repayment from Okun.

148.    The $1,533,845.24 repaid to Boulder Capital was misappropriated from the accounts of SOS. Specifically, on September 29, 2006, such funds were wire transferred from an SOS account at Citibank to Lawyers Title Insurance Company, which was handling the refinancing transaction. On that same day, Lawyers Title transferred the misappropriated funds to Boulder Capital's Cambridge Trust Company account. Defendants thus received interest at a rate of nearly 99% on the Water View loan. This was another "loan shark" style loan, designed to result in sizeable and no risk earnings to Boulder Capital for its cooperation in Okun's Ponzi scheme, and rapid turn around of funds.

149.    A summary of pertinent information about the Boulder Capital loans described in this Complaint is represented in the following chart:

| Loan | Amount | Date | Repayment Date | Base Interest Per Annum | Effective Interest Rate Per Annum | Loan Fees | Total Interest and Fees |
|---|---|---|---|---|---|---|---|
| Columbus Works | $18 million | 7/8/05 | 9/7/05 | 17.64-31.67% | 55% | $540,000 | $2,176,200 |
| AEC Loan | $4 million | 8/22/05 | 9/7/05 | 211% | 211% | | $400,000 |
| West Oaks Mall | $18 million | 9/20/05 | 6/26/06 | 17.64-35% | | $360,000 initial + $360,000 extension | Over $4,000,000 |
| Lulling Payment Loan | $15 million | 3/2/06 | 5/4/06 | 44% | 62% | | $1,550,000 |
| Salina | $6.24 million | 8/8/06 | 3/30/07 $5 million Principal Payment, balance outstanding | 32% | | $240,000 | $1,567,692 plus interest accrued since 3/30/07 |
| Water View | $6 million | 8/23 and 8/28/06 | 9/29/06 | 72% | 99% | | $497,726 |
| | | | | | | **TOTAL** | More than $10,191,618 |

150.    Boulder Capital was on notice that Okun was wrongfully converting Exchanger funds, yet it conspired with and assisted Okun and the Okun Entities in these conversions by loaning Okun millions of dollars to enable him to continue his misconduct, to prolong the fraud and theft. Okun's misconduct generated millions of dollars in fees for Boulder Capital, while the loan repayment was virtually guaranteed so long as Okun's Ponzi scheme continued

1  uninterrupted. Without complicity from Boulder Capital, many new Exchangers would have

2  been spared the loss of life savings, because Okun's scheme would have been exposed far

3  sooner.

## XII.

## ALLEGATIONS AGAINST CORDELL

6      151.   Cordell, like Boulder Capital, is a "hard money" lender, specializing in asset

7  based lending, where higher rates of interest are charged relative to loans based on cash flow.

8  Lending limits are based on a percentage value of assets pledged as collateral. Cordell is a

9  sophisticated lender which operates effectively to ensure that each collateral asset can support its

10 debt.

11     152.   Cordell's principal, Robin Rodriguez, has over 30 years of financial experience in

12 currency arbitrage, commodities trading, and financial futures. He has acted as a broker-dealer,

13 and is the chairman of a commercial bank. Rodriguez was intimately involved in approving the

14 terms and conditions of each loan Cordell made to Okun and Okun Entities, whose due

15 diligence reviews he personally performed or reviewed for Cordell.

16     153.   Over the course of 13 months, Cordell made five separate loans to Okun and/or

17 Okun Entities, and ultimately loaned them more than $50 million. The Cordell Loans to Okun

18 formed a large part of the Cordell loan portfolio, and these loans assisted Okun and his co-

19 conspirators in perpetuating Okun's Ponzi scheme. Okun's purpose was to withdraw equity

20 from real estate through refinancing, to make payments owed to pending QI Exchangers.

21 Okun's intention was communicated to Cordell, which assisted Okun in effectuating this

22 purpose for Cordell's own individual advantage and significant financial gain.

23     154.   On or about May 3, 2006, Cordell made its first loan to the Okun Entities,

24 lending $26.5 million (the "Columbus Lulling Payment Loan") to refinance Okun's loans on

25 Columbus Works, to generate more cash to make lulling payments. Lara Coleman told Cordell

26 Consultant, Gardy Bloemers ("Bloemers"), the underwriter for Cordell, that a portion of the loan

27 would be used to fund outstanding 1031 Exchanges. Because of the intended use of these loan

28 proceeds, Cordell demanded that the collateral for the Columbus Lulling Payment Loan include

a pledge of Okun's membership interests in (a) AEC and (b) 1031 Tax Group -- the parent company of the QIs previously purchased by Okun. Using Okun's insolvent QIs as collateral provided no economic security unless Cordell knowingly acquiesced in Okun's plan to access the remaining Exchange Funds on deposit for repayment of the loan.

155.    Contrary to its usual practices, Cordell did not commission its own appraisal of the real property, nor did it question the supposed $1.9 million annual revenue stream from the power plant that supported the appraisal provided by Okun. Rather, the only focus of Cordell's underwriting for the loan concerned the QIs. Cordell requested and received information regarding the nature of the QIs, including the AEC Exchange Agreement. Cordell, through Gardy Bloemers, investigated the AEC QI thoroughly. Indeed, Cordell withheld $2 million of the Columbus Lulling Payment Loan proceeds pending the receipt, to Rodriguez's sole satisfaction, of enough information to completely understand the nature of the QIs in which Cordell accepted a pledge of Okun's membership interests. As a result of its due diligence, Cordell knew no later than May 3, 2006 that Okun's QI Exchange Funds were required contractually to be used solely to perform Okun's obligations to Exchangers, and that Okun could not legally "borrow" Exchange Funds.  Cordell explained that Okun had indeed "borrowed" significant QI Exchange Funds, and that Cordell's loans were to be used to repay QIs depleted as a result of Okun's "borrowing".

156.    Cordell consultant Bloemers, who was directly responsible for the origination of the Columbus Lulling Payment Loan, has testified that Rodriguez knew from the outset that Okun was "borrowing" money from his various QIs. Lara Coleman confirms that she told Bloemers about the nature and extent of Okun's borrowing.  Specific dollar amounts borrowed by Okun were identified in the financial statements sent to Cordell.  Coleman told Bloemers that a portion of the Cordell loan would be used to close pending QI escrows.

157.    At the time of the Columbus Lulling Payment Loan in May, 2006, Pajonas was alerting Okun to liquidity problems at AEC and SOS, and demanding money to fund Exchanges. Okun's purpose in obtaining the loan from Cordell was to silence Pajonas, so as to perpetuate Okun's Ponzi scheme.

1    158.    By October 2006, Okun was in default on his obligations to Cordell but Cordell

2  did not move against the QIs pledged as collateral.   Instead, Cordell requested updated Personal

3  Financial Statements ("PFS") from Okun which Cordell assisted Okun in drafting. Various

4  versions of the PFS included as liabilities those "loans" to Okun from The 1031 Tax Group in

5  amounts between $92 million and $134 million.

6    159.    Okun reiterated what he had told Cordell since May 2006: that he needed to

7  "borrow" money from the QIs for real estate purchases and needed Cordell's loans to avoid

8  defaulting on QI escrows.  But for Cordell's loans, Okun's scheme would have collapsed, and

9  the Plaintiffs would have been spared extensive damages caused by Okun's theft.

10    160.    At this time, one of Rodriguez's potential investors questioned Rodriguez's

11  estimate of Okun's net worth and the need for continued financing, stating, in an email: "may

12  seem like a dumb question but why does someone who made 200 million need to borrow 30

13  million".  Ignoring the obvious, Cordell remained committed to assisting Okun in order to reap

14  the profits generated from patching Okun's escalating financial predicament.

15    161.    In November 2006, Cordell agreed to loan another $5.5 million to Okun even

16  though by that time, Okun's Entities were already in default on the Columbus Lulling Payment

17  Loan.  Cordell was questioning Okun's PFS in general, Cordell's investors were questioning

18  Okun's net worth and need for financing, and Cordell itself was questioning the "loans" to Okun

19  from the QIs.

20    162.    On December 12, 2006, Cordell made a loan of $2.5 million to an Okun Entity.

21  A week later, Cordell Retirement made another loan to Okun, personally, in the amount of

22  $3,000,000 (the "1031 Advance Acquisition Loan").  The 1031 Advance Acquisition Loan was

23  secured by liens on residential properties previously purchased with QI Funds. The closing

24  statement for this loan allocates a small portion of the proceeds for specified uses.   The bulk of

25  the loan -- a balance of $2,726,416.67 -- is unallocated, and Rodriguez testified that he made no

26  inquiry into the use of those proceeds.   However, Okun disclosed to Rodriquez when he

27  requested the loan that the purpose was to purchase another QI, 1031 Advance, to gain access to

28  additional Exchange Funds.

57

163.    On December 18, 2006, The 1031 Tax Group purchased 1031 Advance in California for $2.5 million. Proceeds from the $3 million loan from Cordell were used for this purchase, just as represented to Rodriquez by Okun. Okun then looted the 1031 Advance Exchange Funds on deposit in segregated accounts at Countrywide as previously alleged herein.

164.    In February 2007, with Okun's QIs in a substantial liquidity crises, Cordell made a $13.4 million loan to an Okun Entity (the "Shreveport Lulling Loan"), secured by a mortgage on warehouse property in Shreveport, Louisiana (the "Shreveport Facility"). This warehouse was purchased with $7.4 million in QI Funds misappropriated from IXG approximately six months earlier. The Shreveport Lulling Loan was made for nearly twice the acquisition price of the property and the extra cash obtained by Okun would be used to make lulling payments on pending escrows at Okun's various QIs.

165.    In April 2007, Okun's Ponzi scheme was about to collapse, sending Okun to jail. At that time, in an attempt to gain much needed liquidity, Okun and Rodriguez traveled to Columbus, Ohio to meet unsuccessfully with number of hedge funds owners for a $125 million loan. In April 2007, Cordell made one final loan to Okun, days after the failed pitch to the hedge funds.  At that time, Randall Kominsky, an independent financial consultant, was assisting Okun with refinancing his real estate holdings. Okun informed Kominsky that he needed $6-10 million within two days and advised Kominsky to reach out to Rodriguez at Cordell for the loan.  Okun explained that he needed funds to complete pending, deficient 1031 Exchanges. Okun promised to repay the loan with cash from funds of another QI in the following week. Okun further admitted to Kominsky that without the loan, he would face lawsuits and liability. Kominsky approached Rodriguez, as requested by Okun, and relayed the facts as they had been set forth to him by Okun.

166.    Rodriguez responded by approving a $7 million loan to Okun personally (the "$7 million Lulling Payment Loan") within a few hours. Rodriguez extracted terms very favorable to Cordell on this loan, namely $1 million dollars in fees, an 18% annual interest rate, a third mortgage on the Hibiscus Home (which had been purchased with QI Exchange Funds misappropriated from AEC), and a pledge of collateral from Okun's Salina Mall which had been

58

THIRD AMENDED COMPLAINT
Case No. 09-cv-2079-JW

1  purchased, in part, with approximately $3 million of QI Exchange Funds misappropriated from

2  IXG and REES). Cordell closed the loan in two days.

3        167.    From the proceeds of the $7 million Lulling Payment Loan, Cordell immediately

4  transferred $6.7 million to Okun's personal account on April 20, 2007. Depositing the funds in

5  Okun's personal account would conceal the source of the funds, or their use for lulling

6  payments. Cordell was well aware that the monies were being used to perpetuate Okun's Ponzi

7  scheme. The closing statement for the $7 million Lulling Loan specifically states that

8  $6,777,248.81 of loan proceeds will be wired directly to Okun's personal account. That same

9  day the funds were transferred to the account of The 1031 Tax Group.

10       168.    Despite notice that Okun was wrongfully appropriating Exchange Funds, Cordell

11 assisted Okun and the Okun Entities by loaning millions of dollars to enable him to continue this

12 misconduct through lulling payments. Cordell benefitted significantly from the participation in

13 the scheme, as it generated substantial fees for Cordell, increased Cordell's loan portfolio to the

14 point where the Cordell Loans constituted a substantial portion of Cordell's entire loan portfolio,

15 and provided Cordell with liens on many properties owned by Okun or Okun Entities. Contrary

16 to usual lending practices, Cordell conducted little due diligence on the value of the properties.

17 Cordell was aware that there was another revenue stream from which Okun could repay them –

18 misappropriated QI Exchange Funds.

19                              **XVI.**

20               **ALLEGATIONS AGAINST KUTAK ROCK**

21       169.    In January 2005, Joseph O. Kavan and Kutak Rock (collectively, "Kutak") began

22 providing extensive legal representation to Okun, IPofA, and other Okun entities. In fact, Kutak,

23 became the **"regular outside counsel"** to Okun and his entities throughout most of the 2-year

24 term of Okun's fraud. Kutak billed over **$1 million** in fees in 2005 and 2006 for work

25 performed for Okun and the Okun entities. Work performed by Kutak encompassed **all matters**

26 relevant to this litigation and required thousands of hours of Kavan's time as a lawyer while

27 working at Kutak. In 2005, Kavan billed **over 1,600 hours** working on Okun-related matters.

28

170.    Kutak understood Okun's IPofA to be in the business of acquiring real property and then selling partial interests in the real estate (commonly referred to as "Tenant-In-Common (TIC)" transactions) to buyers seeking to purchase real estate to complete 1031 Exchanges. Kutak's representation included involvement in IPofA's sales on TIC interests. Kutak "represented the company to make sure all the documents were in order and the sale was a legal sale." Kutak understood that IPofA was owned and controlled by Okun.

171.    In August 2005, Kutak became aware "that [Okun] was going to be acquiring a Qualified Intermediary." Okun disclosed to Kutak that Stephen Burr of F&L had brought him the opportunity to purchase a QI, Atlantic Exchange Company.  Kutak understood that:

> "Qualified Intermediaries hold the cash for people who have sold a piece of property and plan to defer the gain under the tax laws. So there's a lot of people who the Qualified Intermediary would be holding money for."

Kutak also understood that Atlantic Exchange Company was Okun's target QI, and that it held substantial sums in Exchange Funds on deposit.

172.    In August 2005, Okun engaged Kutak to perform legal work regarding the financing of Okun's purchase of Atlantic Exchange Company, including review of the Acquisition Loan of $4 million from Boulder Capital.

173.    Kutak represented Atlantic Exchange Company, LLC ("AEC") in the August 25, 2005 acquisition of Atlantic Exchange Company from Patrick Dowdall ("Dowdall") and William Hazel ("Hazel") for $4,250,000.  Kavan reviewed and revised the August 15, 2005 Letter of Intent to acquire Atlantic Exchange Company prepared by Stephen Burr ("Burr") of F&L.  On August 18, 2005, Kavan received a copy of a draft of the Asset and Purchase Agreement, as Burr considered Kavan to be **"Ed's regular outside counsel"** who should receive and review the transaction documents evidencing the acquisition of Atlantic Exchange Company by AEC.

174.    Kutak reviewed the AEC Acquisition Loan which revealed, on its face, that it was a usurious two-week loan from Boulder Capital to Okun at a cost of $400,000 in interest-- equivalent to an annual interest rate of 211%.  Therefore, by August of 2005 Kutak knew that

60

Okun was buying Atlantic Exchange Company, which was itself a trustee holding Exchanger Funds, and that Okun required an unconscionable and usurious loan from Boulder Capital in order to complete the purchase. The only reasonable inference to be drawn by Kutak was that Okun intended to repay the $4 million loan from Boulder Capital with looted Exchange Funds, once he acquired the QI. This is exactly what occurred.

175.    Consistent with Okun's readily apparent scheme, at the "end of August/September 2005," Kutak was informed that "Okun was considering using AEC client funds as a loan." Kutak was "asked [by Okun] to draft some loan documents from AEC to Investment Property of America," and to Okun, himself. Although Kutak had "concerns regarding the appropriateness of these loans," it agreed to act as counsel for IPofA and Okun (the borrowers) in documenting the loans.

176.    Kavan's job assignments for AEC included reviewing the standard form Exchange Agreement utilized by Atlantic Exchange Company with its 1031 Exchange clients to determine if, after the acquisition, AEC could transfer Exchange Funds deposited into escrow accounts established at First Republic Bank by Atlantic Exchange Company to a new bank account in the name of AEC at Bank of America controlled only by Okun and Coleman. Kavan testified as to these facts regarding this legal job assignment in his deposition testimony in the bankruptcy proceeding.

177.    In addition to Steve Burr of F&L, Kutak also represented AEC in the acquisition of the assets of Atlantic Exchange Company for $4,250,000 from Dowdall and Hazel whereby AEC (Kutak's client now controlled by Okun) would assume all of the existing obligations of Atlantic Exchange Company as set out in the standard form Exchange Agreements reviewed by Kavan which included the obligations to have: (i) deposited the Exchange Funds in an escrow account at, mainly, First Republic Bank; and (ii) used the Exchange Funds on deposit in the escrow accounts **solely** to effectuate each client's 1031 Exchange. As noted in ¶1.3 of each standard Exchange Agreement reviewed by Kavan:

7316.001
THIRD AMENDED COMPLAINT
Case No. 09-cv-2079-JW

"Exchange Funds shall at no time be considered part of the intermediary's general assets nor subject to claims by the intermediary's creditors."

178.     Exchange Funds could not be transferred out of the "escrow accounts" at First Republic without breaching each existing client's Exchange Agreement.  More fundamentally, Exchange Funds deposited in escrow accounts could not be loaned by AEC to Okun during the pendency of the 1031 Exchange because the assets were not the QIs to loan.  Included in ¶ 6.7 of each Exchange Agreement was an anti-assignment and anti-delegation clause precluding the transfer of control over the Exchange Funds to Okun or anyone else, without each Exchanger's consent.

179.     Kavan understood the basic concept that escrowed Exchange Funds had to stay in escrow and could not be loaned to the escrow officer or an affiliate of the escrow officer during the pendency of the 1031 Exchange, as in his deposition testimony in the Bankruptcy Proceedings.

180.     Notwithstanding Kavan's admitted knowledge of the objectively observable facts (he read the form Exchange Agreement) and the law (escrow agents cannot transfer money out of escrow accounts in breach of escrow instructions), Kavan advised Okun that AEC could transfer Exchange Funds deposited in escrow accounts at First Republic Bank under the control of Atlantic Exchange Company to an AEC account at Bank of America under the exclusive control of Okun and Coleman without each existing Exchanger's written consent.  This advice was either negligent or intentionally wrong and it caused Okun to transfer the Exchange Funds in breach of each existing Exchange Agreement which allowed Okun to then loot the Exchange Funds out of the commingled Bank of America account in illegal transfers made to or on behalf of himself as shown on the following page:

7316.001                          THIRD AMENDED COMPLAINT
                                    Case No. 09-cv-2079-JW

| | Date | Amount of Wire | Destination of Funds 1 | Destination of funds 2 | Use of Funds |
|---|---|---|---|---|---|
| 1 | 8/30/2005 | $2,000,000 | Parkway Industrial – Union Federal Bank #59-018520-9 | $2,000,000 Ed Okun personal checking account – Union Federal Bank #58-089607-2 | Acquisition of 394 S. Hibiscus Dr., Miami (Okun's personal residence) |
| 2 | 9/1/2005 | $4,100,000 | Ed Okun -- Union Federal Bank #58-089607-2 | 1. $4,832,655.72 to Stewart Title 2. $100,000 to Stephen Burr | 1. Acquisition of 394 S. Hibiscus Dr., Miami (Okun's personal residence) 2. Pay Stephen Burr $100,000 as broker fee *(continued next page)* |
| 3 | 9/7/2005 | $4,400,000 | Boulder Capital – Cambridge Trust Co. | | Repay loan to buy Atlantic Exchange Company |
| 4 | 9/7/2005 | $18,369,000 | Boulder Capital – Cambridge Trust Co. | | Repay loans related to Columbus Works |
| | TOTAL: | $28,869,000 | | | |

181.    Kutak understood that Okun, as the owner and fiduciary controlling AEC, intended to borrow AEC Exchange Funds to acquire real property in the name of IPofA-owned entities (in turn owned and controlled by Okun), and also to acquire residential property for Okun, himself.  Kutak knew that QI Exchangers at AEC would not be informed that their funds had been borrowed by Okun and IPofA.  Kutak further knew that a "loan" requires notice and consent by the lender.  "Borrowing" money from a "lender" without the "lenders" knowledge is not "borrowing", but constitutes theft, and Kutak understood this elementary legal principal.  Kutak further understood that "[b]y definition" IPofA and AEC were affiliated companies "because they had the same owner," and its transactional lawyers admitted that "loans between affiliates" cause them "a great deal of concern."  Before documenting these illegal "loans," Kutak advised Okun and Coleman that they "need[ed] to treat these funds in somewhat the same manner as an escrow agent and be cognizant of the fact that these funds are the property of the parties for which [AEC] is holding these funds."  In response to Kutak's concerns, Okun explained that his motives were innocent. AEC's Exchange Agreements prohibited AEC from lending Exchange Funds, and AEC Exchangers never would have consented to Okun's use of their Exchange Funds to buy real estate in his and his companies' names, yet Okun nevertheless convinced Kutak to assist him because investing Exchange Funds in his real estate deals would

7316.001

THIRD AMENDED COMPLAINT
Case No. 09-cv-2079-JW

1    benefit the Exchangers by garnering greater returns on their deposited funds.

2        182.    Compounding Kavan's first error in advice or intentional tort, Kavan then

3    prepared three (3) Loan Agreements, whereby between **$31,100,000 and $33,100,000** in

4    Exchange Funds would be loaned by AEC to Okun and his entities without any Exchanger's

5    knowledge or consent.  In August and September of 2005, Kutak drafted 3 Promissory Notes

6    and 3 Mortgage and Security Agreements (for $4.1 million, $27 million and $2 million) to

7    document loans made by Okun acting as owner and principal of AEC, to Okun (for himself) and

8    to other Okun-owned and controlled entities.  Exchange Funds belonging to AEC Exchangers

9    were transferred out-of-trust to Okun and his companies without the knowledge or consent of

10   the beneficial owners of these Exchange Funds, in willful breach of the terms of the AEC

11   Exchange Agreements. Two of the Loan Documents are fraudulent on their face.  The first Loan

12   Agreement prepared by Kavan and transmitted to Okun and Chris Hoctor ("Hoctor") at 1:00

13   a.m. on August 30, 2005 documented a $27 million loan between the following parties:

14        **This Loan Agreement** (this "Loan Agreement") is dated as of the 30th
         day of August, 2005 and is by and between **Columbus Works Virginia**
15        **Trust,** a Virginia irrevocable trust created pursuant to an Irrevocable
         Trust Agreement dated March 14, 2005 as amended July 7, 2005 (the
16        "Borrower"), **LK Holdings, LLC,** a Virginia limited liability company,
         as Trustee ("Trustee") and **Atlantic Exchange Company, LLC,** a
17        Delaware limited liability company (the "Lender").

18        183.    Hoctor refused to sign the $27 million Loan Agreement as Attorney-in-Fact for

19   **LK Holdings, LLC,** the alleged Trustee of Columbus Works Virginia Trust (the borrower).  At

20   7:46 a.m. on August 30, 2005, Hoctor emailed Kavan the citations to three cases [*Cahaly v.*

21   *Benistar, Grand Pacific v. Braver* and *Kaarola v. Birkhead*] and then faxed the actual written

22   opinions to Kavan an hour later.

23        184.    *Cahaly v. Benistar Prop.Exch. Trust Co.,* 16 Mass. L. Rep. 220 (Mass. Super. Ct.

24   2003) supports the **indisputable legal propositions** that (i) Exchange Funds can be converted,

25   (ii) 1031 QIs are fiduciaries, and (iii) third persons who knowingly participate with the owners

26   of the QI in the conversion of Exchange Funds on deposit at the QI will be held liable as aiders

27   and abettors of the tort of conversion. The other cases cited by Hoctor impose liability on

28   attorneys who convert funds held in escrow or attorney trust accounts.  A trustee or escrow

64

1  agent may not borrow funds deposited into an escrow account or trust account.  See *Cahaly v.*
2  *Benistar Prop. Exch. Trust Co.*, 16 Mass. L. Rep. 220 (Mass. Super. Ct.2003) *remanded,* 18
3  Mass. L. Rep. 375 (Mass. Super. Ct. 2004), *aff'd,* 68 Mass. App.Ct. 668 (Mass. App.Ct. 2007),
4  *aff'd,* 451 Mass. 343 (Mass.2008)).

5       185.    Undeterred by Hoctor's refusal to sign on behalf of the borrower (and after
6  reading the *Cahaly* case and standard form Exchange Agreement), Kavan then drafted a new
7  $25 million Loan Agreement to document the AEC loan of Exchange Funds between the
8  following parties:

9        **This Loan Agreement** (this "Loan Agreement") is dated as of the
10       30th day of August, 2005 and is by and between **Columbus Works**
         **Virginia Trust**, a Virginia irrevocable trust created pursuant to an
11       Irrevocable Trust Agreement dated March 14, 2005 as amended July
         7, 2005 (the "Borrower"), **Columbus Works Trustee, LLC**, a
12       Delaware limited liability company, as Trustee ("Trustee") and
         **Atlantic Exchange Company, LLC**, a Delaware limited liability
13       company (the "Lender").

14       186.    Instead of Hoctor's signing as Trustee on behalf of **LK Holdings, LLC** (of an
15  alleged irrevocable trust established March 13, 2005) for the borrower, Kavan included Burr of
16  F&L as the Attorney-in-Fact for **Columbus Works Trustee, LLC** on behalf of the borrower
17  acting as the Trustee of this alleged irrevocable trust established March 14, 2005.

18       187.    Cognizant of *de facto* civil liability for aiding and abetting as set out in *Cahaly*,
19  Kavan was able, in his mind, to avoid Kutak's risk in drafting the new $25 million Loan
20  Document by making it clear to Coleman and Okun that Kavan was now (for this transaction
21  only) representing only the borrower, Columbus Works, and not the lender, AEC.  Kavan stated
22  in his email to Coleman and Okun at 5:15 p.m. on August 30, 2005  that:

23       (i)  Kutak represents the borrower, Columbus Works Trust;

24       (ii)  Kutak does not represent the lender, AEC;

25       (iii)  There must be an adversarial relationship between the borrower
         and the lender;

26

27       (iv)  AEC must rely on legal counsel to opine that AEC can loan
         Exchange Funds to Okun; and

28

<center>65</center>

---

(v) F&L's Boston office (Burr's office) represents the lender and has expressed the opinion that, pursuant to Massachusetts law, AEC **can** loan Exchange Funds on deposit in escrow accounts to Okun without informing the Exchangers.

188.    Kavan's view of the world of conflicts of interest as set out in his August 30, 2005 email is consistent with his testimony at Okun's criminal trial and at his 2004 Examination by the Trustee of AEC.

189.    From the perspective of a charge of aiding and abetting, there is no legal distinction in the knowing representation of the person who receives stolen property (the borrower) and the knowing representation of the person who stole the property (the lender). This is especially true when the lender (AEC) and the borrower (i.e., Columbus Works Virginia Trust) are both controlled by the same person – Okun.

190.    From a malpractice point of view, Kavan could not establish an effective adversarial relationship between the lender and the borrower when Burr of F&L is counsel to the lender (AEC), but at the same time Burr is the Attorney-in-Fact for the Trustee of the Trust (the borrower), Columbus Works Virginia Trust.  If Kutak only represented the borrower (the trust), then Burr was Kutak's client as the legal representative of the LLC acting as Trustee while Burr was also acting in an adversarial capacity as counsel to the lender, AEC.

191.    The other illegal loans drafted by Kavan included the $2,000,000 loan from AEC to Parkway Virginia Trust, which went through two iterations trying to find a trustee complicit or foolish enough to sign as the borrower and the $4.1 million loan from AEC which went directly to Okun to buy Okun's house in Miami.

192.    Kavan's motive in drafting the three illegal Loan Agreements documenting Okun's embezzlement of Exchange Funds **was purely financial**.  As set out in his August 30, 2005, 10:15 p.m. email to Coleman, Okun owed $215,208 in fees which were over sixty days past due and Kutak's Billing Committee was putting pressure on Kavan to get the outstanding invoice paid.  Kavan knew that he had to assist Okun in his efforts to access cash from Exchange Funds or suffer the consequences of not getting paid for work already performed.

193.    Kutak was informed by Okun that: the $27 million loan directed by Okun as

66

1  owner and fiduciary controlling AEC, to Okun as owner and principal of another Okun entity,

2  was "to buy out one of Okun's partners"; that the $2 million loan directed by Okun as owner

3  and fiduciary controlling AEC, to an Okun entity was to be used to "complete the acquisition of

4  property or for business purposes of Parkway Virginia properties"; and that the $4.1 million

5  loan from Okun as owner and fiduciary controlling AEC, to Okun personally, "was to facilitate

6  the purchase of his home in Miami, Florida," known as the "Hibiscus House."

7      194.    Kutak believed that it could assist Okun in documenting these illegal loans as

8  counsel only for the borrower, and not for the lender, even though Kutak fully understood that

9  Okun, himself, owned and controlled all involved entities, and was directing both sides of the

10  loan transactions.   The fictitious legal distinction did not linger in Kutak's perception.  By

11  February 26, 2006, Kavan had dropped  the requirement of any illusory adversarial relationship

12  between the borrower and the lender, acknowledging to Coleman that from:

13      ". . . a practical perspective, it really does not matter what the rates
        and terms are between AEC and the LLC so long as the one loan
14      between the LLC and the LP is shorter and at a higher interest rate,
        both directed at protecting the LLC (borrower) from exposure."
15

16      195.    Kavan was also advising Okun about the structure of borrowing Exchange Funds

17  in the future from SOS and The 1031 Tax Group where he states:

18      "One final matter, since AEC will very soon no longer be a legal
        entity, should we make these loans from The 1031 Tax Group, LLC
19      or perhaps SOS?"

20      196.    Kutak's representation of AEC expanded from simply documenting illegal loans

21  to:

22      i)   counseling Okun on communications with the bank
           regarding the transfers of Exchange Funds;
23

24      ii)  revising operative Exchange Agreements going forward at
           AEC to eliminate the troublesome escrow language; and
25

26      iii) as discussed below, terminating Dowdall (and Hazel) as
           executives of AEC after Dowdall expressed concern to Okun
27         over the safety of the Exchange Funds now supposedly on
           deposit at Bank of America.
28

<center>67</center>

197.    In September 2005 (while the $33.1 million in loans from Exchange Funds were being documented and remained outstanding), Kutak was retained as counsel for AEC (the "lending" entity) in employment matters.    Specifically, Kutak was retained by AEC, the corporate defalcating Trustee, to document the termination of Dowdall, the former owner of AEC.

198.    Dowdall was hired to be President of AEC after Okun's acquisition.  Dowdall was also President of the Federation of Exchange Accommodators ("FEA"), and considered by Okun to require compliance with the FEA's Code of Ethics.  Dowdall, as the acting President of AEC, had been demanding access to information on AEC Exchange Funds on deposit at Bank of America, but Okun and Coleman were the only authorized signators.  Okun knew that granting Dowdall access to bank records would reveal his prior loans, documented by Kutak. Okun therefore engaged Kutak to terminate Dowdall as the President of AEC.

199.    Kutak, as counsel for AEC, despite its acknowledged concerns as to the propriety of Okun's borrowing from AEC Exchange Funds, assisted Okun in concealing the loans by carrying out the Okun-directed termination of Dowdall.  Kutak, as counsel for AEC, became fiduciary to the AEC Exchangers, as beneficiaries of the trust.  Thus, Kutak owed fiduciary duties directly to the Exchangers.  Kutak breached its fiduciary duties, which included the duties of full disclosure, loyalty, and fair dealing.  Instead, Kutak actively concealed the prior $33.1 million in loans from Dowdall and from the Exchangers to its own financial gain.

200.    In November of 2005 Coleman telephoned Kavan of Kutak Rock and informed him that Okun wanted to acquire another Qualified Intermediary, and she requested that Kutak prepare and negotiate the documents for the acquisition. Kutak agreed to do so, and provided further assistance to the known defalcating fiduciaries.

201.    Specifically, Kutak negotiated and prepared the documentation for Okun's purchase of SOS from Pajonas in November 2005 for $3 million, thereby enabling Okun to gain access to approximately $40 million in Exchange Funds.  Kutak knew that the acquisition of SOS for $3 million made no financial business sense to Okun, except to give Okun ready access to SOS trust funds to loot.

68

202.    SOS was incorporated by Pajonas in Connecticut one year earlier – "the company was only a year old." SOS, as an entity, earned little net income but held $40 million in Exchange Funds which Pajonas told Okun was "client money" and "belonged to the client." Exchange Funds for each Exchanger were maintained in "separate, segregated escrow account[s]." SOS owned no trade secrets, copyrights, trademarks, income stream, accounts receivable, equipment or other assets worth anything near $3 million. Okun nevertheless insisted on acquiring SOS, and Kutak assisted Okun in the transaction. The funds to purchase SOS came directly from Exchange Funds looted from AEC.

203.    As previously alleged, immediately after Okun's acquisition of SOS, he transferred SOS Exchange Funds to AEC to close pending QI escrows for awaiting AEC clients. Kutak had assisted Okun in looting over $33 million of AEC Exchange Funds by documenting Okun-directed loans from AEC to Okun and his companies. Ultimately, Okun looted a minimum of $27.7 million of SOS Exchange Funds, causing losses to 52 Exchangers doing business with SOS.

204.    The 1031 Tax Group was formed in December 2005 to act as the holding company for the multiple QIs acquired by Okun. Kutak represented The 1031 Tax Group in corporate matters attempting to integrate the newly acquired QIs into The 1031 Tax Group umbrella.

205.    In December of 2005, then outside counsel for IPofA (Chris Hoctor and Robert Kaplan) contacted Kutak to opine that the loans documented by Kutak from AEC to Okun's entities constituted an illegal use of Exchange Funds on deposit at AEC. Kutak contacted Coleman and Okun about these accusations of impropriety. Okun insisted that these lawyers were "wrong," that his actions regarding AEC Exchange Funds were not their concern, and that they should not have contacted Kutak (now counsel to AEC, the "lender") about the issue. Kutak did not disclose the illegality of these loans to Pajonas, who was at this time President of both SOS and AEC.

206.    In September of 2006, Kutak was retained by The 1031 Tax Group to research the propriety of the "borrowing" of Exchange Funds by the owner of a QI to invest in real

69

estate. Okun requested that Kutak locate a state in the United States which would allow such borrowing. In response, Kutak prepared a series of legal memos dated October 9, 2006, October 23, 2006, and November 14, 2006 (the "Kutak Memos"). All of the Kutak Memos described the controlling law in existence at the time Kutak had documented the Okun-directed loans to Okun and his companies in September 2005. In substance, as confirmed by the Kutak Memos, the law is unequivocal:

> (i)    QIs are fiduciaries holding Exchange funds in trust;

> (ii)    as fiduciaries, QIs must comply fully with the terms of the Exchange Agreements;

> (iii)    as fiduciaries, QIs are bound by the Prudent Investor Rule and any applicable statutes;

> (iv)    the Prudent Investor Rule requires that Exchange Funds be deposited in safe, secure and liquid investments;

> (v)    the Exchange Agreements and the Prudent Investor Rule prohibit lending Exchange Funds to the owner of the QI to invest in real estate for his own account; and

> (vi)    such acts of "borrowing" or "investing" by Okun constituted clear breaches of fiduciary duties.

227.    Kutak had, through its own research, established that Okun and the entities he owned and controlled had breached their fiduciary duties by appropriating Exchange Funds to themselves. Kutak assisted Okun in breaching his fiduciary duties, and Kutak breached its own identical duties, by documenting and then concealing the loans. Kutak also breached its own duty owed to the Exchangers, as beneficiaries of the Trust, by silently allowing Okun to borrow. Kutak was motivated by pecuniary gain and collected over $1,000,000 in fees in 2005 and 2006 from Okun and the entities he owned and controlled. The bulk of payments for these services can be traced back to stolen Exchange Funds. Kutak knew that Okun's cash came from usurious loans or from Exchange Funds. There was no other known source of cash for Okun.

228.    What is more telling than the late 2006 legal memos prepared by Kutak, stating the obvious, is an October 30, 2006 "Private and confidential – attorney/client privilege" email

7316.001

THIRD AMENDED COMPLAINT
Case No. 09-cv-2079-JW

drafted by Kavan to Okun in which Kavan summarized the legal advice Kavan claimed to have

given Okun and Coleman at the time AEC acquired Atlantic Exchange Company in August of

2005. In the email to Okun, **Kavan implicates himself** as follows:

> As I have said to you and Lara since the time you purchased your first accommodator [Atlantic Exchange Company] . . . although activities [borrowing] with respect to these [Exchange] funds is not proscribed by any statute, they are not specifically allowed by any statute. I also advised you at that same time [when acquiring Atlantic Exchange Company] that at a minimum, you would be held to a Prudent Investor Standard . . which would suggest that any funds invested would have to be invested in liquid short-term investment grade investments . . .[A]s I advised you at the time [of the acquisition], you need to treat these funds in somewhat the same manner as an escrow agent . . you are very much at risk in using any of these funds in any manner . . . I would caution you now as we did a year ago . . . and we certainly cannot give anyone any level of comfort that this activity [borrowing Exchange Funds] is the type that does not violate any statutes or regulations.

229. The Hunter Plaintiffs have standing to assert tort claims on behalf of themselves

directly against Kutak because the fiduciary duties Kutak owed to the QIs, as trustees of the

Exchange Funds, ran directly to the Plaintiffs as beneficiaries.

230. <u>Restatement (Third) Law Governing Lawyers § 96 (2000)</u> ("Restatement") states

that a law firm retained by an organization such as AEC, SOS, or The 1031 Tax Group must

represent the interests of the constituent organizations as against its owners' interests.

Therefore, Kutak owed duties of competence, loyalty, fair dealing, and full disclosure to the

QIs and to the Exchangers, not to Okun. In fact, Kutak's duties to Exchangers and to the QIs

created an irreconcilable conflict of interest in the firm's representation of Okun.

231. In application, Section 51, subsection (4) of the <u>Restatement</u> requires that when

Kutak's QI clients act as trustees or as fiduciaries, Kutak owes a duty of care to the QI

Exchangers when:

> (i) Kutak knows that appropriate action is necessary to prevent or rectify the breach of fiduciary duty owed by the QIs to their customers;
>
> (ii) the QI's breach of fiduciary duty amounts to crime and fraud, and/or Kutak has assisted the QI's breach;

<div align="center">71</div>

<div align="center">THIRD AMENDED COMPLAINT

Case No. 09-cv-2079-JW</div>

        (iii)   the QI customers are not reasonably able to protect their interested rights; and

        (iv)   such a duty imposed on Kutak would not significantly impair its obligations owed to the QIs.

Each of these elements are satisfied in the case at bar against Kutak and against all other lawyer Defendants in this action.

    232.    Plaintiffs allege that Kutak and Kavan are liable for the class members' damages because, among other things, they knowingly aided and abetted Okun's intentional breaches of fiduciary duties.   However, Plaintiffs anticipate that the defendants will assert at trial or afterward that they did not do so, and that if they did anything wrong, it was all just a mistake. Therefore, pursuant to Fed. R. Civ. P. 8(d), Plaintiffs have included alternative allegations based upon negligence.  As an additional alternative allegation, Plaintiffs contend that Kavan is liable for aiding and abetting and Kutak is vicariously liable for Kavan's actions performed in the course and scope of his duties at Kutak.

## VIII.

## ALLEGATIONS AGAINST FOLEY & LARDNER

    233.    In May 1999, Okun retained Stephen I. Burr, Esq. ("Burr"), an attorney in the Boston office of Eckert Seamans Cherin & Mellot, LLC ("Eckert Seamans"), to assist two other Okun-owned and controlled entities, Nuko Enterprise, Inc. and Nuko Holdings I, LLC (collectively, "Nuko"), in acquiring the assets of another company, A-1 Trailer Rental ("A-1"). When Okun did not pay his Eckert Seamans legal bills, this receivable was assigned to Burr for collection, on his own account.  Burr's efforts to collect the bill were, at first, unsuccessful.

    234.    Specifically, on March 11, 2004, Burr represented the buyer, 9595 Mansfield Road LLC, in connection with its execution of a Purchase and Sale Agreement with Okun. That same day, Okun and Burr also executed a separate document entitled "Settlement Agreement."

    235.    The Settlement Agreement provided:

        "Burr has asserted certain claims against Okun for attorney fees relating to the Nuko Holding - A-1 failed transaction . . .

72

(the 'Burr Claims')," and indicated that "Okun and Burr wish to resolve the Burr Claims."

However, this Settlement Agreement was contingent upon "the closing (the 'Related Closing') occurring under that certain Purchase and Sale Agreement, dated as of March ___, 2004, between Okun and 9595 Mansfield Road Retail LLC (the 'Related Agreement'). If the Related Closing does not occur, this [Settlement] Agreement will terminate with neither party having waived any rights."

236.    The Settlement Agreement further provided:

> "In full settlement of the Burr Claims, Okun will pay Burr $500,000 in two installments, the first, in the amount of $200,000 . . . will be paid at the time Okun receives the initial, $400,000 payment under the Related Agreement... The second, in the amount of $300,000 will be paid at the time Okun receives the second, $550,000 payment under the Related Agreement . . ."

237.    On June 22, 2004, Burr wrote to Okun's counsel, Barbara Wolenty, Esq. (of Robinson Wolenty & Young LLP), as follows:

> "The purpose of this letter is to confirm that as the Related Closing (as defined in the Settlement Agreement) will not occur, the Settlement Agreement has terminated "with neither party having waived any rights." As we have discussed, both in an effort to resolve the Burr Claims (as defined in the Settlement Agreements) and to separate those claims from the resolution of the Shreveport matter, *I am open to discussing moving my recovery to some alternative transaction.* If that is not possible, obviously I will take whatever action is necessary to protect my interests."

238.    In November 2004, Burr, in his personal capacity, brought suit against Nuko and Okun in the United States District Court for the Southern District of Indiana, seeking recovery of unpaid attorney fees and costs owed by Okun to Eckert Seamans in the A-1 engagement. Burr sued Okun, alleging in public filings that Okun's business conduct was "unconscionable" and "contrary to the fundamental principles of justice and equity". In correspondence dated June 22, 2004, Burr wrote that Okun was guilty of "fraudulent inducement" involving Burr's clients' contract to purchase real property from Okun. According to Burr's own statements, he well knew that Okun lacked financial resources, and was not ethically capable of serving as a

73

1   trustee of a trust. Burr knew that if Okun had free access, as Trustee, to other peoples' money in

2   an unsupervised and unregulated business environment, it was more than predictable that Okun

3   would cause financial harm to the beneficiaries of such a trust.

4       239.    In July 2005 Burr joined the Boston office of Foley & Lardner LLP in an "of

5   counsel" capacity. Unfortunately, F&L hired Burr without an adequate background check. This

6   timeframe corresponded with the expansion of Burr's role as Okun's witness, legal adversary,

7   creditor and business broker to include serving as counsel for Okun (again), this time while

8   Okun was a trustee.

9       240.    At that time, Burr became aware that Okun was in need of financing for certain

10  commercial transactions that he was pursuing. Atlantic Exchange Company became the focus

11  of Okun's attention when Burr suggested Okun could acquire it, and utilize its funds, *inter alia*,

12  to pay legal fees from Eckert Seamans which Burr was attempting to collect for his own

13  account.

14      241.    More specifically, on or about July 22, 2005, Burr approached Okun and stated

15  that he had a financing opportunity for Okun, but that he would not share it unless Okun agreed

16  to settle Burr's lawsuit seeking recovery for the Eckert Seamans legal fees. At this juncture,

17  Burr assured Okun that his own research indicated that borrowing from a QI was permitted and

18  lawful, despite the fact that no such borrowing is legally authorized under any circumstances.

19  Burr promised to deliver a written opinion of counsel, documenting this advice, following the

20  close of the Atlantic Exchange Company purchase. Burr claimed that the time required to

21  prepare closing documents and securities instruments for Okun's purchase of Atlantic

22  Exchange Company took priority, and in more than one conversation, Burr reassured Okun of

23  the propriety of his plan to borrow cash from the QI. No such opinion letter was drafted or

24  produced to Okun. However, the launch of Okun's Ponzi scheme, with its momentous eventual

25  damages to QI Exchangers, was precipitated by this oral advice and assurance from Burr to

26  Okun.

27      242.    On that same day, July 22, 2005, Okun informed his defense counsel in the Burr

28  lawsuit that he was "settling with Burr for [$]200,000. $100,000 payable on Sept. 1, 2005 and

74

the other $100,000 by Dec 31, 2005." Immediately thereafter Burr introduced Okun to Atlantic Exchange Company, a Boston, Massachusetts based QI. Burr explained to Okun that QIs were completely unregulated and that Okun could make use of the Exchange Funds the QI held as a source of "mezzanine financing" for Okun's real estate deals. A week later, on July 29, 2005, Burr, Nuko, and Okun executed a Settlement Agreement and Release and on August 1, 2005 a Stipulation of Dismissal was filed in the lawsuit. Three days later, on August 4, 2005, F&L prepared a letter of intent "confirm[ing] the material terms and conditions pursuant to which an Okun Entity would acquire all of the assets of Atlantic Exchange Company".

243. F&L was formally retained on August 19, 2005 by Okun's Investment Properties of America ("IPofA"). The Retention Agreement described the scope of legal services as the formation of Atlantic Exchange Company, LLC (a Delaware LLC and hereinafter referred to as "AEC"). The Retention Agreement included a Massachusetts choice of law provision. AEC was to be formed by F&L to acquire Atlantic Exchange Company (a Massachusetts LLC and Qualified Intermediary) from Patrick Dowdall ("Dowdall") and William Hazel ("Hazel"). Pursuant to the Retention Agreement, F&L's clients included "affiliates that we [F&L] established in connection with the transaction", which included AEC. Therefore, AEC was a client of F&L.

244. On August 25, 2005, an Asset and Membership Purchase Agreement was executed, whereby AEC acquired the assets of Atlantic Exchange Company. F&L represented the new AEC, billing $76,419.12 for legal services rendered in the acquisition of assets of the old AEC. In addition to that fee, one week after the AEC asset acquisition was completed, on September 2, 2005, a check for $100,000 was issued from IPofA's operating account, payable to Burr, personally, and sent to his residential address, representing the first installment of the settlement that Burr had leveraged from Okun in exchange for Burr's QI financing plan.

245. F&L represented AEC in the acquisition of the assets of Atlantic Exchange Company for $4,250,000 from Dowdall and Hazel. Pursuant to the Memorandum of Understanding, AEC (F&L's client now controlled by Okun) was to assume all of the existing obligations of Atlantic Exchange Company, as set out in standard form Exchange Agreements

with its existing clients. These Exchange Agreements expressly included the duties to: (i) deposit the Exchange Funds in an escrow account, primarily at First Republic Bank; and (ii) use the Exchange Funds **solely** to effectuate the 1031 Exchanges. Paragraph 1.3 of the standard Exchange Agreement read, in pertinent part, as follows:

> 1.3 <u>Escrow Account</u>. The Exchange Funds shall be deposited in an escrow account (the "Escrow Account") established by the Intermediary at a financial institution (the "Escrowee"), as designated in Exhibit B attached hereto...... The parties hereto acknowledge and agree that the Exchange Funds shall be used solely in accordance with the provisions of Article 3 to enable the Intermediary to perform its obligations as set forth hereunder and to effectuate the exchange. The Exchange Funds shall at no time be considered part of the intermediary's general assets nor subject to claims by the intermediary's creditors."

246.    Clearly and unequivocally, Exchange Funds could not be transferred out of the "escrow account" for purposes of loans by the QI to Okun during the pendency of the 1031 Exchange, because the assets were not assets of the QI to loan. Included in paragraph 6.7 of each Exchange Agreement was an anti-assignment and anti-delegation clause prohibiting the transfer of control over Exchange Funds to Okun, or anyone, without each Exchanger's consent.

247.    The acquisition of Atlantic Exchange Company closed on August 25, 2005 pursuant to the terms of an Asset and Membership Interest Purchase Agreement. Burr (personally) was paid $100,000 on September 2, 2005 and another $100,000 on December 23, 2005 as the business broker who brought the deal to Okun and to settle the lawsuit between Okun and Burr. F&L was paid a $50,000 fee for acting as AEC's lawyers in the transaction. The sum of $200,000 held in trust at F&L as a holdback on the purchase price paid by Okun was physically disbursed by F&L on behalf of AEC to Dowdall and Hazel on October 25, 2005.

248.    As part of Okun's acquisition, F&L negotiated and then drafted Consulting Agreements with Dowdall and Hazel, the prior owners of Atlantic Exchange Company. Thus, as of August 25, 2005, Dowdall and Hazel became "managing directors" of AEC, serving in executive capacities subject to the control of the chief executive officer of AEC, which would be

Okun as its sole managing member. Burr understood that these two individuals would "continue to run the business" after the acquisition, and has twice testified under oath to that fact.

249.    Based on Burr's oral representation that Okun was permitted to borrow Exchange Funds, immediately following Okun's assumption of control over the Exchange Funds on deposit at AEC, on September 1, 2005, Okun transferred $4.1 million out of the AEC account at BofA. Over the next week he improperly transferred a total of at least $28,869,000 in Exchange Funds as previously alleged in the discussion addressing Kutak, above.

250.    Following Burr's receipt of his $100,000 check on September 2, 2005, and despite the fact that he had:

> (i)    initially proposed the plan of buying AEC for the purpose of borrowing from its Exchange Funds;
>
> (ii)    assisted Okun in completing that purchase; and
>
> (iii)    reaped financial benefit for himself and for F&L.

Burr nonetheless informed Okun on September 7, 2005 that neither he nor F&L would assist in documenting or participating in the lending of Exchange Funds held by AEC to Okun.

252.    On September 7, 2005, Burr returned from a long weekend to find on his desk at F&L two Loan Agreements drafted by Joe Kavan of Kutak Rock which attempted to document Okun's "borrowing" of AEC Exchange Funds as "loans". The first Loan Agreement was for a **$25 million loan** from AEC (Burr's client) to Columbus Works Virginia Trust (the Borrower) **which required Burr's signature** as the Attorney-in-Fact for Columbus Works Trustee, LLC. The second Loan Agreement was for a $2 million loan from AEC (Burr's client) to Parkway Virginia Trust (the Borrower) which also required Burr's signature as Attorney-in-Fact for Parkway Trustee, LLC. Burr's conflict of interest in these purported loan transactions is unmistakable, irreconcilable, and not subject to any waiver, which Burr knew, since he formulated after the fact advice to Okun on the subject of borrowing QI funds.

253.    Burr did not execute the two Loan Agreements between his client, the lender, and Okun, whose conduct he previously described as "unconscionable" and "contrary to the

77

1  fundamental principles of justice and equity," as borrower. Instead, he simply returned them to

2  Okun and wrote the critical September 7, 2005 email saying that AEC should not be in the

3  business of loaning its clients' Exchange Funds.  Burr advised Okun on September 7, 2005 at

4  4:08 p.m. that:

5                 "I am particularly concerned about the documents sent to me

6                 for signature. They appear to make use of the money of
               clients of AEC to finance Parkway and Columbus Works.

7                 AEC is not and should not be in the business of lending
               money, certainly not its clients' money."

8

9       254.    Following Burr's refusal to act as Trustee and to assist the lending of the

10 Exchange Funds held by AEC, and during Burr's engagement as counsel to the newly-formed

11 AEC, Coleman advised Burr that despite his new and contrary advice, Okun would proceed

12 with the loans, specifically telling Burr that "they didn't really need [his] help anymore because

13 they had found another trustee."

14      255.    Burr's statements in his September 7, 2005 email contradict his earlier oral

15 statements approving Okun's borrowing of Exchange Funds, which induced Okun to acquire

16 AEC and, of course, pay Burr.  Ignoring the significance of the receipt of the "trust

17 documents", which clearly reflect Okun's unlawful intent to convert the funds held in escrow

18 by AEC for its clients, Burr did not withdraw from continued representation of Okun and/or

19 AEC or make any other effort to extricate himself from this conflict of interest.  He did not

20 inform Dowdall or Hazel, as managing directors of AEC, of explicit intent to borrow Exchange

21 Funds.  Nor did Burr take any action to inform the Exchangers at AEC whose Exchange

22 deposits (at least **$27 million**) were converted to pay Burr and to repay loans taken by Okun /
IPofA.

23

24      256.    Despite his knowledge of Okun's continuing improper intent to borrow Exchange

25 Funds held by AEC, Burr took no action to prevent this misconduct nor to rectify the breach.

26 Further, Burr of F&L concealed the borrowing from AEC's President, Dowdall, and from the

27 AEC Exchangers. F&L's failure to inform Dowdall, the highest-ranking officer of AEC, of

28 Okun's misconduct, allowed $27 million in improper loans which had already occurred based

7316.001
THIRD AMENDED COMPLAINT
Case No. 09-cv-2079-JW

upon Burr's initial advice to Okun, to remain undetected. These actions and omissions directly and proximately caused injury to the AEC Exchangers who lost $15.7 million in Exchange Funds.

257. But for Burr's solicitation of Okun and Burr's active involvement as a broker and then as counsel, Okun would have never known about Atlantic Exchange Company, would not have purchased the company, and would not have looted its Exchange Funds held in trust after he purchased it. Burr's efforts for pecuniary gain, to propel Okun into a position of access to trust funds were reckless and wonton. The Plaintiffs are the foreseeable victims of the destructive force which Burr set in motion.

258. Plaintiffs allege that F&L are liable for the class members' damages because, among other things, they knowingly aided and abetted Okun's intentional breaches of fiduciary duties. However, Plaintiffs anticipate that the defendants will assert at trial or afterward that they did not do so, and that if they did anything wrong, it was all just a mistake. Therefore, pursuant to Fed. R. Civ. P. 8(d), Plaintiffs have included alternative allegations based upon negligence. As an additional alternative allegation, Plaintiffs contend that Burr is liable for aiding and abetting and F&L is vicariously liable for Burr's actions performed in the course and scope of his duties at F&L.

## XIV.

## ALLEGATIONS AGAINST JORDEN BURT

259. Richard Simring was a partner at Jorden Burt throughout the period January 1, 2000 to December 31, 2006. Starting on January 1, 2007, Simring was "of counsel" at Jorden Burt while at the same time serving as general counsel to Okun Holdings, which was owned and controlled by Okun and which "held" The 1031 Tax Group (which in turn ostensibly owned the various QIs acquired, owned and controlled by Okun).

260. Before Okun started acquiring QIs, Simring represented Okun as a successful plaintiff in a tortious interference with contract action in a Florida State Court. As a result of Jorden Burt's efforts, Okun obtained a $7 million Judgment in a jury trial, which was collected. Okun was an ongoing and important client of Simring and of Jorden Burt.

THIRD AMENDED COMPLAINT
Case No. 09-cv-2079-JW

7316.001

261.    On May 11, 2006, IPofA signed the first of two engagement letters with Jorden Burt.  The engagement concerned IPofA's potential acquisition of First Montauk Securities Corp. ("Montauk").  The legal assignment related to whether Montauk and the QIs acquired by Okun could be merged into a single financial services company.  Jorden Burt's Washington D.C. office performed the legal services for Okun on this matter.

262.    On November 21, 2006, Coleman emailed Simring while a partner with the law firm of Jorden Burt.  The subject of the email was "Memorandum Regarding QI Loan," and it attached a Memorandum that had been prepared by IPofA's Chief Legal Officer, Eric C. Perkins, on November 7, 2006 (the "Perkins Memo").

263.    The Perkins Memo outlined the history of Okun's acquisitions of QIs and the use of Exchange Funds by Okun and IPofA to acquire real estate.  The Perkins Memo stated that new controls were being put in place to limit Okun's borrowing of Exchange Funds, but that even with these limits, Okun's "borrowing" conflicted with the terms of the Exchange Agreements being utilized by the QIs.

264.    The Perkins Memo concluded that "[b]ased upon information made available to date – the prior conduct surrounding the loans:

(i)    violates existing Exchange Agreements with QI Entity customers;

(ii)   violates any fiduciary or "prudent investor" standard that might apply under applicable law; [and]

(iii)  could potentially subject one or more involved parties to criminal prosecution in multiple states and/or at the Federal level (under theories ranging from theft, embezzlement, and/or conversion to racketeering and laundering statutes). . ."

265.    The same day that Simring of Jorden Burt received Coleman's email attaching the Perkins Memo (November 21, 2006), Simring spoke with Okun.  Thereafter, he emailed various of his partners at Jorden Burt as follows:

"[Ed] wants our help with a ton of transactional work related to Qualified Real Estate Intermediaries ("QIs") – if we can do it.  He is in the process of buying two or more QIs and

80

also has $8 million down on his purchase of Montauk Securities in New Jersey. . .

Yesterday, Eric Perkins, in-house securities counsel at Okun Holdings (the holding company of IP of A), resigned. And as a result, McGuire Woods, outside counsel for The 1031 Tax Group (which consists of five QIs: Atlantic Exchange, SOS 1031, REES, NES, and IXG) resigned because of "ethics" concerns.

Okun says that he wants Jorden Burt to represent (i) him and (ii) "1031 Tax Group." The current CEO apparently wigged out (Todd Pajonas, Esq. of New York) and stole money and did some other bad things. . .

Todd has threatened to tell the NASD things about Montauk that would either kill NASD approval and/or greatly delay the purchase. . . Ed's plan is to pay Todd $2 million to resign quietly so as not to upset the deal.

His immediate concern is that he wants us to perform the legal work that McGuire Wood was going to perform (and he offered to let us handle the purchase of the next two QI's if we want). . ."

266.    The next day, November 22, 2006, in an email bearing the subject line of "My thoughts," Simring expressed to his partners at Jorden Burt that "[t]his is essentially an unregulated Ponzi scheme, and with the real estate market going down." He further advised: "I am thinking of referring Ed to Kluger Peretz."

267.    Instead, one week later, on December 1, 2006, Simring and Jorden Burt sent Okun an engagement letter. The letter provided: "Thank you for selecting Jorden Burt LLP ("Jorden Burt" or "the firm") to represent you, in your individual capacity, with regard to potential litigation matters, including potential litigation involving Todd Pajonas." Pajonas was employed by The 1031 Tax Group and was the President of SOS and AEC. Any litigation with Pajonas concerned Pajonas' employment and work for the QIs.

268.    Despite the attempt to limit the scope of representation as set forth in the engagement letter, in November and December 2006, Simring, who was still a partner in the firm of Jorden Burt, throughout that period, in fact, acted as counsel to Okun, IPofA, and

1  Okun's QIs.

2       269.    Simring's voluntary decision to expand the scope of Jorden Burt's involvement

3  as legal counsel to the QIs is clearly evidenced by his writings and actions.  For instance, in a

4  dispute with Hoctor (now IPofA's in-house counsel) over the scope of representation to be

5  provided by Jorden Burt, Simring informed Hoctor on November 29, 2006, that Jorden Burt was

6  counsel to Okun, personally, and to "all of Ed's companies," which included the QIs.

7       270.    Three business days later, on December 4, 2006, Coleman sent an email to

8  IPofA's entire legal department (i.e., Perkins, Hoctor, Dan Applewhite, and Kelly Morrison),

9  advising:

10              "all further communications regarding the company, our
                affiliates, Ed or his affiliates should be directed to . . .Richard."

11       271.    Moreover, three days later, December 7, 2006, Perkins emailed Simring at Jorden

12  Burt as follows:

13              "I enjoyed meeting you and hope we were able to give you
14              a good sense as to what is currently going on at IPofA.  Per
                Ed and Lara, we will copy you on all legal matters going
15              forward for your attention.  At your earliest opportunity,
                please provide your thoughts regarding transition of the
16              files  (or  copies)  you  saw  organized  throughout  the
                conference room yesterday."
17

18       272.    Immediately thereafter, according to Okun, Simring became involved in the

19  decision-making for all legal matters that Okun and his various companies (including the QIs)

20  were involved in at that time.

21       273.    The legal matters of concern for The 1031 Tax Group and its QIs in November

22  and December of 2006 were the Perkins Memo outlining the illegality of borrowing QI

23  Exchange Funds, and Okun's intent to purchase another QI, 1031 Advance, on behalf of The

24  1031 Tax Group.    Simring, while employed at Jorden Burt, provided faulty and inadequate

25  legal advice on each of these matters.  Simring, after reading and reviewing the Perkins memo,

26  traveled to Richmond, Virginia in December 2006 to advise the QIs on how to respond to the

27  dilemma.  Simring negligently concluded that Exchange Funds "belonged" to the QIs and could

28  be used in whatever manner Okun wished, provided that future Exchange Agreements were

7316.001                        THIRD AMENDED COMPLAINT
                                   Case No. 09-cv-2079-JW

1  amended to provide that:

2  　　　　Proceeds shall be held in the account of [a] QI with a
3  　　　　nationally insured bank or savings institution until
   　　　　invested by QI for its own account.

4  　　　274.   Simring, as counsel to the QIs, knew that the Exchange Agreements used in the

5  past by the QIs did not contain this language because on November 24, 2006, Dashiell sent an

6  email to Simring at his Jorden Burt address, attaching copies of the 1031 Advance Exchange

7  Agreement which specifically provided that:

8  　　　　Exchanger and QI expressly agree that any cash proceeds
9  　　　　received from the disposition of the relinquished property
   　　　　(Exchange Proceeds) shall be held in the account of QI with
10 　　　　a nationally insured bank or savings institution.

11 　　　275.   Simring's advice to the QIs to modify the Exchange Agreements to authorize

12 borrowing of Exchange Funds by Okun did nothing to alleviate the problems created by Okun's

13 prior "borrowings" of Exchange Funds deposited by Exchangers pursuant to Exchange

14 Agreements that specifically prohibited such borrowing.   Regardless of whether future

15 Exchange Agreements might be drafted to somehow allow for borrowing, before Okun's QIs

16 could continue operating as QIs, all deficits in the various trust accounts had to be eliminated by

17 an infusion of unencumbered funds.  With deficits existing in the trust accounts, the QIs would

18 continue to perpetuate Okun's Ponzi scheme regardless of the language employed in the

19 Exchange Agreements.

20 　　　276.   The only reasonable advice that Simring and Jorden Burt could have offered in

21 December of 2006 to the Okun-controlled QIs and to Okun was that the deficits in the trusts had

22 to be eliminated immediately, or the QIs must cease operating due to their obvious insolvency.

23 This advice was not given.  Rather, Simring's inadequate advice on modifying future Exchange

24 Agreements was slowly and sporadically implemented for some accounts.   Old Exchange

25 Agreements continued to be utilized, the trust deficits remained, the Ponzi scheme continued,

26 and the Plaintiffs identified herein were injured because of Jorden Burt's malpractice in

27 rendering inadequate and erroneous legal advice.

28

7316.001
　　　　　THIRD AMENDED COMPLAINT
　　　　　Case No. 09-cv-2079-JW

277.    Further, in or around December 2006, while the QIs continued to be operated as a Ponzi scheme, Simring and Jorden Burt provided counsel and advice to The 1031 Tax Group in its efforts to acquire 1031 Advance from Dashiell. At that time Okun informed Simring that his acquisition of 1031 Advance would serve as a further source of funds for financing Okun's real estate business deals.

278.    With Jorden Burt's counsel and assistance, on December 18, 2006, Okun, through The 1031 Tax Group, LLC acquired the assets of, and ownership interest in, 1031 Advance. As part of the negotiation process, Simring received correspondence from SVLG (counsel to 1031 Advance) requesting that Okun limit his borrowing of 1031 Advance Exchange Funds to 30% of the total Exchange Funds on deposit at 1031 Advance. Simring counseled Okun on these issues and assisted Kluger Peretz (Okun's other counsel) in convincing Dashiell to eliminate all borrowing limitations from The 1031 Tax Group Purchase Agreement.

279.    Immediately after the acquisition, Okun looted the 1031 Advance Exchange Funds on deposit at Countrywide as alleged previously in the complaint. The looting was accomplished with the assistance and counsel of Simring and Jorden Burt in negotiating and documenting The 1031 Tax Group acquisition, with full knowledge of Okun's intentions and purpose in acquiring 1031 Advance.

280.    On January 1, 2007, Simring became "of counsel" to Jordan Burt and general counsel to Okun Holdings with promised compensation in excess of $800,000 per year. Simring's willingness to advance Okun's interests at the expense of the QIs and the Exchangers while a partner at Jorden Burt was based, in part, on Okun's promise to pay him an exorbitant salary after he became "of counsel" at Jorden Burt and general counsel at Okun Holdings.

281.    Plaintiffs allege that Simring and Jorden Burt are liable for the class members' damages because, among other things, they knowingly aided and abetted Okun's intentional breaches of fiduciary duties. However, Plaintiffs anticipate that Simring and Jorden Burt will assert at trial or afterward that they did not do so, and that they did anything wrong, it was all just a mistake. Therefore, pursuant to Fed. R. Civ. P. 8(d), Plaintiffs have included alternative allegations based upon negligence. As an additional alternative allegation, Plaintiffs contend

84

that Simring is liable for aiding and abetting and that Jorden Burt is vicariously liable for Simring's conduct performed in the course and scope of his duties at Jorden Burt.

## XV.

## ALLEGATIONS

## AGAINST SILICON VALLEY LAW GROUP

282.    As previously alleged, in December 2006, Okun acquired another QI, 1031 Advance, a California corporation owned by Dashiell and Allred and others. Dashiell, Allred, and 1031 Advance were represented in the sale transaction by Michael Schachter, Esq., ("Schachter") and James Chapman Esq., ("Chapman"), employees of the Silicon Valley Law Group ("SVLG").

283.    At the time of the sale of 1031 Advance, Dashiell was advised that Okun owned, either directly or through various Okun-owned and controlled entities, five other QIs. She further learned that Okun had been making loans to himself and various entities under his control from the Exchange Funds held by the QIs he owned. Dashiell understood that, upon completion of the sale transaction, Okun intended to make further loans to himself or other entities he owned and controlled, from Exchange Funds held by 1031 Advance. Dashiell and Allred communicated these facts to SVLG.

284.    Dashiell requested advice from SVLG, for the intended benefit of 1031 Advance Exchangers, as to whether the proposed sale of 1031 Advance to Okun was lawful or prudent.

285.    Despite SVLG's knowledge that Okun intended to misappropriate the Exchange Funds held by 1031 Advance to his own use and for his own purposes, SVLG failed to counsel Dashiell to reject the sale of 1031 Advance to Okun. Instead, SVLG approved the proposed sale, advising Dashiell that "Okun was an angel compared to Donald McGhan of SWX," who had previously attempted to purchase 1031 Advance to perpetuate McGhan's own Ponzi scheme. SVLG had previously advised against a sale of 1031 Advance to McGhan after conducting due diligence and research as to the propriety of such a sale. SVLG knew that borrowing QI funds was unlawful for McGhan, and thus knew *a fortiori* that Okun's intent to

85

1    borrow QI funds was an unlawful purpose with regard to the proposed sale of 1031 Advance to

2    Okun.

3          286.    Despite SVLG's failure to counsel against a sale of 1031 Advance to Okun,

4    Dashiell and Allred remained concerned about Okun's intent to convert Exchange Funds at

5    1031 Advance to his own use. They therefore requested that SVLG, for the intended benefit of

6    1031 Advance's Exchangers, include language in the Purchase and Sale Agreement to limit

7    Okun's "borrowing" of Exchange Funds. In response, SVLG, with gross negligence, inserted

8    clauses in the Purchase and Sale Agreement regarding the total sum Okun could borrow from

9    Exchange Funds. Of course, all borrowing from QI funds was unlawful, and SVLG knew that

10   modifying the extent of the borrowing could not cure its illegality. Had SVLG properly advised

11   Dashiell that borrowing QI Exchange Funds was unlawful *per se*, Dashiell and the other owners

12   would not have sold 1031 Advance to Okun. SVLG's inadequate advice to Dashiell and the

13   other owners, which advice was obtained for the intended benefit and protection of 1031

14   Advance's Exchangers, constituted gross negligence and directly and proximately caused the

15   loss of QI Exchange Funds at 1031 Advance.

16         287.    On December 18, 2006, Dashiell and Allred sold all of their right, title and

17   interest in all of the outstanding shares of the capital stock of 1031 Advance to The 1031 Tax

18   Group, Okun's QI. In advance of the sale, SVLG reviewed copies of 1031 Advance's Exchange

19   Agreements, which prohibited assignment of obligations owed to 1031 Advance Exchangers to

20   The 1031 Tax Group without first obtaining the consent of each Exchanger. SVLG failed to

21   obtain, from any of the Exchangers, consent to the transfer of Exchange Funds on deposit in

22   segregated accounts at Countrywide to commingled accounts of 1031 Tax Group held at

23   Wachovia.

24         288.    The Exchange Agreements between 1031 Advance and its clients expressly

25   provided at paragraph 7.1 that Exchange Funds were to be held in trust, and, at paragraph 6, that

26   Exchange Funds were to be used **solely** for the purchase of replacement property on behalf of

27   each Exchanger. Paragraph 13 prohibited the assignment of control over the trust *res* to Okun

28   without consent of each Exchanger

289.    SVLG knew that 1031 Advance was a trustee and as such, owed fiduciary duties of loyalty and care to its clients.  SVLG further knew that 1031 Advance's Exchange Agreements specifically provided that:

> Exchanger and QI expressly agree that any cash proceeds received from the disposition of the Relinquished Property (exchange proceeds) shall be held in the account of QI with a nationally insured bank.

290.    Despite notice that Okun would "borrow" 1031 Advance Exchange Funds in direct contravention of the Exchange Agreements, SVLG took no steps to amend the Exchange Agreements, to advise against the sale, to notify the 1031 Advance Exchangers of Okun's intent to borrow their Exchange Funds, to withdraw from representation of 1031 Advance, or to advise law enforcement authorities of Okun's intended theft.

291.    As predicted and alleged, after Okun acquired 1031 Advance, he looted its Exchange Funds, causing damages to 55 Exchangers at 1031 Advance in the amount of $30.2 million in lost Exchange Funds.  The 55 Exchangers who executed the 1031 Advance Exchange Agreement and deposited their Exchange Funds with 1031 Advance lost their Exchange Funds and became class members.  47 of those Exchangers deposited their Exchange Funds (totaling $30,672,105.68) after December 18, 2006, which is after the sale of 1031 Advance stock to Okun and after his initial looting of approximately $23 million -- which occurred on or about December 19, 2006, the day after the transaction closed.  There are eight Exchangers who had $2,371,737 on deposit at 1031 Advance at the time of the sale.

292.    Plaintiffs allege that SVLG is liable for the class members' damages because, among other things, SVLG knowingly aided and abetted Okun's intentional breaches of fiduciary duties.  However, Plaintiffs anticipate that SVLG will assert at trial or afterward that it did not do so, and that if SVLG did anything wrong, it was all just a mistake.  Therefore, pursuant to Fed. R. Civ. P. 8(d), Plaintiffs have included alternative allegations based upon negligence.  As an additional alternative pleading, Plaintiffs contend that SVLG lawyers aided and abetted Okun, and that SVLG is vicariously liable for the lawyers' actions.

# XVI.

## CLASS ACTION ALLEGATIONS

293.    Plaintiffs bring this action on behalf of themselves, individually, and as Class representatives pursuant to Fed. R. Civ. P. 23.

294.    The Class is defined as: "All Persons whose 1031 Exchange Funds were deposited with QIs owned or controlled by Edward Okun (1031 Advance, AEC, 1031 Tax Group, IXG, NES, REES, and/or SOS), and who have been deprived of access to those funds (the "Class")."

295.    Upon completion of discovery with respect to the scope of the Class, Plaintiffs reserve the right to amend the class definition and to define sub-classes as required. Excluded from the definition of the "Class" are the named Defendants and any person, corporation, or other entity related to, controlled by or affiliated with any named Defendant. Also excluded from the Class are the Court, the Court's spouse, all persons within the third degree of relationship to the Court, and the spouses of such persons. Included in the term "Persons" in the definition of the Class are natural persons, entities, representatives of such entities, and the assignees of such persons or entities, if any.

296.    The members of the Class are so numerous that joinder of all of them is impracticable. There are at least 330 victims of the Defendants' conduct residing in numerous states including, but not limited to, Arizona, California, Colorado, Connecticut, Florida, Georgia, Hawaii, Idaho, Illinois, Indiana, Kansas, Massachusetts, Michigan, Nevada, New Hampshire,
New Jersey, New York, Ohio, Oregon, Rhode Island, Texas, Virginia, and Washington.

297.    There are questions of law and fact which are common to the Class which predominate over questions affecting any individual Class member. The common questions include, *inter alia,* the following:

   (i)    whether Okun and his entities operated a Ponzi scheme;

   (ii)    whether Defendants knowingly assisted Okun and the QIs he controlled in operating a Ponzi scheme by accepting the

88

deposit of Exchange Funds and transferring these same funds to close escrows for non-Plaintiff clients of the QIs he controlled while a deficit existed in the trust account;

(iii) whether Defendants knowingly assisted Okun and the QIs entities he controlled in breaching their fiduciary duties by wiring Exchange Funds, whose purpose was to be used solely to close the escrows of purchases of replacement properties to accounts controlled by Okun or other entities owed by Okun, where these monies were converted, stolen and/or looted;

(iv) whether Defendants knowingly assisted Okun and the QIs he controlled in the commission of fraud by accepting the deposit of Exchange Funds based upon the false representation that these Exchange Funds would be held and used solely to close the escrows of purchases of replacement properties; and

(v) whether Defendants knowingly assisted Okun and the QIs he controlled in the conversion of Exchange Funds of Plaintiffs and the Class members by exercising unauthorized dominion and control over the Exchange Funds required to be returned to Plaintiffs and putative class members or used to fund the close of escrows of replacement property within 180 days after the sale of relinquished property.

298.    The claims of the named Plaintiffs are typical of the claims of the Class as a whole. The named Plaintiffs are members of the Class and have suffered harm and are likely to continue to suffer harm due to the loss of entrusted funds.

299.    The named Plaintiffs will fairly and adequately protect the interests of the Class. The interests of the named Plaintiffs are consistent with and not antagonistic to the interests of the Class. The named Plaintiffs lost millions of dollars in Exchange Funds and have sought out and retained counsel experienced in complex Class Actions in an effort to recover these lost funds. The named Plaintiffs have agreed to act for the benefit all QI Exchangers similarly situated and pledge not to advance their own individual interests ahead of any member of the Class.

300.    The prosecution of a multitude of separate actions by individual Class members may establish incompatible standards of conduct for the parties opposing the Class, may

1  substantially impair or impede the interests of other members of the Class to protect their

2  interests, and will result in waste of resources and assets.

3        301.    The actions of Defendants applicable to the named Plaintiffs apply generally to

4  the Class thereby making the final relief granted by the Court to the named Plaintiffs applicable

5  to the Class and as a whole.

6        302.    This Class Action would be superior to other available methods for the fair and

7  efficient adjudication of the controversy between the parties. The interest of most members of

8  the Class individually to control the prosecution of separate actions appears low, due to the

9  complexity of the case. Most members would be unable or unwilling to prosecute claims and

10 actions individually, without joining their claims with other claimants, which is generally

11 difficult. The amount of damages at stake for each victim varies widely, from $300 to

12 $10,500,000. Concentrating litigation in this forum will also promote judicial efficiency.

13       303.    This proposed Class Action is manageable. There are approximately 330 victims

14 with relatively large claims compared to most Class Actions involving large numbers of

15 claimants with minimal claims. Participation in the case by Class members who do not opt out

16 will be assured by the size of the loss sustained by each member.

17                                    **XVII.**

18                          **CAUSES OF ACTION**

19                      <u>**FIRST CAUSE OF ACTION**</u>

20                      **Breach of Fiduciary Duty**
                        **(Against the Lawyer Defendants)**

21

22       304.    Plaintiffs repeat and reallege all prior paragraphs, and incorporate them by

23 reference, as though fully set forth again here.

24       305.    Lawyers, serving as counsel to fiduciaries, and/or who intend their legal services

25 to benefit the trust beneficiaries, themselves owe fiduciary duties to the beneficiaries of the trust.

26 The Lawyer Defendants, serving as counsel to the QIs, who intended their legal services to

27 benefit the QIs' clients, breached their fiduciary duties of loyalty, care, communication, and fair

28 dealing, among others, owed to the QI Exchanger clients, which breaches proximately caused

---

90

Plaintiffs damages in an amount to be proven at trial, but not less than $150 million.

## SECOND CAUSE OF ACTION

### Aiding and Abetting Breach of Fiduciary Duty by Means other than Electronic Transfers (Against Citibank and Matrix)

306.    Plaintiffs repeat and reallege all prior paragraphs, and incorporate them by reference, as though fully set forth again here.

307.    Citibank and Matrix knew that Exchange Funds were trust funds and that each QI Trustee owed fiduciary obligations to its clients and was required to use Exchange Funds solely to close its clients' replacement property escrows.  Citibank and Matrix both knew that Okun and/or the QIs he owned or controlled had misappropriated many millions in Exchange Funds, created a deficit in the respective trusts, and was operating a Ponzi scheme to conceal the misappropriations, all in breach of the fiduciary duties owed to the QIs' Exchanger clients. Instead of immediately taking action to halt the Ponzi scheme by freezing the Exchange Funds on deposit with them, both Citibank and Matrix knowingly continued to assist the QIs' breaches by, *inter alia*, assisting in the misuse of newer QI clients' funds to close older clients' escrows through non-electronic (and electronic) transfers of Exchange Funds on deposit with them, thereby concealing and perpetuating the Ponzi scheme.  Moreover, after Matrix knew a deficit existed in the IXG trust, Matrix encouraged IXG to execute Exchange Agreements with new Exchangers which contained false promises, and, in fact, Matrix paid IXG $300 for each Exchanger who executed such a contract so that Matrix would become the depository for those Exchangers' Exchange Funds.  Had Matrix and/or Citibank refused to provide banking services and frozen the funds on deposit, the misuse of client funds and breaches related thereto would have ceased, the authorities would have been alerted, and the Ponzi scheme would come to an end.  Citibank and Matrix aided and abetted the QIs' breaches of fiduciary duties through non-electronic (and electronic) transfers of Exchange Funds for their own personal advantage and economic gain.  Defendants' knowing assistance in the breaches directly and proximately caused Plaintiffs' damages in an amount to be proven at trial, but not less than $150 million.

\ \ \

\ \ \

91

### THIRD CAUSE OF ACTION

#### Aiding and Abetting Breach of Fiduciary Duty
#### (Against all Defendants)[15]

308.    Plaintiffs repeat and reallege all prior paragraphs, and incorporate them by reference, as though fully set forth again here.

309.    Okun and the seven QIs owed fiduciary duties to the QI Exchangers.    All Defendants knew that Okun and the QIs which he controlled engaged in material breaches of their fiduciary duties owed to the QI Exchangers.    The Defendants, and each of them, assisted Okun and the seven QIs, and each of them, in breaching their fiduciary duties.

310.    The Defendants' actions in aiding and abetting the breaches of fiduciary duty owed to the QI Exchangers proximately caused Plaintiffs' damages in an amount to be proven at trial, but not less than $150 million.

### FOURTH CAUSE OF ACTION

#### Aiding and Abetting Fraud by Means other than Electronic Transfers
#### (Against Citibank and Matrix)

311.    Plaintiffs repeat and reallege all prior paragraphs, and incorporate them by reference, as though fully set forth again here.

312.    The Exchange Agreements referenced in this complaint provided that Exchange Funds would be safeguarded at banks or banking institutions and would be used solely to close escrows for the QI Exchanger who executed the Exchange Agreement.    The Exchange Funds could not be used for any other purpose, including Okun's purchases of real estate or luxury items, or to fund the close of escrows for other QI clients.    Okun, and the seven QIs he controlled offered Exchange Agreements for signature to prospective Exchangers, knowing that they contained false promises, because the Exchange Fund deposits were being solicited with intent to misuse them in ways prohibited by the Exchange Agreements.    The false promises

---

[15] The prior Cause of Action against Citibank and Matrix for aiding and abetting breaches of fiduciary duties addressed only non-electronic transfers of Exchange Funds. The remainder of the conduct by Citibank and Matrix which aided and abetted breaches of fiduciary duties is addressed, along with the actions of the other defendants, in this cause of action.

7316.001                      THIRD AMENDED COMPLAINT
                              Case No. 09-cv-2079-JW

1  contained in the Exchange Agreements were relied upon by the Exchangers as evidenced by the

2  fact that they deposited their Exchange Funds with the QIs.

3          313.    Citibank and Matrix both knew (by virtue of the banks' prior assistance in

4  improper transfers of millions of dollars in Exchange Funds, which had created deficits in the

5  respective QI trusts, and, by virtue of Matrix's knowledge of the IXG Exchange Agreement of

6  which it had a copy) that the Exchange Agreements contained false promises, and that the QIs

7  were being fraudulently operated as a Ponzi scheme. Nonetheless, instead of immediately taking

8  action to halt the fraudulent Ponzi scheme by freezing and/or interpleading the Exchange Funds

9  on deposit, both Citibank and Matrix knowingly and willfully continued to assist Okun and the

10 QIs he controlled by providing depository services for the Exchange Funds on deposit with the

11 banks, thereby concealing and perpetuating the fraud. Moreover, after a deficit existed in the

12 IXG trust, and armed with the knowledge that all new IXG Exchangers were executing

13 fraudulent Exchange Agreements, Matrix paid IXG $300 per Exchanger for the right to serve as

14 the depository for the defrauded Exchanger's funds, so that the bank could earn interest on the

15 money, interest which Matrix was entitled to keep for itself pursuant to the agreement between

16 IXG and Matrix. If Citibank or Matrix had refused to provide depository and other banking

17 services with respect to these Exchange Funds, the Ponzi scheme fraud would have immediately

18 ceased and the authorities would have been alerted.  Citibank and Matrix substantially assisted

19 Okun's fraud by providing depository services and through non-electronic (and electronic)

20 transfers of Exchange Funds for their own personal advantage and economic gain.  Defendants'

21 knowing assistance in Okun's fraud directly and proximately caused Plaintiffs damages in an

22 amount to be proven at trial, but not less than $150 million.

23 \ \ \

24 \ \ \

25 \ \ \

26

27

28

# FIFTH CAUSE OF ACTION

## Aiding and Abetting Fraud
## (Against all Defendants)[16]

314.    Plaintiffs repeat and reallege all prior paragraphs, and incorporate them by reference, as though fully set forth again here.

315.    The Exchange Agreements referenced in this complaint provided that Exchange Funds would be deposited at banks or banking institutions and would be used solely to close escrows for the QI Exchanger who executed the Exchange Agreement.  The Exchange Funds could not be used by Okun to purchase real estate or luxury items, and the Exchange Funds could not be used to fund the close of escrows for clients of other QIs.  Okun, and the seven QIs he controlled, offered Exchange Agreements for signature by Exchangers, knowing that they contained false promises.  Each Defendant knew that the Exchange Agreements contained false promises, but nonetheless willfully assisted Okun and the QIs in making these false promises, for the sole and exclusive purpose of assisting Okun in perpetrating his Ponzi scheme, and with intent to advance the personal advantage and economic gain of each Defendant.

316.    The false promises contained in each Exchange Agreement were relied upon by each QI Exchanger.  Defendants' knowing assistance in Okun's fraud directly and proximately caused Plaintiffs damages in an amount to be proven at trial, but not less than $150 million.

# SIXTH CAUSE OF ACTION

## Conversion and Aiding and Abetting Conversion by Means other than Electronic Transfers
## (Against Citibank and Matrix)

317.    Plaintiffs repeat and reallege all prior paragraphs, and incorporate them by reference, as though fully set forth again here.

318.    Citibank and Matrix both knew that the QI Trustees were required to use each Exchanger's Exchange Funds solely to close its replacement property escrow.  Citibank and

---

[16] The prior Cause of Action against Citibank and Matrix for aiding and abetting fraud addressed only non-electronic transfers of Exchange Funds.  The remainder of the conduct by Citibank and Matrix which aided and abetted fraud is addressed, along with the actions of the other defendants, in this cause of action.

94

Matrix both knew that deficits existed in the trust accounts at the respective banks. Consequently, the banks each knew that future escrow closings would require conversions of Exchange Funds since, due to the deficits in the trusts, newer Exchangers' Exchange Funds would impermissibly be used to close older Exchangers' escrows (the older Exchangers' Exchange Funds having been misappropriated from the trusts). At the behest of Okun and/or the QIs he owned or controlled, both Citibank and Matrix knowingly exercised dominion and control over newer QI Exchangers' Exchange Funds on deposit with them, and utilized the Exchange Funds in a Ponzi scheme without the consent of the newer Exchangers. In so doing, Citibank and Matrix converted Exchange Funds, and knowingly assisted conversions of Exchange Funds by Okun and/or the QIs he owned or controlled. Defendants' repeated conversions and assistance in others' conversions directly and proximately caused Plaintiffs damages in an amount to be proven at trial.

## SEVENTH CAUSE OF ACTION

### Conversion
### (Against all Defendants, Except SVLG) [17]

319.    Plaintiffs repeat and reallege all prior paragraphs, and incorporate them by reference, as though fully set forth again here.

320.    The Defendants, and each of them, exercised dominion and control over Exchange Funds without the Exchangers' consent, and contrary to the use of these funds as articulated in each Exchange Agreement. The converted Exchange Funds were deposited as a specific and identifiable sum that Plaintiffs were entitled to recover in a period no more than 180 days after deposit with the QIs.

321.    Defendants' conversion proximately caused Plaintiffs damages in an amount to be proven at trial, but not less than $150 million, because the Exchange Funds have been dissipated.

---

[17] The prior Cause of Action against Citibank and Matrix for conversion addressed only non-electronic transfers of Exchange Funds. The remaining actions by Citibank and Matrix which constituted conversion are addressed, along with the actions of the other defendants, in this cause of action.

7316.001                       THIRD AMENDED COMPLAINT
                               Case No. 09-cv-2079-JW

## EIGHTH CAUSE OF ACTION

### Aiding and Abetting Conversion
### (Against all Defendants) [18]

322.    Plaintiffs repeat and reallege all prior paragraphs, and incorporate them by reference, as though fully set forth again here.

323.    Defendants, and each of them, knowingly aided, abetted and assisted Okun and the seven QIs in converting the Exchange Funds to Okun's own use for his personal benefit and to deprive the rightful QI Exchanger owners of these sums.

324.    The conduct of Defendants in aiding and abetting the conversion of Exchange Funds directly and proximately caused Plaintiffs damages in an amount to be proven at trial, but not less than $150 million in the aggregate.

## NINTH CAUSE OF ACTION

### Conspiracy to Convert Exchange Funds and to Commit Fraud
### (Against the Hard Money Lender Defendants)

325.    Plaintiffs repeat and reallege all prior paragraphs, and incorporate them by reference, as though fully set forth again here.

326.    The Hard Money Lender Defendants conspired with Okun to convert Exchange Funds to Okun's use, and after such conversion, each Defendant conspired further with Okun to commit fraud through the use of the false, fraudulent and misleading Exchange Agreements.

327.    The conspiracy between Okun and the Hard Money Lenders to convert Exchange Funds and to commit fraud directly and proximately caused Plaintiffs' damages in an amount to be proven at trial, but not less than $150 million.

\ \ \

\ \ \

---

[18] The prior Cause of Action against Citibank and Matrix for aiding and abetting conversion addressed only non-electronic transfers of Exchange Funds. The remainder of the conduct by Citibank and Matrix which aided and abetted conversion is addressed, along with the actions of the other defendants, in this cause of action.

96

**TENTH CAUSE OF ACTION**

**Interference with Contract**
**(Against All Defendants, Except the Lawyer Defendants)**

328.    Plaintiffs repeat and reallege all prior paragraphs, and incorporate them by reference, as though fully set forth again here.

329.    Plaintiffs, and each of them, executed an Exchange Agreement in good faith with one of the seven QIs controlled by Okun. Each Defendant knew that each Plaintiff had entered such an Exchange Agreement. Each Defendant, wrongfully, willingly and unlawfully committed intentional acts designed to avoid the QIs proper performance, pursuant to the terms of the Exchange Agreements, and actual disruption of performance did occur.

330.    Plaintiffs suffered economic harm directly and proximately caused by the wrongful acts of each Defendant in an amount to be proven at trial, but not less than $150 million.

**ELEVENTH CAUSE OF ACTION**

**Breach of Contract**
**(Against SVLG)**

331.    Plaintiffs repeat and reallege all prior paragraphs, and incorporate them by reference, as though fully set forth again here.

332.    SVLG entered into a written contract with 1031 Advance for the specific purpose of obtaining competent legal advice regarding the potential sale of 1031 Advance to Okun. As SVLG knew that any action taken by the sole purpose QI had to benefit clients (including this sale), the 1031 Advance Exchangers were intended third party beneficiaries of this contract. SVLG knew this, and also knew it was a fiduciary to the Exchange Funds on deposit at 1031 Advance and to each QI Exchanger.

333.    1031 Advance had complied with the terms of its Exchange Agreements prior to the sale to Okun. SVLG breached the terms of its contract of engagement by providing grossly negligent advice and counsel, advising Dashiell to sell 1031 Advance to Okun and to transfer the Exchange Funds to Okun's 1031 Tax Group, in violation of the express terms of the 1031

97

Advance Exchange Agreements. SVLG advised 1031 Advance that Okun was "an angel when compared to McGhan" when Okun was widely known to be engaging in illegal activity by converting Exchange Funds to his own use, all in breach of the contract between 1031 Advance and SVLG, of which Plaintiffs are the intended third-party beneficiaries. SVLG's breach of the contract was a direct and proximate cause of the damages suffered by 1031 Advance in that 55 Exchangers have lost $30.2 million in Exchange Funds on deposit at 1031 Advance.

## TWELFTH CAUSE OF ACTION

### Negligence
### (Against all Defendants)

334.    Plaintiffs repeat and reallege all prior paragraphs, and incorporate them by reference, as though fully set forth again here.

335.    Each of the Defendants owed a legal duty of care to the QI Exchangers, which arose out of their respective affirmative acts in assuming such duty, or which arose by operation of law from the fiduciary nature of their relationship with Okun and the QIs he controlled.

336.    Each Defendant breached his/her or its legal duty of due care and each breach was a direct and proximate cause of the resulting economic injury to the Exchangers, in an amount to be proven at trial, but not less than $150 million.

## THIRTEENTH CAUSE OF ACTION

### Negligent Supervision
### (Against the Lawyer Defendants)

337.    Plaintiffs repeat and reallege all prior paragraphs, and incorporate them by reference, as though fully set forth again here.

338.    The Lawyer Defendants retained and used the services of individual lawyers to perform services as employees, agents and servants without adequately training and supervising them about conflicts of interest, and specific duties of loyalty, care and acting for the exclusive benefit of the client, which duties were owed to the beneficiaries of a trust, and the trust itself, when providing legal representation to the corporate Trustee of a trust. The Lawyer Defendants' failure to adequately train and supervise their agents and employees were the direct and

98

1    proximate cause of Plaintiffs' damages in an amount to be shown at trial, but not less than $150

2    million.

3

4    <center>**FOURTEENTH CAUSE OF ACTION**</center>

5    <center>**Violations of U.C.C. Article 4-A**
**(Against Citibank and Matrix)**</center>

6        339.    Plaintiffs repeat and reallege all prior paragraphs, and incorporate them by

7    reference, as though fully set forth again here.

8        340.    U.C.C. Article 4-A-204, which has been enacted into law by the states of New

9    York and Colorado, as well as other states, provides that unless a payment order received and

10   processed by a bank is both "authorized" **and** "effective" under Section 4-A-202, the bank shall

11   refund any payment of the order, plus interest.

12       341.    The term "authorized," as used in Section 4-A-202, means "[p]ossessed of

13   authority; that is, possessed of legal or rightful power, the synonym of which is 'competency'."

14   (Blacks Law Dictionary, Deluxe, 6th ed., 1990). Therefore, under Article 4-A, a bank can only

15   execute a payment order from a sender who has the "legal authority" to issue the order.

16       342.    Additionally, pursuant to Section 4-A-202, a payment order can be "effective"

17   only if: (i) the bank utilized a commercially reasonable security procedure to protect against

18   unauthorized transfers; and (ii) the bank can prove that it executed the payment order in "good

19   faith". Under Section 4-A-202, "[c]ommercial reasonableness of a security procedure is a

20   question of law to be determined by considering . . . the circumstances of the customer known to

21   the bank . . . ."

22       343.    Citibank and Matrix knew: (i) that Exchange Funds were trust funds which could

23   only be wired out of the QI accounts at Citibank and Matrix to close QI client replacement

24   property escrows; (ii) that they had received and continued to receive transfer orders which were

25   in violation of the terms and conditions of the Exchange Agreements and would result in

26   improper uses of Exchange Funds; (iii) that these improper transfer orders were without the

27   Exchangers' knowledge or consent; (iv) that the improper transfers violated the fiduciary duties

28   owed by Okun and/or the QIs he owned or controlled to the Exchangers; (v) that the QIs were

<center>99</center>

1    being operated as a Ponzi scheme; (vi) that the persons directing the banks to make these

2    improper transfers of Exchange Funds were not authorized to do so; and (vii) that the banks had

3    processed the unauthorized transfer orders and send Exchange Funds to improper destinations.

4        344.    The banks' actual knowledge of what was happening at the QIs necessarily

5    rendered transfer orders received from Okun and/or the QIs he controlled, unauthorized.

6    Indeed, the banks' actual knowledge of what was happening at the QIs necessarily rendered

7    commercially unreasonable any agreed-to security procedures to protect against unauthorized

8    transfer orders with respect to the QI accounts, because no commercially reasonable security

9    procedure would allow a bank to process a transfer order which the bank knew to be

10   unauthorized and in furtherance of a Ponzi scheme.

11       345.    Despite their knowledge, in bad faith, Citibank and Matrix accepted and

12   processed payment orders totaling (at least) $150 million which Citibank and Matrix knew to be

13   unauthorized and which damaged the Exchangers.    Plaintiffs notified Citibank and Matrix

14   within one year of learning of the transfers that they object to the transfers and that the trust

15   funds must be returned.    Pursuant to U.C.C. Article 4-A, Citibank and Matrix must refund all

16   such transfers, with interest.

17                      **FIFTEENTH CAUSE OF ACTION**

18   **Aiding and Abetting Breach of Fiduciary Duty by Means of Marketing Efforts on Behalf
     of Okun and the QIs he Owned and Controlled**
19                          **(Against Citibank)**

20       346.    Plaintiffs repeat and reallege all prior paragraphs, and incorporate them by

21   reference, as though fully set forth again here.

22       347.    Okun and the QIs he owned and controlled owed fiduciary duties to the QI

23   Exchangers.

24       348.    Citibank understood that Okun and his QIs were breaching those fiduciary duties

25   by misappropriating Exchange Funds for their own use and benefit.

26       349.    Citibank understood that such misappropriations had resulted in deficits in the

27   QIs' accounts that Okun was unable to repay, and that operation of the QIs had devolved into a

28

7316.001                          THIRD AMENDED COMPLAINT
                                   Case No. 09-cv-2079-JW

Ponzi scheme whereby Exchange Funds deposited by newer Exchangers were improperly being used to fund exchange transactions of older Exchangers, whose Exchange Funds had been misappropriated.

350.  Citibank understood that the concealment and perpetuation of this Ponzi scheme necessarily depended upon continuous deposits of Exchange Funds from new Exchangers.

351.  With this knowledge and understanding Citibank knowingly participated in further material breaches of Okun's and the QIs' fiduciary duties by engaging in a sustained course of joint marketing conduct intended to induce additional Exchangers to enter in Exchange Agreements with Okun and the QIs he owned and controlled, and which did so. Citibank knowingly participated in further material breaches of Okun's and the QIs' fiduciary duties with intent to advance the personal advantage and economic gain of Citibank thereby.

352.  Citibank's actions in aiding and abetting the breaches of fiduciary duty owed to the Exchangers proximately caused Plaintiffs' damages, whose Exchange Funds were (by electronic and non-electronic means) taken by Okun in further misappropriations for his own uses and/or improperly used to conceal his ongoing Ponzi scheme, in an amount to be proven at trial.

## SIXTEENTH CAUSE OF ACTION

### Aiding and Abetting Fraud by Means of Marketing Efforts on Behalf of Okun and the QIs he Owned and Controlled
### (Against Citibank)

353.  Plaintiffs repeat and reallege all prior paragraphs, and incorporate them by reference, as though fully set forth again here.

354.  The Exchange Agreements extended by Okun and the QIs he owned and controlled promised that Exchange Funds would be deposited at banks or banking institutions and would be used solely to close escrows for Exchangers who entered into such agreements.

355.  Okun and the QIs he owned and controlled made these representations to Exchangers with knowledge of their falsity, with intent to misappropriate Exchange Funds, and with intent to induce reliance by the Exchangers.

101

356.    As a result of their justifiable reliance upon these misrepresentations, Exchangers were damaged.

357.    Citibank had knowledge of the fraud being perpetrated by Okun and the QIs he owned and controlled.

358.    Citibank understood that such fraud had resulted in deficits in the QIs' accounts that Okun was unable to repay, and that operation of the QIs had devolved into a Ponzi scheme whereby Exchange Funds deposited by newer Exchangers were improperly being used to fund exchange transactions of older Exchangers, whose Exchange Funds had been misappropriated.

359.    Citibank understood that the concealment and perpetuation of this fraudulent Ponzi scheme necessarily depended upon continuous deposits of Exchange Funds from new Exchangers.

360.    With this knowledge and understanding Citibank knowingly participated in this fraudulent Ponzi scheme by engaging in a sustained course of joint marketing conduct intended to induce additional Exchangers to enter in Exchange Agreements with Okun and the QIs he owned and controlled, and which did so.  Citibank knowingly participated in this fraudulent Ponzi scheme with intent to advance the personal advantage and economic gain of Citibank thereby.

361.    Citibank's actions in aiding and abetting this fraud proximately caused Plaintiffs' damages, whose Exchange Funds were (by electronic and non-electronic means) taken by Okun in further misappropriations for his own uses and/or improperly used to conceal his ongoing Ponzi scheme, in an amount to be proven at trial.

## SEVENTEENTH CAUSE OF ACTION

**Aiding and Abetting Breach of Fiduciary Duty by Assisting in Convincing Janet Dashiell to Move Exchange Funds Held at Wachovia to Citibank (Against Citibank)**

362.    Plaintiffs repeat and reallege all prior paragraphs, and incorporate them by reference, as though fully set forth again here.

363.    Okun and the QIs he owned and controlled owed fiduciary duties to the QI

102

1  Exchangers.

2      364.    Citibank understood that Okun and his QIs were breaching those fiduciary duties

3  by misappropriating Exchange Funds for their own use and benefit, including Exchange Funds

4  held at Citibank.

5      365.    Citibank understood that such misappropriations had resulted in deficits in the

6  QIs' accounts that Okun was unable to repay, and that operation of the QIs had devolved into a

7  Ponzi scheme whereby (*inter alia*), Exchange Funds deposited with one QI were being used to

8  fund exchange transactions of Exchangers who had deposited Exchange Funds with another QI,

9  but whose Exchange Funds had been misappropriated.

10     366.    Citibank understood that the concealment and perpetuation of this Ponzi scheme

11 necessarily depended upon Okun's ability to access Exchange Funds held by the various QIs.

12     367.    With this knowledge and understanding Citibank knowingly participated in

13 further material breaches of those fiduciary duties by assisting Okun in convincing The 1031

14 Tax Group's new CEO, Dashiell, in or about February 2007, to move nearly $12 million in

15 Exchange Funds held in QI accounts at Wachovia to Citibank, despite Citibank's knowledge of

16 Okun's prior misappropriations of Exchange Funds from Citibank accounts.

17     368.    Citibank's actions in aiding and abetting the breaches of fiduciary duty owed to

18 the Exchangers proximately caused Plaintiffs' damages, whose Exchange Funds were (by

19 electronic and non-electronic means) taken by Okun in further misappropriations for his own

20 uses and/or improperly used to conceal his ongoing Ponzi scheme after being moved from

21 Wachovia to Citibank, in an amount to be proven at trial.

22 ## EIGHTEENTH CAUSE OF ACTION

23 **Aiding and Abetting Fraud by Assisting in Convincing Janet Dashiell to Move Exchange
   Funds Held at Wachovia to Citibank**
24 **(Against Citibank)**

25     369.    Plaintiffs repeat and reallege all prior paragraphs, and incorporate them by

26 reference, as though fully set forth again here.

27     370.    The Exchange Agreements extended by Okun and the QIs he owned and

28

---

103

controlled promised that Exchange Funds would be deposited at banks or banking institutions and would be used solely to close escrows for Exchangers who entered into such agreements.

371.    Okun and the QIs he owned and controlled made these representations to Exchangers with knowledge of their falsity, with intent to misappropriate Exchange Funds, and with intent to induce reliance by the Exchangers.

372.    As a result of their justifiable reliance upon these misrepresentations, Exchangers were damaged.

373.    Citibank had knowledge of the fraud being perpetrated by Okun and the QIs he owned and controlled.

374.    Citibank understood that such fraud had resulted in deficits in the QIs' accounts that Okun was unable to repay, and that operation of the QIs had devolved into a Ponzi scheme whereby (*inter alia*), Exchange Funds deposited with one QI were being used to fund exchange transactions of Exchangers who had deposited Exchange Funds with another QI, but whose Exchange Funds had been misappropriated.

375.    Citibank understood that the concealment and perpetuation of this fraudulent Ponzi scheme necessarily depended upon Okun's ability to access Exchange Funds held by the various QIs.

376.    With this knowledge and understanding, Citibank knowingly participated in this fraudulent Ponzi scheme by assisting in convincing The 1031 Tax Group's new CEO, Dashiell, in or about February 2007, to move nearly $12 million in Exchange Funds held in QI accounts at Wachovia to Citibank, despite Citibank's knowledge of Okun's prior misappropriations of Exchange Funds from Citibank accounts.

377.    Citibank's actions in aiding and abetting this fraud proximately caused Plaintiffs' damages, whose Exchange Funds were (by electronic and non-electronic means) taken by Okun in further misappropriations for his own uses and/or improperly used to conceal his ongoing Ponzi scheme after being moved from Wachovia to Citibank, in an amount to be proven at trial.

\ \ \

\ \ \

7316.001

THIRD AMENDED COMPLAINT
Case No. 09-cv-2079-JW

## NINETEENTH CAUSE OF ACTION

**Plaintiffs' Contingent Assertion of Liquidation Trustee's Claim for Aiding and Abetting Breach of Fiduciary Duty
(Against Citibank)**

378.    Plaintiffs repeat and reallege all prior paragraphs, and incorporate them by reference, as though fully set forth again here.

379.    In the bankruptcy case of The 1031 Tax Group, LLC, *et al.* (Case No. 07-B-11448 (MG)), pending in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), Gerard A. McHale, Jr., P.A., as Liquidation Trustee (the "Trustee") for the 1031 Debtor Liquidation Trust, has commenced an Adversary Proceeding against Citibank, Adv. Pro No. 09-1218 (MG) (the "Trustee's Adversary Proceeding"). The Trustee's Adversary Proceeding alleges that Citibank aided and abetted Okun's breaches of fiduciary duties owed to the 1031 Debtors,[19] and seeks damages from Citibank.

380.    In a motion to dismiss the Trustee's Adversary Proceeding, Citibank asserted that a legal doctrine applied by the courts of the Second Circuit, and known as the Wagoner doctrine, barred the Trustee's claims. Ruling on that motion, the Bankruptcy Court found that the doctrine did apply and that the Complaint, as pleaded, fell short of establishing an exception that would preclude application of the Wagoner doctrine. The Bankruptcy Court, however, granted leave to replead; the Trustee has filed an Amended Complaint; and Citibank has moved for dismissal of the Amended Complaint.

381.    In the event of a final determination dismissing the Trustee's Amended Complaint under the Wagoner doctrine, the claim asserted in the Amended Complaint would, under the Wagoner doctrine, belong to the creditors of the 1031 Debtors.

382.    Accordingly, the Plaintiffs, as creditors of the 1031 Debtors, contingently allege

---

[19] The 1031 Debtors are: The 1031 Tax Group, LLC; 1031 Advance 132 LLC; 1031 Advance, Inc.; 1031 TG Oak Harbor LLC; AEC Exchange Company, LLC; Atlantic Exchange Company, Inc.; Atlantic Exchange Company LLC; Investment Exchange Group, LLC; National Exchange Accommodators, LLC; National Exchange Services QI, Ltd.; NRC 1031, LLC; Real Estate Exchange Services, Inc.; Rutherford Investment LLC; Security 1031 Services, LLC; and Shamrock Holdings Group, LLC.

7316.001    THIRD AMENDED COMPLAINT
Case No. 09-cv-2079-JW

as follows:

383.    By virtue of his position and relationship with, and extent of his control over the operations and administration of, the 1031 Debtors, Okun had fiduciary obligations to those entities.

384.    Okun breached his fiduciary duties to the 1031 Debtors by, among other things, misappropriating Exchange Funds and using such funds (i) to fund his lavish lifestyle, including acquiring residential properties and luxury assets, (ii) to pay monies and bonuses to other participants in the wrongdoing, (iii) to invest for Okun or entities related to him (such as IPofA and its affiliates) in commercial real estate, (iv) to acquire QIs and other companies, (v) to pay off lenders who provided loans secured by residential and commercial properties owned by Okun or related entities (such as IPofA and its affiliates), (vi) to pay operating expenses for Okun's various companies and (vii) to make "lulling" payments -- *i.e.*, to use subsequently deposited funds to complete earlier exchange transactions -- and by concealing and failing to disclose this improper conduct.

385.    Citibank knew that Okun was breaching his fiduciary duties to the 1031 Debtors.

386.    Citibank knowingly participated in Okun's breaches of fiduciary duties, and provided substantial assistance to him, by, among other things, implementing co-marketing efforts to induce clients to do business with the 1031 Debtors (and thus with Citibank, for Citibank's own advantage and gain), and implementing transfers of funds (electronically and non-electronically) out of accounts of the 1031 Debtors to accounts in the names of other 1031 Debtors and non-QI entities, which transfers Citibank knew were not for the purpose of completing the Exchange transactions for which the deposits had been made. Citibank's actions in aiding and abetting Okun's breaches of fiduciary duties to the 1031 Debtors directly and proximately caused damages to Plaintiffs, creditors of the 1031 Debtors, in an amount to be proven at trial.

## CONSEQUENTIAL DAMAGES

387.    Plaintiffs repeat and reallege all prior paragraphs, and incorporate them by reference, as though fully set forth again here.

388.    The damages suffered by Plaintiffs include the loss of Exchange Funds. Consequential damages proximately caused by the Defendants conduct include tax liability, lost deposits on replacement property, professional fees in dealing with the tax problems, interest and other expenses.

## PUNITIVE DAMAGES

389.    Plaintiffs repeat and reallege all prior paragraphs, and incorporate them by reference, as though fully set forth again here.

390.    The conduct described in this complaint includes the willful and wanton disregard for Plaintiffs' rights.  Plaintiffs were not investors with appetites for risk.  Plaintiffs deposited their Exchange Funds in trust fully expecting protection and return of the entire principal sum. Instead, Plaintiffs' funds were stolen without notice and consent and with the assistance of the Defendants.  Punitive damages are warranted to protect society from similar mischief and fraud and to promote the legal significance of fiduciary relationships.

## XVIII.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for Judgment against the Defendants as follows:

1.    For certification of the Class as defined;

2.    For the appointment of named Plaintiffs as Class Representatives, and of Plaintiffs' counsel as counsel for the Class;

3.    For a determination that each law firm defendant is vicariously liable for the acts of the attorneys which were performed within the course and scope of the attorneys' employment at the law firm;

4.    For damages to Plaintiffs and Class members measured by the loss of their property held in trust including consequential damages and the disgorgement of Exchange Funds;

5.    For treble, exemplary and/or punitive damages, as applicable;

6.    For pre-judgment interest;

7.      For costs of this action, including reasonable attorneys' fees as afforded by any applicable law; and

8.      For all other relief the Court deems just and proper.

## JURY DEMAND

Plaintiffs demand a trial by Jury for all issues which may be so resolved.

Dated: September 10, 2010

**HOLLISTER & BRACE**
**FOLEY BEZEK BEHLE & CURTIS LLP**
**ZELLE MCDONOUGH  & COHEN**

By:  /s/ Michael P. Denver

ROBERT L. BRACE
MICHAEL P. DENVER
**HOLLISTER & BRACE**
P.O. Box 630
Santa Barbara, CA  93102
Telephone: (805) 963-6711

and

THOMAS G. FOLEY, JR
**FOLEY, BEZEK, BEHLE & CURTIS**
**LLP**
15 W. Carrillo Street
Santa Barbara, CA  93101
Telephone: (805) 962-9495

*Attorneys for Plaintiff Anita Hunter and the*
*Class*

ANTHONY ZELLE
BRIAN MCDONOUGH
**ZELLE MCDONOUGH  & COHEN LLP**
101 Federal Street, 14th Floor
Boston, MA 02110
Telephone: (617) 742-6520 x219
 (Appearing *Pro hac vice*)

*Attorneys for Plaintiff Quirk Infiniti and the*
*Class*

108