UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANITA HUNTER, et al.,<br><br>    Plaintiffs,<br><br>    v.<br><br>CITIBANK, N.A., et al.,<br><br>    Defendants. | Case No. 09-cv-02079-JCS<br><br>**ORDER PROVIDING INSTRUCTION RE: DISTRIBUTION OF FUNDS TO ASSIGNORS OR ASSIGNEES OF BANKRUPTCY CLAIMS**<br><br>Re: Dkt. No. 629 |

**I.   INTRODUCTION**

On December 18, 2015, Plaintiffs filed a motion seeking: 1) instructions regarding the distribution of settlement funds as to certain claimants (Sam L. Braswell, Steven Schoenfeld and Sandra Stroud, hereinafter "Claimants"); and 2) modification of the "Boulder Settlement."  On March 14, 2016, the undersigned granted Plaintiffs' request to modify the Boulder Settlement but deferred ruling on the first issue, relating to the assignment of certain claims, to allow for briefing on the question.  The Court has now received briefs from Claimants Sam Braswell and Sandra Stroud, as well as from the purported assignee of their claims in this action, ASM Capital, L.P. and ASM Capital III, L.P. (collectively, "ASM" or "ASM Capital").  In the settlement agreements, the Court retained jurisdiction and the parties (including the Claimants, who were members of the class) stipulated that the administration and enforcement of the settlement agreements could be handled by Magistrate Judge Spero.  *See, e.g.,* Docket No. 608.  To the extent that assignees of claims are included in the settlement class, ASM is bound by the ongoing jurisdiction of the undersigned to resolve the issue relating to the assignments if the Claimants' claims in this action have been assigned to it.  In addition, ASM has filed a consent to the jurisdiction of the undersigned magistrate judge pursuant to 28 U.S.C. § 636(c).  *See* Docket No. 642.  Therefore, the

Court may decide the question of whether the claims of Sam L. Braswell and Sandra Stroud in this action have been assigned to ASM.[1] For the reasons discussed below, the Court finds that they have and therefore, that payments under the settlement to which Stroud and Braswell would have been entitled should be made directly to ASM.

## II. BACKGROUND

The claims in this action were asserted on behalf of a class ("the Class Plaintiffs") of approximately 400 individuals who lost money ("Exchange Funds") they deposited with certain Qualified Intermediaries ("QIs") in the business of facilitating exchanges of like-kind property pursuant to Internal Revenue Code 1031. The Class Plaintiffs lost their Exchange Funds as the result of a Ponzi scheme orchestrated by Edward H. Okun, who, with the help of others, acquired several QIs, which were held under the name The 1031 Tax Group, LLC ("1031 Tax Group"). The Class Plaintiffs deposited funds with the 1031 Tax Group QIs but were unable to complete their exchanges because the funds had been misappropriated, causing over $150,000,000 in damages. Stroud and Braswell were class members who lost exchange funds, with claim amounts of $54,363.69 and $51,959.97, respectively. *See* Docket No. 629 at 5. The Class Plaintiffs eventually settled their claims in a series of class settlements.

In the meantime, Okun was convicted of several counts of wire fraud, money laundering and conspiracy to commit those offenses, and was ordered to pay restitution to his victims in an action the United States District Court for the Eastern District of Virginia ("the Criminal Case"). *See* Docket No. 637, Ex. A (Aug. 27, 2009 order in *United States v. Okun*, 09-cr-00132-REP, United States District Court for the Eastern District of Virginia) ("Virginia Order") at 1. In addition, the 1031 Tax Group initiated Chapter 11 bankruptcy proceedings in the United States Bankruptcy Court for the Southern District of New York, Case No. 07-11448 ("the Bankruptcy

---

[1] Steven Schoenfeld, like Stroud and Braswell, was notified of Plaintiffs' pending request for instructions and given an opportunity to file a brief addressing whether his claim in this action was assigned to ASM. Because he did not appear, the Court concludes that he does not contest ASM's assertion that his claim in this action have been assigned to ASM and therefore, payments should be made directly to ASM rather than Schoenfeld. The Court also notes that the language of the assignment signed by Schoenfeld, which is similar to the language in the assignments by Stroud and Braswell, supports this conclusion.

Case").

When "the collapse of Okun's empire became apparent, a significant minority of exchangers sold all or part of their bankruptcy claims against Okun and/or Okun's companies to various claim aggregators, who paid a discounted price for those claims." Virginia Order at 3. Stroud and Braswell were among these individuals, entering into assignment agreements with ASM Capital.

The Stroud assignment ("Stroud Assignment") states, in part, as follows:

> <u>Assignment of Claim</u>. Stroud, Sandra (hereinafter "Seller") with principal address of 7036 Fallbrook Ct, New Port Richey, FL 34652, for good and valuable consideration in the sum of XXXX (the "Purchase Price"), does hereby absolutely and unconditionally sell, convey, and transfer to ASM Capital, which includes ASM Capital, L.P., ASM Capital III, L.P., ASM Offshore Limited, and any of its successors, assigns or designees (hereinafter "Purchaser") all of Seller's right, title, benefit and interest in and to any and all of Seller's prepetition claim or claims, as more specifically set forth as any right to payment (the "Claim"), against The 1031 Tax Group (the "Debtor"), in bankruptcy proceedings in the United States Bankruptcy Court for the Southern District of New York (the "Court"), Case No. 07-11448 (the "Case"); and includes any Proof of Claim (defined below), along with voting and any other rights and benefits which may now exist, or come into existence in regards the Claim, all cash, securities, instruments and other property, to be paid or issued by Debtor or any other party, directly or indirectly, in connection with or satisfaction of the Claim, including without limitation "cure" amounts related to the assumption of the executor contract an any rights to receive all payments in respect thereof, and all rights to received interest, penalties, fees, and any damages from any cause of action, litigation or rights of any nature against Debtor, its affiliates, any guarantor or other third party, which may be paid or issued with respect to and/or in satisfaction of the Claim (the "Recovery"). This Claim Purchase Agreement (the "Agreement") shall be deeded an unconditional purchase of the Claim for the purpose of collection and shall not be deemed to create a security interest. Seller represents the Claim is in an amount not less than $54,363.89 (the "Claim Amount").

Denver Decl., Ex. 3. In a section entitled "Miscellaneous," the Assignment states that "[t]he parties hereby mutually agree that this Assignment is the result of negotiations between the parties and terms hereof are negotiated terms. Accordingly, any rules of interpretation, construction, or resolving ambiguity against the drafter that otherwise apply, shall not apply hereto." *Id*.

The Braswell assignment ("Braswell Assignment") states, in part, as follows:

> <u>Assignment of Claim</u>: Braswell, Sam L. (hereinafter "Assignor")

> having a mailing address at 4918 Rockhurst, San Antonio, TX in consideration of the sum of (the "Purchase Price" see below), does hereby transfer to ASM Capital, which includes ASM Capital, L.P., ASM Capital II, LP (hereinafter "ASM" or "Assignee") having a mailing address at 7600 Jericho Turnpike, Suite 302, Woodbury, New York 11797, all of Assignor's right, title, benefit, interest, voting rights, claims and causes of action in and to, or arising under or in connection with the claim or claims of Assignor against The 1031 Tax Group ("the Debtor"), in bankruptcy proceedings (the "Proceedings") in the United States Bankruptcy Court for the Southern District of New York (the "Court"), Case No. 07-11448 including any and all Proof of Claim(s) associated with and filed by Assignor with the Court (the "Claim") and; all cash, securities, instruments and other property which may be paid or issued in satisfaction of the Claim and all rights to receive interest, penalties, fees, and any damages from any cause of action or litigation which may be paid with respect to the Claim (the "Recovery"). This Assignment of Claim agreement (the "Agreement") shall be deemed an unconditional assignment of the Claim for the purpose of collection and shall not be deemed to create a security interest.

Denver Decl., Ex 1. The Braswell Assignment goes on to state that "[a] Proof of Claim in the amount of $51,958.97 . . . has been duly and timely filed in the Proceedings . . . ." *Id*. It also contains the language quoted above stating that the Assignment was "negotiated" and therefore, that "any rules of interpretation, construction, or resolving ambiguity against the drafter that otherwise apply, shall not apply hereto." *Id*.

In the Criminal Case, some of the victims who had assigned their claims in the Bankruptcy Case argued that they, and not the assignee, were entitled to restitution payments. The court in that case ("the Virginia Court") found that in principle, a crime victim's right to restitution can be sold or assigned away. Virginia Order at 8. It went on to examine the specific assignments at issue to determine if the victims had, in fact, assigned away their right to restitution. One of the victims, Bear Valley, had entered into an assignment agreement with ASM containing language that is similar to the language in the assignments Stroud and Braswell signed. In particular, it provided, in part, that Bear Valley did:

> absolutely and unconditionally sell, convey, and transfer to [ASM]. . . all of [Bear Valley's] right, title, benefit, and interest in and to any and all of [Bear Valley's] pre-petition claim or claims . . . against 1031 Tax Group in the Bankruptcy Court for the Southern District of New York . . . and *any other rights and benefits which may now exist, or come into existence in regards the Claim*, including all cash, securities, instruments, or other property to be paid or issued by [1031 Tax Group] or any other party, directly or indirectly, in connection with or satisfaction of the Claim, including . . . *all rights*

4

> *to receive interest, penalties, fees, and any damages from any cause of action, litigation, or rights of any nature against the Debtor, its affiliates, any guarantor or other third party in Court or any other court of competent jurisdiction which may exist, be paid, or issued with respect to and/or in satisfaction of the Claim.*

Virginia Order at 9 (quoting Bear Valley Assignment) (emphasis added by Virginia Court). Based on the highlighted language in the assignment, the court found it "clear that ASM was purchasing more than just Bear Valley's claim in the affiliated bankruptcy court" and that it was also purchasing "any recovery of funds on the debt underlying the bankruptcy claim in the other litigation." *Id*.

The Virginia Court went on to find that Bear Valley's restitution and bankruptcy claims were, "in essence, the same claim," reasoning as follows:

> While it is true that, nominally, the bankruptcy claim is directed at 1031 Tax Group while the restitution claim is against Okun personally, both Okun and the Court have recognized that these claims are essentially the same. . . . Okun was the sole and controlling shareholder of 1031 Tax Group and that Okun's personal assets are available to satisfy either or both of the restitution or bankruptcy actions. . . . Furthermore, examination of the supporting documentation submitted by Bear Valley and ASM reveals that the source of the claim against 1031 Tax Group in bankruptcy is the same as the restitution claim against Okun: the claim amounts, account numbers, and involved parties are all identical.

*Id*. at 10. Consequently, the court ordered that Bear Valley's restitution payment be made directly to ASM. *Id*.

ASM contends the reasoning of the court in the Criminal Case applies here as well, citing the language in the Stroud and Braswell Assignments, as well as the fact that the amounts of the assignments correspond exactly to the amounts of their claims in this action. *See* Declaration of Douglas Wolf ("Wolf Decl."), Ex. B (filings from Bankruptcy Case reflecting amounts of claims). ASM's General Counsel has also provided a declaration explaining that ASM acquired 30 claims in the Bankruptcy Case and that other than the challenges of Stroud and Braswell in this case, and a handful of challenges in the Criminal Case regarding restitution payments, "the rights of ASM to receive distributions from any source under these assignment agreements have not been questioned." Wolf Decl. ¶ 3. According to Wolf, who was involved in the negotiation of the assignments, the assignments with Stroud and Braswell were negotiated "at arm's length." *Id*. ¶¶

2, 4. Wolf further states that "the Assignments were intended to assign to ASM any and all of Claimants' rights to recoupment, restitution, or damages, regardless of source, arising out of or relating to the Ponzi scheme operated by Okun and/or his entities" and that [p]rior to proposed distribution in [this action], the Claimants never contended that the Assignment limited ASM to recovery from the Estate." *Id*. ¶ 5. Wolf also states that based on his review of the Proof of Claims ("POCs") and the underlying claims, "the POC's and the underlying claims seek to recoup the funds misappropriated by the Debtor, Okun and/or other [QIs] in the course of the Ponzi scheme." *Id*. ¶ 6.

Stroud and Braswell argue that the Assignments are limited to recovery from the Estate in the Bankruptcy Case based on the words "in bankruptcy proceedings . . . in the United States Bankruptcy Court for the Southern District of New York." Docket No. 640 at 2. They also point out that the Assignments reference the POCs, which relate only to the Bankruptcy Case. *Id*. To the extent there is any ambiguity, they contend, it should be construed in their favor because the assignment agreements were drafted by ASM. *Id*. To the extent the Assignments expressly state that they were "negotiated," Stroud and Braswell contend this is untrue, and Braswell has filed a declaration stating as much. *See* Braswell Decl., ¶ 2. According to Braswell, he was sent a preprinted form to sign and there "were no negotiations concerning the terms of the agreement." *Id*. Braswell and Stroud also argue that the decision in the Criminal Case finding that restitution should be paid to ASM under a similar assignment was incorrectly decided and that this Court should reject the interpretation of the Virginia Court. *Id*.

### III.  ANALYSIS

#### A.  Legal Standard[2]

"The fundamental, neutral precept of contract interpretation is that agreements are construed in accord with the parties' intent" and "the best evidence of what parties to a written

---

[2] Both the Stroud Assignment and the Braswell Assignment provide that they will be "governed by and construed in accordance with the laws of the State of New York." Denver Decl., Exs. 1 & 3. Federal district courts apply the choice of law rules of the state in which they are located. Because California courts generally enforce contractual choice of law provisions, *see Hatfield v. Halifax PLC*, 564 F.3d 1177, 1182 (9th Cir. 2009), the Court applies New York law to the interpretation of the Assignments.

agreement intend is what they say in their writing." *Greenfield v. Philles Records, Inc.*, 98 N.Y.2d 562, 569 (2002) (internal quotations and citations omitted). Consequently, "a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms." *Id*.

The question of whether a contract is ambiguous is one of law for the court. *Kass v. Kass*, 91 N.Y.2d 554, 566 (N.Y. 1998). Under New York law, ambiguity is determined by looking "within the four corners of the document, not to outside sources." *Id*. (citation omitted). 566 (N.Y. 1998). A contract is unambiguous "if the agreement on its face is reasonably susceptible of only one meaning." *Greenfield v. Philles Records*, 98 N.Y.2d 562, 569 (N.Y. 2002) (emphasis added). Conversely, "[a] contract is ambiguous if the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings." *Feldman v. National Westminster Bank*, 303 A.D.2d 271, 271 (N.Y. 2003) (internal quotations omitted and emphasis added).

### B.     Discussion

Applying the principles set forth above, the Court finds that the Braswell and Stroud Assignments are unambiguous as to the scope of the Assignments, assigning to ASM not only claims to be paid out of the estate in the Bankruptcy Case but also Stroud and Braswell's claims in this action. In particular, the Braswell Assignment assigns "all . . . right, title, benefit, interest, voting rights, claims and causes of action in and to, or arising under or in connection with the claim or claims of Assignor against The 1031 Tax Group" and assigns "all cash, securities, instruments and other property which may be paid or issued in satisfaction of the Claim *and all rights to receive interest, penalties, fees, and any damages from any cause of action or litigation which may be paid with respect to the Claim*." Similarly, the Stroud Assignment is framed broadly, assigning "all of [Stroud's] right, title, benefit and interest in and to any and all of [Stroud's] prepetition claim or claims, as more specifically set forth as any right to payment (the "Claim"), against The 1031 Tax Group." It goes on to state that assignment "includes any Proof of Claim (defined below), along with voting and any other rights and benefits which may now exist, or come into existence in regards the Claim, *all cash, securities, instruments and other*

7

*property, to be paid or issued by Debtor or any other party, directly or indirectly, in connection with or satisfaction of the Claim . . and all rights to received interest, penalties, fees, and any damages from any cause of action, litigation or rights of any nature against Debtor, its affiliates, any guarantor or other third party, which may be paid or issued with respect to and/or in satisfaction of the Claim.*"

Like the Virginia Court, the undersigned concludes that Braswell and Stroud's claims in this case are essentially the same claims they asserted in the Bankruptcy Case: in both they are trying to recover the Exchange Funds that they lost when they deposited them with QIs associated with the 1031 Tax Group. This is apparent from the fact that the amounts of the Stroud and Braswell Assignments exactly match the claim amounts in this action. As a consequence, the Court finds that the broad language of the Assignments includes the payments on the claims in this action. The Court rejects Braswell and Stroud's assertion that the Assignments cover only payments out of the Estate because of the reference in the Assignments to the Bankruptcy Case. Neither Assignment contains language expressly limiting the Assignment to payments out of the bankruptcy estate and the broad language quoted above points toward a contrary interpretation of the Assignment language. Nor does the reference to POCs imply such a limitation as the POCs are listed only as an example of the claims that are assigned. In short, the Assignments are reasonably susceptible of only one meaning: that Braswell and Stroud assigned any payments on their claims in this action to ASM.

## IV.   CONCLUSION

For the reasons stated above, the Court directs Plaintiffs to make settlement payments on the Braswell, Stroud and Schoenfeld claims in this action directly to ASM, pursuant to the assignments between ASM and those individuals.

**IT IS SO ORDERED.**

Dated:  March 25, 2016

JOSEPH C. SPERO
Chief Magistrate Judge

8